**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

**UNITED STATES OF AMERICA**,

**v.**

**ISABEL FITZGERALD, et al.**,

*Defendants*.

Criminal No. 17-506-GLR

**MS. FITZGERALD'S MOTION TO DISMISS COUNTS ONE, TWO, AND THREE**
**FOR FAILURE TO STATE AN OFFENSE AND COUNT ONE FOR DUPLICITY**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND ................................................................................................................... 2

    The Indictment ................................................................................................................ 2

    Failure of Counts One through Three to state an offense ...................................................... 4

    Count One joins two or more offenses in the same count (duplicity) ................................... 5

ARGUMENT ........................................................................................................................ 8

    I.    COUNTS ONE, TWO, AND THREE SHOULD EACH BE DISMISSED FOR FAILURE TO STATE AN OFFENSE BECAUSE THEY DO NOT ALLEGE INVOLVEMENT OF AN ENTITY COVERED BY SECTION 666 ................................................................................. 10

    II.    COUNTS ONE, TWO, AND THREE SHOULD EACH BE DISMISSED FOR FAILURE TO STATE AN OFFENSE BECAUSE THEY FAIL ADEQUATELY TO ALLEGE THAT MS. FITZGERALD HAD AUTHORITY TO MANAGE FEDERAL PROGRAM FUNDS ................................................................................. 13

    III.    COUNT THREE SHOULD BE DISMISSED FOR FAILURE TO STATE AN OFFENSE BECAUSE IT DOES NOT ALLEGE THE INTENT ELEMENT OF SECTION 666(A)(1)(B) ................................................... 18

    IV.    THE COURT SHOULD DISMISS COUNT ONE BECAUSE IT CHARGES MORE THAN ONE OFFENSE (DUPLICITY) ................................... 19

CONCLUSION .................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Fischer v. United States*,
    529 U.S. 667 (2000)..................................................................................... 11, 12

*Kotteakos v. United States*,
    328 U.S. 750 (1946)............................................................................................ 21

*Ocasio v. United States*,
    578 U.S. ___, 136 S. Ct. 1423 (2016)......................................................... 9, 10, 13

*Russell v. United States*,
    369 U.S. 749 (1962)...................................................................................... 12, 18

*Sabri v. United States*,
    541 U.S. 600 (2004)...................................................................................... 14, 15

*Salinas v. United States*,
    522 U.S. 52 (1997)............................................................................................... 9

*United States v. Aleman*,
    855 F. Supp. 117 (M.D.N.C.) ........................................................................... 22

*United States v. Aleman*,
    33 F.3d 53 (4th Cir. 1994) ................................................................................ 22

*United States v. Bobo*,
    344 F.3d 1076 (11th Cir. 2003) .......................................................................... 8

*United States v. Brady*,
    694 F. App'x 184 (4th Cir. 2017) ...................................................................... 15

*United States v. Brandon*,
    298 F.3d 307 (4th Cir. 2002) .................................................................. 8, 11, 19

*United States v. Braxtonbrown-Smith*,
    278 F.3d 1348 (D.C. Cir. 2002).......................................................................... 14

*United States v. Broce*,
    488 U.S. 563 (1989)............................................................................................ 24

*United States v. Brock*,
    501 F.3d 762 (6th Cir. 2007) ......................................................................... 9, 13

*United States v. Dupree*,
No. 10-627-KAM, 2011 WL 3235763 (E.D.N.Y. July 28, 2011) ........................... 8

*United States v. Eury*,
No. 14-39, 2015 WL 1861807 (M.D.N.C. Apr. 23, 2015) ..................................... 24

*United States v. Holte*,
236 U.S. 140 (1915) ........................................................................................... 9

*United States v. Hoyte*,
51 F.3d 1239 (4th Cir. 1995) .............................................................................. 22

*United States v. Jackson*,
Criminal Action No. 3:16-CR-31, 2017 WL 1129941 (N.D.W. Va. Mar. 24, 2017) ............... 8

*United States v. Jeffers*,
570 F.3d 557 (4th Cir. 2009) .............................................................................. 20

*United States v. Keen*,
676 F.3d 981 (11th Cir. 2012) ............................................................................ 15

*United States v. Koll*,
No. 07 CR 346–1, 2009 WL 595584 (N.D. Ill. Mar. 5, 2009) ......................... 13, 18

*United States v. Lawson*,
No. 3:08-21-DCR, 2009 WL 362108 (E.D. Ky. Feb. 10, 2009) ...................... 10, 13

*United States v. Leavis*,
853 F.2d 215 (4th Cir. 1998) .............................................................................. 20

*United States v. Loayza*,
107 F.3d 257 (4th Cir. 1997) ................................................................................ 8

*United States v. Oaks*,
No. RDB-17-288, 2018 WL 1413005 (D. Md. Mar. 20, 2018) ................................ 8

*United States v. Ortiz*,
No. 15-594-RS-1, 2016 WL 4239370 (N.D. Cal. Aug. 11, 2016) ........................... 8

*United States v. Perry*,
757 F.3d 166 (4th Cir. 2014) ..................................................................... 8, 11, 19

*United States v. Peterson*,
544 F. Supp. 2d 1363 (M.D. Ga. 2008) ................................................................. 8

*United States v. Phillips*,
219 F.3d 404 (5th Cir. 2000) .............................................................................. 14

*United States v. Pinson*,
    860 F.3d 152 (4th Cir. 2017) ............................................................. 11, 12, 13, 21

*United States v. Robinson*,
    855 F.3d 265 (4th Cir. 2017) ............................................................. 19

*United States v. Stewart*,
    256 F.3d 231 (4th Cir. 2001) ............................................................. 24

*United States v. Thomas*,
    847 F.3d 193 (5th Cir. 2017) ............................................................. 14

*United States v. Vitillo*,
    490 F.3d 314 (3d Cir. 2007) ............................................................. 15

**Statutes and Rules**

18 U.S.C. § 371 ............................................................................................ 9

18 U.S.C. § 666(a) ....................................................................................... 10

18 U.S.C. § 666(a)(1)(B) ......................................................................... 9, 18

18 U.S.C. § 666(b) ............................................................................ 5, 10, 12

18 U.S.C. § 666(d)(1) ................................................................................ 13

Fed. R. Crim. P. 12(b)(3)(B)(i) .................................................................. 19

Fed. R. Crim. P. 12(b)(3)(B)(v) .................................................................. 8

Fed. R. Crim. P. 7(c)(1) ............................................................................... 8

Pursuant to Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure, Isabel FitzGerald respectfully moves the Court to dismiss Count One (conspiracy to commit bribery of an agent of a program receiving federal funds, in violation of 18 U.S.C. § 371) and Counts Two and Three (bribery involving an agent of a program receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B)), for failure to state an offense.  In addition, pursuant to Rule 12(b)(3)(B)(i), Ms. FitzGerald moves, in the alternative, to dismiss Count One for joining two or more offenses (duplicity).

Counts One, Two, and Three each fail to state an offense because they do not adequately allege the involvement of a government entity that received federal benefits and therefore these Counts do not allege the threshold circumstance required for liability under Section 666.  These Counts also fail to state an offense because they do not allege that Ms. FitzGerald had authority to act on behalf of such an entity with respect to its federal program funds and therefore do not allege that she was an "agent" of such entity for purposes of Section 666.

Count Three fails to state an offense for the additional reason that it does not allege that Ms. FitzGerald, when accepting something of value, acted with the requisite intent to affect the business of an entity to which Section 666 applies.

Count One, in addition to failing to state an offense, suffers from duplicity.  While purporting to allege a single conspiracy lasting from 2011 to 2014 with multiple objects, it in fact alleges multiple conspiracies with different agreements that had different objectives, employed different methods, and were reached at different times by different people.

## **BACKGROUND**

### **The Indictment**

The Indictment alleges that Ms. FitzGerald served in the Maryland government between 2007 and 2011, worked in the private sector from 2011 to 2012, and rejoined the Maryland government between 2012 and 2014. Indictment, ECF No. 1 ("Indictment"), at 1–2 ¶ 2. In 2008, while Ms. FitzGerald served as the Chief Information Officer ("CIO") of the Maryland Department of Human Resources ("DHR"), DHR awarded Company #1 two multi-million dollar contracts: the "Hosting Contract" and "Applications Contract." *See id.* at 3 ¶ 3. There is no allegation that the award of either contract to Company #1 resulted from any corrupt influence. Instead, the Indictment alleges that Ms. FitzGerald and her co-defendants (Kenneth Coffland, Steven Maudlin and James Pangallo) enriched themselves, years after the contracts were awarded, through various agreements to redirect subcontracting work on these contracts to The Consultants' Consortium, Inc. ("TCC"), a company owned in part by Mr. Maudlin and Mr. Pangallo.

Ms. FitzGerald served as the CIO of DHR from February 2007 to October 14, 2011. *See id.* at 1 ¶ 2(a). In that role, she "oversaw the day-to-day operations of DHR's Office of Technology for Human Services ("OTHS")," which "was responsible for reviewing and implementing DHR's technology plans, programs, projects, budgets, staff, and purchasing, and had an annual budget of approximately $70 million." *Id.* at 1–2 ¶ 2(a). Ms. FitzGerald left state government on October 14, 2011. *See id.*

Between November 2011 and December 4, 2012, Ms. FitzGerald worked in the private sector, offering consulting services through her private consulting company, Aeon Consulting and Technical Services, Inc. ("Aeon"). Through Aeon, she allegedly served as an "Executive Consultant" to the Secretary of DHR. As a consultant, she allegedly "exercise[d] managerial

2

discretion over DHR matters, including the supervision of the Acting DHR CIO." *See id.* at 2 ¶ 2(b).

Much of the conduct described in the Indictment is alleged to have occurred during the time Ms. FitzGerald was a private citizen. *See id.* at 6–7 ¶¶ 17–23; 9–14 ¶ 31 (a)–(t).  At some point between October 27 and December 17, 2011, Mr. Maudlin allegedly "negotiated an agreement" with Ms. FitzGerald that she would "us[e] her influence" as a consultant "to convince" Subcontractor #1 (a subcontractor to Company # 1, working on a portion of the Applications Contract called the CARES Modernization project) to further subcontract work to TCC; in exchange, TCC would further subcontract one-third of the work it obtained from Subcontractor #1 to Aeon. *See id.* at 6–7 ¶¶ 17–20; 9–14 ¶ 31(a)–(e).  Between December 2011 and December 2012, Ms. FitzGerald and Mr. Maudlin allegedly agreed that Ms. FitzGerald would exert her influence on Company #1 itself to get subcontracting work for TCC, and, in exchange, Ms. FitzGerald, through Aeon, would accept one-third of TCC's profits on the subcontracts it received from Company #1.  *See id.* at 8 ¶¶ 27–28; 11–14 ¶ 31(f)–(j), (l)–(n), (p), (t).

In November 2012, just before Ms. FitzGerald left the private sector and returned to state government as the Deputy Secretary of Operations of DHR ("Deputy Secretary of DHR"), Ms. Fitzgerald and Mr. Maudlin allegedly agreed that payments Ms. FitzGerald had been receiving under this agreement would, in the future, be made to Mr. Coffland through his consulting firm, Blue Northern Consulting LLC ("Blue Northern").  *See id.* at 7 ¶¶ 22–23.  Mr. Pangallo began issuing checks to Blue Northern in February 2013.  *See id.* at 7 ¶ 24; 13–14 ¶ 31(r)–(s), (u)–(v). Beginning December 5, 2012, Ms. FitzGerald began her tenure as the Deputy Secretary of DHR. *See id.* at 2 ¶ 2(c).  In this position, she "reported directly to the DHR Secretary and oversaw OTHS and numerous additional offices within DHR."  *See id.*  She remained in that role until August 25,

2013.  *See id.*  During the time Ms. FitzGerald served as Deputy Secretary of DHR, the Indictment alleges that she "threaten[ed]" Company #1 that she would "use her influence" to cause DHR not to renew Company #1's Hosting Contract or to impose financial penalties on Company #1 unless Company #1 gave certain subcontracts to TCC.  *See id.* at 8–9 ¶¶ 28–29.  Company #1 executed a fixed price contract to TCC in August 2013 and June 2014.  *See id.* at 14–15 ¶ 31(x), (bb).

Additionally, the Indictment alleges that, between January and August 2013, Ms. FitzGerald "directed" Company #1 to hire Mr. Coffland.  *Id.* at 9 ¶ 30.  In July 2013, Company #1 retained Mr. Coffland as an independent contractor.  *See id.* at 4 ¶ 10; 14 ¶ 31(w).

On August 26, 2013, Ms. FitzGerald became the Secretary of the Department of Information Technology ("DoIT"), "a separate state agency" from DHR.  *See id.* at 2 ¶ 2(d).  As Secretary of DoIT, Ms. FitzGerald "was a member of the Governor's cabinet and exercised supervision over the activities of the CIOs of all state agencies, including the DHR CIO."  *Id.* Beginning in the second half of 2013, when Ms. FitzGerald was still serving as Deputy Secretary of DHR, and carrying through 2014, when she served as Secretary of DoIT, Ms. FitzGerald and Mr. Coffland allegedly demanded that Mr. Maudlin and Mr. Pangallo pay Mr. Coffland one third of TCC's profits on the subcontracts it had allegedly received as a result of the influence Ms. FitzGerald allegedly asserted over Company #1 to award those subcontracts to TCC.  *See id.* at 7–8 ¶ 25.  Mr. Maudlin and Mr. Pangallo allegedly agreed they would make the payments.  *See id.* at 15 ¶ 31(z)–(aa), (cc).

### Failure of Counts One through Three to state an offense

With these allegations, the Indictment purports to state violations of Section 666 and a Section 371 conspiracy to violate Section 666.  No Count, however, states all the essential elements of those crimes.  All three Counts fail to allege that Section 666 applied to DHR during the period

4

alleged.  First, DHR is alleged to have received at least $10,000 in "benefits under a Federal program" in each fiscal year between 2011 and 2014, *see id.* at 1 ¶ 1, but the Indictment does not allege that the type of "benefits" DHR received are of the type to which Section 666 applies, *i.e.*, benefits "involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  *See* 18 U.S.C. § 666(b).  Second, all three Counts fail to allege that Ms. FitzGerald had authority to act on behalf of DHR with respect to federal program benefits at any point in time relevant to the Indictment, much less at a time that she agreed to accept a thing of value in return for influencing DHR.

Count Three also fails to state an offense because it does not allege that Ms. FitzGerald acted with the requisite corrupt intent, a separate essential element of a violation of Section 666.  Instead, it alleges only that she demanded Company #1 hire Mr. Coffland into a certain position.  *See* Indictment at 9 ¶ 30; 18 ¶ 2.

### Count One joins two or more offenses in the same count (duplicity)

In addition to failing to state an offense, Count One suffers from duplicity because it alleges a series of agreements with different objectives, between and among various participants, over a span of years.  Count One alleges not one conspiracy, but at least four.  Accordingly, Count One joins two or more offenses in the same count.

Two distinct agreements alleged in Count One were allegedly reached while Ms. FitzGerald worked in the private sector as a consultant, through Aeon.  First, the Indictment alleges that, between late October and mid-December 2011, Ms. FitzGerald and Mr. Maudlin entered into an agreement that Ms. FitzGerald would use her influence as a private consultant to convince Subcontractor #1 to provide subcontracts to TCC, and TCC would further subcontract a portion of that work to Aeon.  Second, at some point between December 2011 and December 2012,

Ms. FitzGerald and Mr. Maudlin allegedly agreed that Ms. FitzGerald would use her influence as a consultant to convince Company #1 to give work to TCC, and Ms. FitzGerald would accept one-third of TCC's profits on those subcontracts.  As part of this second agreement, Ms. FitzGerald allegedly threatened Company #1 that she would cause officials at DHR to take adverse action against Company #1 if it declined to accede to her demand.

Two separate, additional agreements described in Count One were allegedly entered much later.  One of these agreements was allegedly reached in November 2012 as Ms. FitzGerald was returning to a role in the Maryland state government as Deputy Secretary of DHR.  A second agreement was allegedly reached in August 2013 when Ms. FitzGerald left DHR for DoIT.

First, in November 2012, Ms. FitzGerald and Mr. Maudlin allegedly agreed that payments Ms. FitzGerald had been receiving as a private consultant would be paid to Blue Northern once Ms. FitzGerald became the Deputy Secretary of DHR, and, consistent with that purported agreement, Mr. Pangallo began issuing checks to Mr. Coffland in February 2013.  In exchange for those payments to Blue Northern, between January 2013 and June 2014, Ms. FitzGerald allegedly threatened Company #1 that she would use her influence, first as Deputy Secretary of DHR and then as Secretary of DoIT, to cause DHR to take adverse action against Company #1 unless it gave certain subcontracts to TCC.

Second, in August 2013, when Ms. FitzGerald left DHR and went to DoIT, Ms. Fitzgerald and Mr. Coffland allegedly agreed to "solicit[] and demand[]" that Mr. Maudlin and Mr. Pangallo pay Mr. Coffland one-third of TCC's profits on certain contracts Ms. FitzGerald had helped procure for TCC.

These four agreements are necessarily separate from one another.  The Indictment clearly alleges an agreement made between October 27 and December 17, 2011 between Ms. FitzGerald

and Mr. Maudlin that Ms. FitzGerald, as a private consultant, would influence Subcontractor #1, and then a separate agreement, in or about December 2011, between Ms. FitzGerald and Mr. Maudlin that Ms. FitzGerald, as a private consultant, would influence Company #1. Importantly, the Indictment does not allege that, in late 2011, Ms. FitzGerald or Mr. Maudlin anticipated that Ms. FitzGerald would return to state government, much less that they agreed, in late 2011, when Ms. FitzGerald was a private citizen, that when she returned to state government at some future date, she would use her position to threaten adverse action against Company #1. Instead, the first two agreements plainly pertain to Ms. FitzGerald's ability to wield influence as a *private-sector consultant*.

The first allegation in the Indictment that Ms. FitzGerald agreed to use her position as a Maryland state official to TCC's advantage is in November 2012, just prior to her return to State government in December 2012. There is no allegation that any defendant, Ms. FitzGerald included, knew prior to November 2012 that Ms. FitzGerald was going to end her consulting business and again become an employee of the Maryland state government.

In November 2012, the Indictment alleges that Mr. Maudlin, Mr. Pangallo, and Mr. Coffland allegedly reached a new agreement. Pursuant to this third agreement, payments would be made to Blue Northern, in return for Ms. FitzGerald's future exertion of influence over Company #1 in her capacity as Deputy Secretary of DHR.

Nine months later, in August 2013, Ms. FitzGerald and Mr. Coffland allegedly made a collective demand that Mr. Maudlin and Mr. Pangallo pay Mr. Coffland a percentage of the profits from the subcontracts TCC received as a result of the influence Ms. FitzGerald allegedly exercised over Company #1. Mr. Maudlin and Mr. Pangallo allegedly acceded to this demand, constituting the fourth agreement referenced in Count One.

## **ARGUMENT**

The Court must dismiss any count in the indictment that fails to state an offense. Fed. R.

Crim. P. 12(b)(3)(B)(v).  An indictment must "contain the elements of the offense charged, fairly

inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense

in a future prosecution for the same offense."  *United States v. Oaks*, No. RDB-17-288, 2018 WL

1413005, at *2 (D. Md. Mar. 20, 2018) (quoting *United States v. Loayza*, 107 F.3d 257, 260 (4th

Cir. 1997)); *see* Fed. R. Crim. P. 7(c)(1).  It is not enough to parrot the statute or simply state the

elements of the charged offense.  To survive a defendant's motion to dismiss, the indictment must

also contain the "essential facts" of the offense.  *See United States v. Perry*, 757 F.3d 166, 171 (4th

Cir. 2014) (internal quotation marks omitted); *United States v. Brandon*, 298 F.3d 307, 310 (4th

Cir. 2002); *e.g.*, *United States v. Jackson*, Criminal Action No. 3:16-CR-31, 2017 WL 1129941

(N.D.W. Va. Mar. 24, 2017) (dismissing indictment for failure to allege "essential facts" of mail

fraud).[1]

---

[1] Courts across the country routinely dismiss indictments that do not allege "essential facts" supporting the charges therein.  *See, e.g.*, *United States v. Bobo*, 344 F.3d 1076, 1083–86 (11th Cir. 2003) (reversing district court's denial of motion to dismiss indictment and vacating defendant's convictions for health care fraud and conspiracy to commit health care fraud, 18 U.S.C. §§ 371, 1347(1), on the ground that indictment contained "no indication of what the government contended was unlawful about [the defendant's] conduct"); *United States v. Ortiz*, No. 15-594-RS-1, 2016 WL 4239370, at *6–7 (N.D. Cal. Aug. 11, 2016) (granting defendants' motion to dismiss two counts of the indictment on the ground that those counts failed to allege the "essential facts" of which official proceeding defendants obstructed or conspired to obstruct when they participated in a murder, in violation of 18 U.S.C. § 1512); *United States v. Dupree*, No. 10-627-KAM, 2011 WL 3235763, at *5–6 (E.D.N.Y. July 28, 2011) (dismissing count of indictment that charged defendant with violating 18 U.S.C. § 1344, bank fraud statute, on ground that the count did not allege "essential facts" supporting a charge that the bank was defrauded); *United States v. Peterson*, 544 F. Supp. 2d 1363, 1375–76 (M.D. Ga. 2008) (dismissing count in indictment that parroted the statutory language—"abuse or threatened abuse of the law or legal process," from 18 U.S.C. § 1589(3), and "official proceeding," from 18 U.S.C. § 1515—but did not allege "essential facts" supporting those generic terms, either by alleging how defendant abused the legal process or identifying the "official proceeding" allegedly obstructed).

Counts One, Two, and Three purport to allege violations of Section 371 and Section 666(a)(1)(B).  Section 371's elements, as relevant here, are: (1) an agreement between two or more persons (2) to violate Section 666 and (3) an "act to effect the object of the conspiracy."  *See* 18 U.S.C. § 371; *Salinas v. United States*, 522 U.S. 52, 63 (1997).  Section 666(a)(1)(B) has four essential elements: (1) that the defendant solicited or demanded for the benefit of any person, or accepted or agreed to accept something of value; (2) in connection with any business, transaction, or series of transactions of a government entity involving anything of value of $5,000 or more; (3) that the person was an "agent" of the entity; and (4) that the entity received within one year more than $10,000 in federal program "benefits . . . under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  *See* 18 U.S.C. § 666(a)(1)(B) (cross-referencing Section 666(b)).

As to Count One, the Indictment must allege an agreement to violate a law that the co-conspirators *could* complete, as a collective, even if not every co-conspirator could himself satisfy all the elements.  As the Supreme Court has explained, "the fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'"  *Ocasio v. United States*, 578 U.S. ___, ___, 136 S. Ct. 1423, 1429, 1430 (2016) (alteration in original) (quoting *Salinas*, 522 U.S. at 65); *accord United States v. Holte*, 236 U.S. 140 (1915).  It follows, then, that to allege a Section 371 conspiracy to violate Section 666, the Indictment must contain allegations setting forth "essential facts" that the co-defendants reached an agreement with the specific intent to violate Section 666 and that at least one co-conspirator *could* complete all the elements of an offense under that statute.  *See United States v. Brock*, 501 F.3d 762, 767 (6th Cir. 2007) (reversing defendants' conviction for conspiracy to violate the Hobbs Act where the alleged conspirators could not have

violated the underlying statute without involvement of another person), *abrogated on other grounds by Ocasio*, 136 S. Ct. 1423; *United States v. Lawson*, No. 3:08-21-DCR, 2009 WL 362108, at \*4 (E.D. Ky. Feb. 10, 2009) (dismissing count of indictment charging Section 371 conspiracy to violate Section 666 because facts alleged could not "legally constitute" a violation of the underlying statute).

The first three Counts in the Indictment purport to allege an agreement by Ms. FitzGerald from 2011 through 2014 to violate Section 666 and substantive violations by Ms. FitzGerald of Section 666 by accepting an offer of something of value in return for using her influence as an "agent" of the Maryland government, generally, or DHR, specifically. *See* Indictment at 5 ¶ 14; 17 ¶ 1–2; 18 ¶ 1–2. The Indictment, however, does not allege that the State of Maryland was in receipt of any federal funds. While it alleges that DHR was a government entity in receipt of federal funds, it does not allege that DHR received the kind of federal benefits required to make Section 666. Neither does it allege that Ms. FitzGerald was authorized to act on behalf of DHR with respect to its federal funds.

## I.    COUNTS ONE, TWO, AND THREE SHOULD EACH BE DISMISSED FOR FAILURE TO STATE AN OFFENSE BECAUSE THEY DO NOT ALLEGE INVOLVEMENT OF AN ENTITY COVERED BY SECTION 666.

Count One fails to allege a Section 371 conspiracy to violate Section 666(a) from 2011 through 2014, as it purports to do, *see* Indictment at 5 ¶ 14, because it does not contain factual allegations that the threshold "circumstance" under Section 666(b) existed. Section 666 only reaches those actors who bribe an "agent" of particular entities—those in receipt of "benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(a), (b). The statute's express language makes clear that the agency's receipt of such federal benefits under a specified type of federal program is an element of the offense. *See id.*; *Fischer v. United States*, 529 U.S. 667, 676

(2000); *United States v. Pinson*, 860 F.3d 152, 164 (4th Cir. 2017) (per curiam).  Here, the Indictment parrots a portion of the statutory element with a boilerplate allegation that DHR "received in excess of $10,000 in benefits under a Federal program," Indictment at 1 ¶ 1, but does not allege, even by parroting the statutory language, that the federal program at issue involved a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

There is no allegation that the "Federal program" under which DHR received its federal funds involved "a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  *Compare id.* at 1 ¶ 1(DHR "received in excess of $10,000 in benefits under a Federal program"), *and id.* at 17 ¶ 2; 18 ¶ 2 (DHR was "an agency that received federal benefits in excess of $10,000"), *with* 18 U.S.C. § 666(b) ("The circumstance referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.").  By stopping its allegation at the word "program," the Indictment falls short of even parroting the statutory language.

For the Indictment to state a violation of Section 666, however, the Indictment must not only parrot the applicable statutory language, but it must also allege the essential of facts of the allegation that DHR was an entity for which Section 666(a) liability could be triggered.  It has long been the law that "any general description based on the statutory language must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which [s]he is charged."  *Perry*, 757 F.3d at 171 (alteration adopted) (internal quotation marks omitted); *accord Brandon*, 298 F.3d at 310.  The Indictment fails to meet either aspect of the criminal pleading requirement with respect to the federal benefits allegedly received by DHR.

The criminal pleading rule is particularly important in this context, where the statute's plain text makes clear and the Supreme Court has explained that not all money from the government qualifies as a "benefit" within the meaning of Section 666(b).  The statute's use of the word "involving" functions to make the items in the list that follows inclusive of certain kinds of funds and exclusive of others.  *See* 18 U.S.C. § 666(b).

Consistent with this reading, the Supreme Court has expressly rejected the argument that the word "benefit" in Section 666(b) is satisfied every time "the Federal Government [is] the source of the payment."  *Fischer*, 529 U.S. at 677.  Just last year, the Fourth Circuit applied this principle and explained:

> [W]hile a government "benefit" could come in many forms, like a "loan" or "contract" or "grant," the term d[oes] not include certain payments made "in the usual course of business."  . . . Because any receipt of federal funds could "at some level of generality" be characterized as a benefit, and because the "statute does not employ this broad, almost limitless use of the term," . . . . [t]he key question is whether the funds are paid to the entity "for significant and substantial reasons in addition to compensation or reimbursement." To make this determination, courts should examine the recipient entity's "structure, operation, and purpose" as well as "conditions under which the organization receives the federal payments." Entities receive a "benefit" for purpose of § 666 when they are the subject of "substantial Government regulation" that helps them achieve "long-term objectives" or policy goals "beyond performance of an immediate transaction."  In contrast, if the payment is made "simply to reimburse," then the recipient entity isn't receiving a "benefit."

*Pinson*, 860 F.3d at 166–67 (citations omitted) (quoting *Fischer*, 529 U.S. at 679–81).

None of the first three Counts contains any allegations setting forth the facts and circumstances under which DHR allegedly received benefits under a federal program.  Count One fails to advance any factual allegation that "descend[s] to [the] particulars" of this element of the offense. *See Russell v. United States*, 369 U.S. 749, 765 (1962) (internal quotation marks omitted);

*United States v. Koll*, No. 07 CR 346–1, 2009 WL 595584, at *5 (N.D. Ill. Mar. 5, 2009). Without any allegation of fact concerning the type of federal program benefits DHR received between 2011 and 2014, there is nothing from which the Court could conclude that the Indictment has adequately alleged this threshold-circumstance element of the offense.

Without adequately alleging that DHR satisfied the threshold circumstance set forth in Section 666(b), the first three Counts do not state offenses. Absent that threshold circumstance existing, the Indictment fails to allege it was possible for the co-conspirators to agree to commit an endeavor which, if completed, would satisfy all the elements of Section 666(a). *See Lawson*, 2009 WL 362108, at *4; *cf. Ocasio*, 136 S. Ct. at 1429; *Brock*, 501 F.3d 767; *see also Pinson*, 860 F.3d at 165–66. Similarly, it was not possible for Ms. FitzGerald to be liable for substantive violations of that statute. Accordingly, the Court should dismiss Counts One, Two, and Three.

## II.   COUNTS ONE, TWO, AND THREE SHOULD EACH BE DISMISSED FOR FAILURE TO STATE AN OFFENSE BECAUSE THEY FAIL ADEQUATELY TO ALLEGE THAT MS. FITZGERALD HAD AUTHORITY TO MANAGE FEDERAL PROGRAM FUNDS.

To allege a substantive violation of Section 666, an indictment must allege the defendant was an "agent" of a type of entity covered by the statute, and, to allege a conspiracy to violate Section 666, an indictment must allege at least one member of a conspiracy was an "agent" of such an entity. An individual is an "agent" within the meaning of Section 666 if she is "authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." 18 U.S.C. § 666(d)(1). Counts One, Two, and Three fail to state a Section 371 conspiracy to violate Section 666 or that Ms. FitzGerald violated Section 666 because they do not adequately allege that Ms. FitzGerald (or any other member of the conspiracy) was an "agent."

13

Recognizing that money is fungible, the Supreme Court has explained there is no requirement for an indictment to allege a connection between the giving or receiving of a bribe and an agent's misuse of the federal monies her agency received. *See Sabri v. United States*, 541 U.S. 600, 604–05 (2004). The Fifth Circuit has held that whether an individual qualifies as an "agent"—and, correlatively, the outer limits of the applicability of Section 666—should "turn[] on whether [the defendant] was authorized to act on behalf of [the entity receiving federal monies] with respect to [the entity's] funds." *United States v. Phillips*, 219 F.3d 404, 411 (5th Cir. 2000); *accord United States v. Thomas*, 847 F.3d 193, 198 (5th Cir. 2017) (reaffirming *Phillips* after *Sabri*). Thus, an indictment need not allege that the defendant had the authority to act with respect specifically to funds that the entity received from the federal government, only that the entity received federal benefits and the defendant had the authority to act with respect to the entity's funds.

This holding makes sense in light of the purpose of Section 666, which is to protect the integrity of federal spending. If an entity receives federal funds and an agent of that entity with control over its funds is corruptly influenced, then federal dollars are at risk of being "frittered away in graft." *See Sabri*, 541 U.S. at 605. Money laundering cases involving an account with commingled funds, where the fungibility of the funds makes tracing the federal funds impossible, hold that a transaction using the funds in that account may involve unlawful proceeds. *See, e.g.*, *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1354–55 (D.C. Cir. 2002). Likewise, where a state agency commingles its funds from other sources with funds received by the federal government, a misuse of the state agency's funds puts the federal funds at risk. *See Sabri*, 541 U.S. at 605–06.

However, if an individual who has no authority to act on behalf of a government entity with respect to the entity's funds (regardless of the source of those funds) is corruptly influenced, then there is no risk of the misuse of federal monies.  Accordingly, there is no threat to the federal interest in ensuring that federal spending is in furtherance of the general welfare.  In this instance, Congress has no role in criminalizing the individual's corrupt action.  Consequently, while a bribe need not "be traceably skimmed from specific federal payments or show up in the guise of a *quid pro quo* for some dereliction in spending a federal grant," *see id.* at 605–06, the statute still requires that the federal interest by implicated by the possibility that a bribe *could affect* federal dollars.

Some courts nonetheless read *Sabri* to stand for the dangerously broad proposition that an indictment need only allege that an individual has *any* authority to act on behalf of the state entity to qualify as an "agent" under Section 666, regardless of whether or not that authority relates to the entity's funds.  *See, e.g.*, *United States v. Vitillo*, 490 F.3d 314, 322–23 (3d Cir. 2007); *United States v. Keen*, 676 F.3d 981, 989–90 (11th Cir. 2012).[2]

Ms. FitzGerald respectfully submits that this is a misreading of *Sabri* and, indeed, would render Section 666 unconstitutional.  As set forth in Ms. FitzGerald's Motion in the Alternative to Dismiss Counts One and Two in Part for Failure to State an Offense, Section 666 pushes the outer bounds of Congress's constitutional authority under the Spending Clause.  Accordingly, it should

---

[2]  In an unpublished opinion, the Fourth Circuit rejected an argument that an indictment alleged an unconstitutional application of Section 666 because it did not allege a nexus between the bribe the defendant paid an "agent" and any federal funds of which the local state agency was in receipt. *United States v. Brady*, 694 F. App'x 184, 185 (4th Cir. 2017) (per curiam) (mem.).  This holding is consistent with *Sabri*.  The *Brady* Court did not address whether Section 666 requires an agent to have authority over the funds of the entity receiving federal monies.  However, even were the Court to read *Brady* as holding that there is no requirement that an indictment allege an "agent" had authority with respect to the agency's funds, the Court still would not be bound by that holding. Unpublished opinions are not the precedent of this Circuit and do not bind the Court's resolution of this case.  *See id.* at 184 ("Unpublished opinions are not binding precedent in this circuit.").

not be read more expansively than necessary, particularly in ways that further attenuate it from Congress's role in protecting the integrity of federal spending, thus further intruding into the realm left by the Constitution to the States.

Counts One, Two, and Three fail to allege that Ms. FitzGerald was authorized to act on behalf of DHR *with respect to DHR's funds*. Instead, the Indictment merely alleges that Ms. FitzGerald held a supervisory position with respect to others in the Maryland government. As DHR CIO, she "oversaw" daily operations of OTHS. *See* Indictment at 1–2 ¶ 2(a). As a private consultant, she "exercised managerial discretion over DHR matters, including the supervision of the Acting DHR CIO." *See id.* at 2 ¶ 2(b). Similarly, as Deputy Secretary, she "oversaw OTHS" and other DHR offices. *See id.* at 2 ¶ 2(c). Lastly, as Secretary of DoIT, Ms. FitzGerald "exercised supervision" over the CIOs of all Maryland agencies. *See id.* at 2 ¶ 2(d). These allegations speak to Ms. FitzGerald's oversight of individuals, not fiscal decision making. The Indictment does not allege, for example, that Ms. FitzGerald had the authority to bind DHR to contracts. Indeed, at no point does the Indictment allege that Ms. FitzGerald had *any* authority to act on behalf of DHR with respect to *any* spending of DHR funds.

The Indictment does not even attempt to allege that as a private-sector consultant, the Deputy Secretary of DHR, or the Secretary of DoIT, Ms. FitzGerald had authority over DHR's spending. The Indictment comes closest to suggesting Ms. FitzGerald had responsibilities related to DHR's budget when she served as DHR CIO, but the allegations suggesting a connection between Ms. FitzGerald's role as DHR CIO and DHR's budget do not result in the first three Counts in the Indictment stating an offense.

First, the Indictment lacks any allegation that Ms. FitzGerald accepted, or agreed to accept, something of value during her time as DHR CIO in return for her either taking action or foregoing

action, in her capacity as an employee of DHR.  The earliest date on which the Indictment alleges any co-defendant reached an agreement with Ms. FitzGerald that she would be provided something of value in return for influencing DHR is October 27, 2011, *see id.* at 9 ¶ 31(b)—two weeks *after* Ms. FitzGerald left her role as DHR CIO.  Accordingly, even if the Indictment can be read to suggest that, while DHR CIO, Ms. FitzGerald had authority over DHR's spending, the Indictment would still fail to state a violation of Section 666 because it contains no allegation that she had such authority when she subsequently allegedly accepted something of value in return for her influence.

Second, a careful reading of the Indictment demonstrates that the Indictment fails to allege that Ms. FitzGerald had authority over DHR's spending even when she was DHR CIO.  The Indictment alleges that, as CIO of DHR, Ms. FitzGerald oversaw OTHS, and "OTHS was responsible for reviewing and implementing DHR's technology plans, programs, projects, budgets, staff, and purchasing, and had an annual budget of approximately $70 million."  *Id.* at 1–2 ¶ 2(a).  This allegation, however, does not allege that, in her role as DHR CIO, Ms. FitzGerald had authority to act on behalf of DHR with respect to DHR's spending and, therefore, had authority to act on behalf of DHR with respect to its funds while serving as DHR CIO.

In light of its failure to allege that Ms. FitzGerald, at any point—much less when she allegedly agreed to accept something of value in return for influencing DHR—had authority over DHR's budget, the Indictment does not adequately allege Ms. FitzGerald was an "agent."  Counts One, Two, and Three should be dismissed for failing to allege an essential element of Section 666(a)(1)(B) or a conspiracy to violate that Section.

### III. COUNT THREE SHOULD BE DISMISSED FOR FAILURE TO STATE AN OFFENSE BECAUSE IT DOES NOT ALLEGE THE INTENT ELEMENT OF SECTION 666(A)(1)(B).

Even if the Court were to conclude that the Indictment adequately alleges DHR was in receipt of "benefits" sufficient to satisfy Section 666(b) and that Ms. FitzGerald was an "agent" of DHR during the time she served as its Deputy Secretary, Count Three would still fail to allege all the essential elements of a violation of Section 666(a)(1)(B). Section 666(a)(1)(B) punishes an "agent" who acts with "inten[t] to be influenced or rewarded in connection with any business, transaction, or series of transactions of such . . . agency." 18 U.S.C. § 666(a)(1)(B). Count Three fails to advance any factual allegation that Ms. FitzGerald acted with this requisite intent, much less a factual allegation that "descend[s] to [the] particulars" of that element of the offense. *See Russell*, 369 U.S. at 765 (internal quotation marks omitted); *Koll*, 2009 WL 595584, at *5.

Count Three alleges Ms. FitzGerald "solicit[ed] and demand[ed] that Company #1 hire [Mr. Coffland] as an independent contractor serving as the Hosting Director," Indictment at 18 ¶ 2, but it does not allege that Ms. FitzGerald did so intending to be affected "in connection with" any business of DHR. Neither the second paragraph of Count Three nor Paragraph 30 of Count One, incorporated by reference, includes any allegation that Ms. FitzGerald "demanded" or "directed" Company #1 to hire Mr. Coffland in return for her taking action or foregoing action in connection with DHR business. *See id.* at 9 ¶ 30; 18 ¶ 2. Indeed, there is no allegation anywhere in the Indictment from which the Court might even infer that Ms. FitzGerald's demand implicated the business of DHR. The Indictment alleges only that, at some point between January 1 and June 26, 2013, Ms. FitzGerald demanded Company #1 provide something of value to Mr. Coffland. There is no allegation that, in return, she agreed to or intended to be influenced in connection with DHR.

This failure in Count Three stands in stark contrast to the allegations in other counts. For instance, in Count One, the Indictment alleges that Ms. FitzGerald threatened Company #1 that she would use her influence to cause DHR to withhold funding, not to renew DHR's contract with Company #1, or DHR would impose financial penalties on Company #1 if Company #1 did not comply with her demands. *See id.* at 8–9 ¶¶ 27–29. In contrast, the allegation at issue in Count Three—that Ms. FitzGerald demanded Company #1 hire Mr. Coffland—lacks any allegation of a connection between that demand and action by DHR toward Company #1, either favorable or unfavorable.

Count Three's boilerplate parroting of the statute cannot save Count Three. *See Perry*, 757 F.3d at 171 ("any general description based on the statutory language must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which [s]he is charged." (alteration adopted) (internal quotation marks omitted)); *Brandon*, 298 F.3d at 310. Since such allegations are wholly lacking in Count Three, the Court must dismiss Count Three for failure to state an offense by not meeting an essential element of Section 666(a)(1)(B).

## IV.   THE COURT SHOULD DISMISS COUNT ONE BECAUSE IT CHARGES MORE THAN ONE OFFENSE (DUPLICITY).

In addition to the reasons stated above, Count One also must be dismissed because it charges multiple conspiracies. Pursuant to Rule 12 of the Federal Rules of Criminal Procedure, the Court must dismiss any count in the indictment that "join[s] two or more offenses in the same count (duplicity)." Fed. R. Crim. P. 12(b)(3)(B)(i). Charging more than one offense in a single count creates a "risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count." *See United States v. Robinson*, 855 F.3d 265, 269 (4th Cir. 2017)

(internal quotation marks omitted).  Here, the Indictment alleges several conspiracies within a single Count.

As discussed above, the Indictment alleges at least four separate agreements:

- First, "[b]etween approximately October 27, 2011 and December 17, 2011," after Ms. FitzGerald left state government, Ms. FitzGerald and Mr. Maudlin "negotiated an agreement whereby" she would "us[e] her influence to convince" Subcontractor #1 to give TCC subcontracting work on the CARES Modernization project and, in exchange, Aeon would receive one-third of TCC's work.  *See* Indictment at 6–7 ¶¶ 17–20; 9–14 ¶ 31(a)–(e).

- Second, between December 2011 and December 2012, also while in the private sector, Ms. FitzGerald agreed with Mr. Maudlin that she would cause Company #1 to give TCC work by "threatening to use her influence" as an Executive Consultant to cause others at DHR to take adverse action against Company #1; in exchange, Ms. FitzGerald would accept one-third of TCC's profits on those subcontracts.  *See id.* at 8 ¶¶ 27–28; 11–14 ¶ 31(f)–(j), (k)–(n), (p), (t).

- Third, between November 2012 and June 2014, Ms. FitzGerald agreed with Mr. Maudlin, Mr. Pangallo, and Mr. Coffland that she would cause Company #1 to give TCC certain subcontracts by "threatening to use her influence," first as Deputy Secretary of DHR and then as Secretary of DoIT, to cause DHR to take adverse action against Company #1 and, in exchange, Blue Northern would accept one-third of TCC's profits on those subcontracts.  *See id.* at 8–9 ¶¶ 28–29; 13–15 ¶ 31(r)–(s), (u)–(v), (x)–(y), (bb); and

- Fourth, "from at least August 2013 through at least November 2014," first while Deputy Secretary and then while Secretary of DoIT, Ms. FitzGerald and Mr. Coffland, collectively "solicited and demanded" that Mr. Maudlin and Mr. Pangallo pay Mr. Coffland "one third of TCC's profits on specified subcontracts with DHR's prime contractor, Company #1, that TCC obtained through [Ms. FitzGerald]'s influence on Company #1."  *Id.* at 7–8 ¶ 25; 14–15 ¶ 31(z)–(aa), (cc).

These allegations do not reflect the uniformity or continuity required for a single conspiracy to exist.  The Fourth Circuit has explained that "[w]hether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals."  *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1998); *cf. United States v. Jeffers*, 570 F.3d 557, 567 (4th Cir. 2009) ("[A] single conspiracy exists[] when the conspiracy had the same objective, it had the same goal, the same nature, the same geographic spread, the same results, and the same

product." (internal quotation marks omitted)).   Here, the Indictment itself speaks of multiple different agreements reached at different times by different actors, and, in Ms. FitzGerald's case, agreements made at times that she was in different roles, allegedly exercising different types of influence.

First, the later agreements contain different groups of participants than the earlier agreements.  Mr. Maudlin and Ms. FitzGerald are alleged to have formed and participated in the original agreement, that, as a private consultant, Ms. FitzGerald would influence Subcontractor #1.  They subsequently allegedly agreed that Ms. FitzGerald would exert her influence as a private consultant over Company #1 to convince Company #1 to subcontract work to TCC.  In contrast, all four co-defendants allegedly participated in the third agreement, that Ms. FitzGerald would exert her influence as Deputy Secretary and Secretary of DoIT on Company #1, with payments for that alleged influence paid to Blue Northern.  Finally, Ms. FitzGerald and Mr. Coffland allegedly engineered the fourth agreement, in which they allegedly demanded that Mr. Maudlin and Mr. Pangallo pay Mr. Coffland a portion of the proceeds derived from contracts Ms. FitzGerald helped procure for TCC.

Ms. FitzGerald's alleged participation in each alleged agreement does not transform the separate agreements into a single conspiracy.  She alone is not a "rim" to connect the spokes.  *Cf. Kotteakos v. United States*, 328 U.S. 750, 755 (1946) (finding evidence reflected multiple conspiracies where the only tie between and among co-defendants was that each used the same individual to obtain a fraudulent loan); *Pinson*, 860 F.3d at 162 (explaining, in the context of vacating defendant's RICO conspiracy conviction, that evidence did not support a single conspiracy where the "conspiratorial tie . . . boils down to just two members").

Second, the time periods during which the agreements took place separate each agreement. The first agreement between Mr. Maudlin and Ms. FitzGerald allegedly occurred in the space of a specific seven-week-two-day period in late 2011, when she was a private consultant. *See* Indictment at 9–10 ¶ 31(b). Their second agreement was reached after that, between December 2011 and December 2012. *See id.* at 8 ¶¶ 27–28; 11–14 ¶ 31(f)–(j), (k)–(n), (p), (t). There is no allegation that, at the time the first and second agreements were reached, either Ms. FitzGerald or any co-defendant anticipated she would return to state government. Thus, Ms. FitzGerald necessarily could not have reached an agreement with any co-defendant that, in return for benefits offered to her, she would use her influence as a state employee to benefit her co-defendants at the time she reached the initial alleged agreements with Mr. Maudlin. Instead, the third agreement, in which all four defendants allegedly participated, occurred between November 2012—when Ms. FitzGerald was imminently returning to state government—and June 2014. *See id.* at 8–9 ¶¶ 28–29; 13–15 ¶ 31(r)–(s), (u)–(v), (x)–(y), (bb). Finally, the last agreement occurred from August 2013 to November 2014. *Id.* at 7–8 ¶ 25; 15 ¶ 31(z)–(aa), (cc). As such, the four agreements are not temporally coextensive.[3]

Third, the agreements have distinct objectives and methodologies. The first two agreements involve the payment of something of value by TCC in return for Ms. FitzGerald's influence as a private consultant. The first agreement between Ms. FitzGerald and Mr. Maudlin

---

[3] The minor overlaps in time periods do not render the agreements a single conspiracy. *Cf. United States v. Hoyte*, 51 F.3d 1239, 1246 (4th Cir. 1995) (successive indictments alleged two distinct conspiracies even where "the time period of the second conspiracy . . . included the first conspiracy"); *United States v. Aleman*, 855 F. Supp. 117, 121 (M.D.N.C.) (successive indictments alleged separate conspiracies, and "[t]he inclusion of one time period within another [and] the slight overlap of named co-conspirators" did not direct a contrary conclusion because those characteristics "are not conclusive as to the existence of only one conspiracy"), *aff'd per curiam*, 33 F.3d 53 (4th Cir. 1994) (mem.).

involves Ms. FitzGerald allegedly using her influence with Subcontractor #1 for the purpose of directing work on a particular subcomponent of the Applications Contract to TCC and, subsequently, delegating some portion of that work to Aeon. In contrast, their second agreement involves her allegedly using her influence with a different entity—Company #1—and aims to give TCC subcontracting work, with a direct cut of the proceeds of those subcontracts going to Aeon, facilitated through straw employment arrangements with TCC. The third agreement involves the payment of something of value not by TCC, but by Company #1, and routes payments to Blue Northern, not Aeon. Finally, the fourth agreement represents not the common objectives of all four defendants, but rather a schism in the group of prior co-conspirators—two co-defendants, Mr. Coffland and Ms. FitzGerald, agree to demand payment from the other two co-defendants, Mr. Maudlin and Mr. Pangallo. Indeed, the allegation that Ms. FitzGerald and Mr. Coffland demanded money from Mr. Maudlin and Mr. Pangallo contradicts the stated purpose of the conspiracy—"that FitzGerald and Coffland received and agreed to receive a stream of financial benefits from Maudlin, Pangallo, and TCC in exchange for FitzGerald's performance of favorable official acts for the benefit of TCC." *See id.* at 6 ¶ 15. Demanding payment be made to Mr. Coffland is at odds with the theory that the co-conspirators collectively intended to benefit TCC. As such, the Indictment cannot reasonably be read to allege the commission of numerous criminal acts aimed at the accomplishment of a single overarching objective.

Neither are the four agreements so interdependent as to be a single conspiracy. Interdependence can be found based on a "pattern of mutual cooperation between participating individuals" or "activities of alleged co-conspirators in one aspect of the charged scheme [that] are necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole." *See United States v. Eury*, No. 14-

39, 2015 WL 1861807, at *5 (M.D.N.C. Apr. 23, 2015) (quoting *United States v. Stewart*, 256 F.3d 231, 251 (4th Cir. 2001)).  In contrast, Count One alleges "multiple agreements to commit separate crimes" and is therefore duplicitous.  *See id.* (quoting *United States v. Broce*, 488 U.S. 563, 570–71 (1989)).

The first scheme is not dependent on the other three schemes.  Mr. Maudlin and Ms. FitzGerald's alleged agreement to cause Subcontractor #1 to give subcontracting work to TCC is not alleged to have had any bearing on or been advantageous to the success of their alleged later effort to obtain subcontracts for TCC from Company #1.  Nor is the first agreement alleged to have had any capacity to affect Ms. FitzGerald and Mr. Coffland's alleged later demand for payments from Mr. Maudlin and Mr. Pangallo from the proceeds of subcontracts awarded to TCC by Company #1.  As such, the first scheme stands apart, independent from the others.

The fourth scheme may appear, at first blush, to be related to the two prior alleged agreements to have Ms. FitzGerald use her influence to cause Company #1 to provide subcontracts to TCC, but closer scrutiny demonstrates the allegations do not reflect such a connection.  The schemes could be viewed as interdependent insofar as Ms. FitzGerald and Mr. Coffland's agreement to demand money from Mr. Pangallo and Mr. Maudlin is predicated on Ms. FitzGerald's procurement of subcontracts from Company #1.  However, while the second alleged agreement involves Ms. FitzGerald influencing DHR as a private consultant and the third alleged agreement involves Ms. FitzGerald's influence as a state employee in connection with the business of DHR, the fourth alleged agreement is not connected to DHR at all.  There is no allegation that the demand for payments to Mr. Coffland was premised on a threat to influence DHR to take adverse action against TCC.  *Compare* Indictment at 7–8 ¶ 25, *with* 18 U.S.C. § 666(a).  This stands in stark contrast to the second and third schemes, which are premised on

bribing Ms. FitzGerald to extort subcontracts from Company #1 on threat of DHR taking adverse action against Company #1, in violation of Section 666(a).  *See* Indictment at 7–9 ¶¶ 19, 27–29; 15 ¶ 31(bb).[4]

Because Count One charges "multiple agreements to commit separate crimes," *see Broce*, 488 U.S. at 571, Count One joins multiple offenses in a single count.  Because of this duplicity, it must be dismissed.

## **CONCLUSION**

The Court should dismiss the first three Counts of the Indictment.  All three Counts fail to state an offense as a result of a fatal failure to allege a requisite element of the offense.  These Counts do not allege that DHR is an entity meeting the circumstances of Section 666(b).  Nor do they allege that Ms. FitzGerald had authority to act on behalf of DHR with respect to its funds at any point in time, much less when agreeing to accept something of value.  Count Three also lacks essential factual allegations that Ms. FitzGerald acted with the intent to be influenced with respect to DHR's business.  All three Counts must be dismissed under Rule 12(b)(3)(B)(v) for failure to state an offense.

Lastly, Count One must be dismissed in its entirety because it alleges multiple conspiracies. Because it joins more than one offense in the same count, it suffers from duplicity and must be dismissed under Rule 12(b)(3)(B)(i).

---

[4] Even if the Court were to find that some combination of the various alleged agreements constituted a single conspiracy, unless all four agreements constituted a single conspiracy, Count One would continue to allege multiple conspiracies and suffer from duplicity.  As set forth above, all four agreements, with their different participants, timeframes, objectives, and methods, cannot constitute a single overarching agreement.

Date:   October 5, 2018                    Respectfully submitted,

                                           */s/ Barry J. Pollack*
                                           Barry J. Pollack
                                           Jessica Arden Ettinger
                                           ROBBINS  RUSSELL  ENGLERT  ORSECK
                                           UNTEREINER & SAUBER LLP
                                           1801 K Street NW, Suite 411-L
                                           Washington, D.C. 20006
                                           Telephone: (202) 775 4500
                                           Fax: (202) 775 4510
                                           bpollack@robbinsrussell.com
                                           jettinger@robbinsrussell.com

                                           Addy R. Schmitt
                                           MILLER & CHEVALIER CHARTERED
                                           900 Sixteenth Street NW
                                           Washington, D.C. 20006
                                           Telephone: (202) 626 5837
                                           Fax: (202) 626 5801
                                           aschmitt@milchev.com

                                           *Counsel for Ms. FitzGerald*

**CERTIFICATE OF SERVICE**

On this 5th day of October, 2018, I caused the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Maryland by using the Court's CM/ECF system, which will serve electronic notification of this filing on all counsel of record.

Respectfully submitted,
*/s/ Barry J. Pollack*
Barry J. Pollack
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street NW, Suite 411 L
Washington, District of Columbia 20006
Telephone:  (202) 775 4500
Fax:  (202) 775 4510
Email: bpollack@robbinsrussell.com

*Counsel for Ms. FitzGerald*