IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. TEJ-17-0506 |
| ) | |
| ISABEL FITZGERALD, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |
| _____ ) | |

**THE GOVERNMENT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF OTHER UNRELATED GOOD ACTS OR NONCRIMINAL PERFORMANCE BY DEFENDANT FITZGERALD OF HER OFFICIAL STATE GOVERNMENT RESPONSIBILITIES BETWEEN 2011 AND 2014**

The United States of America, by its undersigned counsel, hereby files the following motion to exclude evidence that the defense may seek to introduce at trial concerning other good acts or examples of legitimate, noncriminal performance of her official duties by defendant Isabel FitzGerald in her various positions with the Maryland State Government between 2011 and 2014. In particular, the government anticipates that defendant FitzGerald's counsel may seek to present evidence relating to her performance when she assisted Carolyn Quattrocki, the Director of the Maryland Health Benefits Exchange (MHBE), in the effort to redesign and bring online the Maryland state Health Insurance Exchange (HIX) website between December 2013 and November 2014.

However, defendant FitzGerald's work in connection with the redesign of the previously failed Maryland HIX is not the subject of any of the charges brought against her in the superseding indictment. The indictment instead deals with her management of the Hosting and Applications contracts between the Maryland Department of Human Resources (MDHR) and state contractor ACS/Xerox between 2011 and 2014.

1

Testimonial or documentary evidence relating to FitzGerald's performance during the HIX redevelopment effort would therefore shed no light on whether she is guilty of the unrelated crimes involving the Hosting and Applications contracts that are the subject of the pending indictment. Rather, it would constitute improper "other good acts" evidence (sometimes referred to as "reverse" Rule 404(b) evidence). Admission of evidence relating to FitzGerald's performance in connection with the HIX redesign project or other matters unrelated to the charges set forth in the indictment here would further violate Federal Rules of Evidence 401 (because it is not relevant), 403 (because it would confuse the issues, mislead the jury, cause undue delay, and waste time), and 404(a)(1) and 405 (because it is not a proper or authorized way of presenting evidence of good character). And the courts in public corruption (and other types of fraud cases) have consistently recognized that evidence of other unrelated good acts by a defendant are not relevant to prove that he or she did not commit criminal acts or have criminal intent with respect to other unrelated transactions charged in an indictment. Thus, if FitzGerald seeks to offer evidence of this kind, it should be excluded pursuant to all of these rules, and based as well upon the Court's authority pursuant to FED. R. EVID. 611(a)(2).

## **RELEVANT FACTS**

### A. **The Facts Underlying the Charges in the Indictment**

The superseding indictment in this case charges that over a roughly three-year period starting in the fall of 2011, defendant FitzGerald and defendant Kenneth Coffland, another state contractor with whom FitzGerald was romantically involved, received and were promised a stream of financial benefits from The Consultants

2

Consortium (TCC), an information technology (IT) services company that was a subcontractor on two large IT contracts that the Maryland Department of Human Resources (MDHR) had issued to ACS/Xerox, which are respectively referred to in the superseding indictment as the Hosting Contract and the Applications contract. Superseding Indictment (ECF # 75) at pages 4-5. The indictment charges that in return for these benefits, FitzGerald took various actions while working for the state that benefitted TCC. The remaining two defendants in this case, Steven Maudlin and James Pangallo, were respectively the Chief Executive Officer (CEO) and Chief Financial Officer (CFO) of TCC, and each also owned a one-third interest in the company. *Id.* at pages 7-17, 19-21.

More specifically, the indictment charges that beginning while FitzGerald held the position of "Executive Consultant" to the MDHR Secretary from November 2011 through December 2012, TCC agreed to pay her the profits it received for the services of one contractor who worked on the Applications contract, and another contractor who worked on an Indiana contract, as well as one-third of TCC's profits on specified subcontracts that TCC had obtained from ACS/Xerox as a result of FitzGerald's exercise of her influence and authority at MDHR. These payments were made to a consulting company named Aeon that FitzGerald had established, but FitzGerald did not disclose these payments to the other state officials with whom she worked. ECF # 75, Count One, ¶s 19-22 (pages 7-8). Once FitzGerald reassumed the status of a full-time state employee in November 2012 when she became MDHR's Deputy Secretary of Operations, FitzGerald arranged for the payments she had been receiving from TCC for one of these contractors to instead go to a consulting company established by defendant Coffland, although this arrangement only continued for a short time. ECF # 75, Count

3

One, ¶s 23-26 (page 8). In return for these payments, the indictment charges that FitzGerald took the official actions detailed in Count One, ¶s 29-32. These included causing ACS/Xerox to issue a task order to TCC that had no specified work obligations in the approximate amount of $253,000 by threatening to use her influence to cause the MDHR Secretary and the Acting MDHR CIO to withhold funding approval of the another major project that was important to ACS/Xerox unless it complied with her demand. She also caused ACS/Xerox to give a fixed price subcontract to TCC worth approximately $23.72 million over six years by threatening to use her influence to cause MDHR not to renew the Hosting Contract with ACS/Xerox if it did not comply. Finally, the indictment charges that FitzGerald also compelled ACS/Xerox to hire defendant Coffland as the Hosting Director on the Hosting Contract, a position for which Coffland demanded that he be paid an annual salary and potential bonuses totaling some $500,000 – a figure that far exceeded what the previous incumbents in that position had been paid. *Id.*

Thus, the indictment focuses exclusively on the relationships between FitzGerald and Coffland, on the one hand, and TCC, Maudlin, and Coffland on the other, from approximately October 2011 through the end of 2014. The benefits that Coffland and FitzGerald received or were promised from TCC all derived from the performance of the Hosting and Applications contracts that ACS/Xerox held with the state of Maryland, on each of which TCC was a subcontractor. The indictment does not charge criminal conduct by FitzGerald relating to any other state contractor or any other state contract other than the Applications and Hosting contracts that ACS/Xerox held with MDHR.

### B. Defendant FitzGerald's Positions with the Maryland State Government between late 2011 and the Fall of 2014, and her Responsibilities in 2014 with regard to the MHBE/HIX

As the indictment states (ECF # 75, Count One, ¶ 4) and the discussion above reflects, FitzGerald held a series of positions with the Maryland State Government between 2011 and 2014:

- **Chief Information Officer (CIO) of MDHR** (February 2007 through mid-October 2011);

- **Executive Consultant to the Secretary of MDHR** and a private consultant who otherwise mainly provided services to Montgomery County (November 2011 through December 2012);

- **Deputy Secretary of Operations of MDHR** (December 2012 through late August 2013);

- **Secretary of the Maryland Department of Information Technology (MDoIT) and Chief Information Officer (CIO) for the Maryland state Government** (Late August 2013 through late December 2014).

The MHBE/HIX was the state health care insurance exchange established by the Maryland legislature in response to the passage of the federal Affordable Care Act (ACA), popularly known as "Obamacare," in early 2009. Like its federal counterpart, Maryland's on-line health insurance exchange was originally supposed to go "live" in the fall of 2013, but the website proved to be completely dysfunctional. Defendant FitzGerald, who had been confirmed as the Secretary of the Department of Information Technology (DoIT), a few months earlier, was tasked by then Governor Martin O'Malley in late 2013 with leading the effort to get new version of the state health benefits exchange up and running. This was accomplished and the new system went online in November 2014. It is fair to say that defendant FitzGerald received substantial public credit for the success of the effort to correct the original deficiencies of the Maryland

HIX and to get the system online and operational in November 2014, including being named by the BALTIMORE SUN as one of finalists for its "Marylander of the Year" award for 2014.

But the MHBE or the HIX plays no part in the charges returned by the Grand Jury in the superseding indictment. There are no allegations in the indictment relating to it. Indeed, the names "Maryland Health Benefit Exchange" or "Health Insurance Exchange" (or their abbreviations) never appear in the indictment.

Nevertheless, in the run-up to the previously scheduled trial date in this matter in the winter of 2019, defendant FitzGerald's counsel identified as potential exhibits a substantial volume of documents relating to her work on the HIX redesign project between late 2013 and the November 2014. The government submits that these documents, as well as any testimony relating to the nature and quality of FitzGerald's work on the HIX redesign project, have no relevance to whether FitzGerald is guilty or innocent of the charges set forth in the indictment here, which relate to her relationship with TCC and her exercise of her authority over ACS/Xerox in connection with its performance of the Applications and Hosting contracts. Thus, if defendant FitzGerald's counsel does try to bring evidence relating to the HIX redesign or other unrelated projects she supervised before the jury at this trial, it appears to the government that this may be for the collateral (and improper) purpose of suggesting that she was a highly competent public official whose work produced substantial benefits for the citizens of the State of Maryland, thereby perhaps encouraging some jurors to feel that her accomplishments elsewhere should cause her criminal actions here to be overlooked. *See, e.g., United States v. Carr*, 424 F.3d 213, 220 (2d Cir. 2005) (rejecting the idea that "in a society committed to the rule of law, jury nullification is desirable or that courts

6

may permit it to occur when it is within their authority to prevent"), *quoting United States v. Thomas*, 116 F.3d 606, 614 (2nd Cir. 1997).

But whether FitzGerald performed well on the HIX redesign project, or on any other project on which she worked over the three-year period between late 2011 and late 2014, is simply not relevant to the question of her guilt or innocence on the specific charges presented by the indictment here. The indictment does not charge her with being a bad or incompetent public official across the board; rather, she is charged with violating the law through specific actions that she took as a state agent and official between 2011 and 2014 that related to the Applications and Hosting contracts, and to ACS/Xerox's work as the prime contractor and TCC's work as a subcontractor on those contracts. Evidence of her performance outside this context is thus not relevant to her guilt or innocence with respect to the charges brought here, but rather appears to be an effort to bring before the jury improper character evidence in a way that is not authorized by the Federal Rules of Evidence, or to distract the jury's attention from the evidence that does actually relate to the transactions involving the Hosting and Applications contracts that are the basis for the charges set forth in the indictment.

Moreover, this is already a complex and involved case as it is, with an estimated trial length of approximately four weeks. Exploring various rabbit holes or embarking upon mini-trials relating to the HIX or other projects that FitzGerald worked on or supervised during the three years between 2011-2014 will further prolong and complicate this trial. Even worse, the presentation of evidence about other contracts and projects that have no connection to the Hosting and Applications contracts is likely to distract and confuse the jury, making it more difficult for them to focus on and understand the lengthy and involved series of events to which the charges brought in the

superseding indictment actually relate. For these reasons, this Court should limit the presentation of the evidence at the trial of this case to matters relating to the particular contracts and transactions that are the subject of the charges set forth in the indictment.[1]

## ARGUMENT

### THE FEDERAL RULES DO NOT PERMIT A DEFENDANT TO INTRODUCE EVIDENCE OF OTHER UNRELATED "GOOD ACTS" FOR THE PURPOSE OF SUGGESTING THAT HE OR SHE WOULD NOT HAVE COMMITTED THE CRIMES CHARGED IN THE INDICTMENT

It is well-settled that a defendant may not produce evidence of specific instances of law-abidingness in order to show his good character unless "law-abidingness was an essential element of the charge or defense" under FED. R. EVID. 405(b), which is not the case here. *United States v. Hill*, 40 F.3d 164, 168-69 (7th Cir. 1994) (in a prosecution of a postal employee for mail theft, evidence that the defendant did not take "test letters" on another occasion was properly held inadmissible because the defendant could not establish that law-abidingness was an essential element of the charge or his defense under Rule 405(b)); *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991) (testimony concerning defendant's refusals to join a drug trafficking conspiracy on another occasion was not relevant under Rule 405(b) and was inadmissible under Rule

---

[1] Of course, if defendant FitzGerald is convicted on any of the charges brought against her in this indictment, she would of course be entitled to present evidence of her other positive accomplishments in mitigation as part of the subsequent sentencing proceeding in this matter. *See. e.g.*, 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); § 3553(a)(1) (in fashioning an appropriate sentence, the district court shall consider "the history and characteristics of the defendant" along with the other factors enumerated in the Sentencing Reform Act).

404(b) because "Evidence of good conduct is not admissible to negate criminal intent."); *United States v. O'Connor*, 580 F.2d 38, 43 (2nd Cir. 1978) (proffered evidence that government meat plant inspector had not taken bribes on other occasions was inadmissible "because such testimony would in effect be an attempt to demonstrate appellant's good character by proof of specific acts"); *United States v. Cleveland*, 1997 WL 253124, at *2 (E.D. La. May 14, 1997) (trial court excluded evidence that public official had acted in conformity with the law on other occasions not addressed by the charges because "a defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions"), *quoting United States v. Scarpa*, 897 F.2d 63, 70 (2nd Cir. 1990).

After all, relatively few defendants who are charged in federal public corruption cases or other white-collar criminal prosecutions spend substantially all of their time committing crimes. Particularly in public corruption cases like this one, the defendants may well be high-profile and respected members of their communities. They are often high-functioning individuals who have significant legitimate accomplishments and good deeds to their credit – assisting constituents in dealing with government agencies; building businesses that have created jobs for their employees; and contributing time and expertise to charities, churches, and other communal activities. Such defendants typically commit their offenses in response to particular temptations or opportunities, or in response to particular stresses or pressures, typically economic or financial in character. Their criminal acts are often highly situational and may in some be cases downright aberrational.

Even where this is not the case, and a corrupt public official commits crimes with regularity, the duties associated with their positions will often call upon them to take

9

actions that are consistent with their public responsibilities and that produce benefits for their fellow citizens. Self-interest may also dictate that a crooked public official confine their lawbreaking to circumstances where the rewards are particularly lucrative and the chances of detection are reasonably low.

These considerations have repeatedly prompted courts to recognize that an indicted politician's or government official's ability to point to other circumstances where they properly exercised their public responsibilities, or where their actions produced benefits or constructive results for constituents or the citizenry at large, are of no probative value in determining whether they committed crimes on other occasions when the calculus of risk and reward was completely different.

Thus, in *United States v. Russell*, 703 F.2d 1243 (11th Cir. 1983), a Florida country commissioner (Russell) who was charged with helping to facilitate a narcotics-smuggling conspiracy sought to present testimony from a witness concerning specific, but unrelated, good acts to prove that "he was a good county commissioner." The district court refused to permit that testimony and the court of appeals readily agreed, finding that "Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant." *Id.* at 1249, *quoting United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978). Russell also sought to introduce evidence through another witness that he had discussed performing undercover work as a government agent and had provided government agents with information helpful in solving a homicide. The district court rejected that testimony on the ground that it involved a collateral matter and was excludable pursuant to FED. R. EVID. 608(b), a ruling that the court of appeals likewise sustained. *Id.*

Similarly, in *United States v. Washington*, 106 F.3d 983 (D.C. Cir. 1997), a police officer charged with corruptly offering to protect drug trafficking activity who was ensnared in an FBI sting sought to have evidence admitted under FED. R. EVID. 405(b) "of several commendations he had received for his work on the police force," contending that this would allow him "to rebut the instances of alleged criminal activity raised by the government . . . ." *Id.* at 999. The district court held that admission of this evidence was authorized under neither Rules 404(a) nor 405, and the court of appeals held that it had "acted well within its discretion when it excluded the evidence at issue here." The D.C. Circuit declared that

> the commendations were not admissible under either Rule because appellant's 'dedication, aggressiveness, and assertiveness' in investigating drug dealing and carjacking is neither 'pertinent' to nor an 'essential element' of his supposed lack of predisposition to engage in the corrupt criminal activity with which he was charged.

*Id. See also United States v. Navarro*, 889 F.2d 1158, 1168 (1st Cir. 1989) (ruling that the district court properly excluded evidence of a prior commendations received by a police officer charged with conspiracy to commit mail fraud and perjury because "the traits which they purport to show – bravery, attention to duty, perhaps community spirit – were hardly 'pertinent' to the crimes of which Navarro stood accused").

More recently, in *United States v. Nagin*, 2013 WL 5532516 (E.D.La. Oct. 4, 2013), a prosecution involving former New Orleans mayor Ray Nagin, the government filed a pre-trial motion *in limine* to exclude "'good deed' evidence, references, or inferences by the defense." *Id.* at \*1. After reviewing the parties' respective submissions, the district court noted that it "disagree[d] with the defense that "the issue of the defendant's good deeds 'is at the very core of the government's charges,'" and also that it "disagree[d] that there is a relevant issue whether the defendant ever provided

11

honest services 'during his tenure' as mayor, as argued by the defense." *Id.* The court concluded by noting that before a defendant can be allowed to offer evidence of a purportedly pertinent character trait by reputation or opinion, he or she must "articulate[] what character traits would be arguably admissible as an essential element of a charge, claim or defense for purposes of Fed. R. Evid. 405(b)" – and this the defense had not yet done. *Id.*

The same applies with respect to "other good deeds" evidence proffered by defendants who are businessmen, professionals, or corporate officials. Thus, in *United States v. Marrero*, 904 F.2d 251 (5th Cir. 1990), a psychologist who was charged with submitting false medical insurance claims to CHAMPUS sought to introduce evidence at her trial "which showed that she provided more services to some clients than they were actually billed for and that sometimes she rendered services free of charge." *Id.* at 259. She further sought to introduce a patient survey showing that out of a sample of 99 patients who were asked to review their bills as submitted by her practice, 77 attested to the accuracy of their bills. *Id.* at 260. The Fifth Circuit found that the district court had properly excluded both categories of evidence:

> Marrero's character in this case was simply not an essential element of the charges against her. Moreover, with respect to Marrero's defenses of lack of intent and lack of motive, Marrero sought at trial to use specific acts circumstantially to prove lack of intent. Such a tactic is not only disfavored, it is not permitted under Rule 405(b). Additionally, the evidence of specific acts of good character which Marrero sought to admit into evidence was irrelevant to the charges contained in the indictment. The fact that Marrero did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment.

*Id.* (citations omitted). *See also United States v. Langford*, 647 F.3d 1309, 1329 (11th Cir. 2011) (holding that district court properly excluded evidence intended to

12

demonstrate the defendant's "generous and philanthropic character"); *United States v. Gravely*, 840 F.2d 1156, 1164 (4th Cir. 1988) (evidence of defendant's prior charitable work with the March of Dimes was properly excluded by the trial court because "Unless evidence of character is an essential element of a charge, claim, or defense, proof of character is limited to general good character (reputation as a good person and law abiding citizen.") *United States v. Ylda*, 643 F.2d 348, 352 (5th Cir. Unit A 1981) (evidence of defendant's prior accumulation of wealth provided no defense to bribery or mail fraud charges).

In the leading case of *United States v. Grimm*, 568 F.2d 1136 (5th Cir. 1978), defendant Grimm, a vice-president at the Bank of Carroll County (BoCC), had been bribed by a used car dealer (Holder) who was using sight drafts drawn on BoCC to purchase used cars from dealers in the mid-Atlantic and upper Midwest which he then transported to the south and re-sold without paying the sight drafts. Grimm sought to introduce in evidence 75 drafts for the purchase of other used cars by Holder that he had honored, presumably in an attempt to demonstrate that he had acted in good faith. The court of appeals readily sustained the trial court's decision to exclude this evidence, stressing that

> Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant. The drafts are simply cumulative of Holder's undisputed testimony that he had paid other drafts. The admission of the 75 drafts could have complicated the case and confused the jury.

*Id.* at 1138.

Likewise, in *United States v. Doyle*, 130 F.3d 523 (2nd Cir. 1997), a businessman charged with the illegal exportation of protected technology to Libya sought to call witnesses to show that he had passed along information about the Libyan military to

13

Army intelligence officers, arguing that "those acts indicate that he would not knowingly act contrary to American policy towards Libya." *Id.* at 541-42. The Second Circuit agreed with the trial court that "Doyle's past co-operation with army intelligence had no bearing on the crimes charged, or that any probative value was substantially outweighed by the risk of confusing the jury." *Id.* at 542. The Court further held that proof of Doyle's specific earlier acts was also not admissible under Rule 405(b). *Id.*

Finally, in *United States v. Molovinsky*, 688 F.2d 243 (4th Cir. 1982), the defendant in a counterfeiting prosecution sought to show that on previous occasions he has likewise explored various "improbable and far-fetched, if legal, money-making schemes" to supplement his regular pursuits as both an attorney and a magician. The district court excluded the testimony and the Fourth Circuit affirmed, emphasizing that:

> The important consideration is that no efforts to break or objectives of breaking the law were involved in those schemes. To have allowed a meandering journey down such collateral paths would have distracted the jury from relevant evidence of the counterfeiting scheme itself, which was illegal. The district judge acted well within his discretion and did not abuse it in preventing the introduction of such collateral testimony.

*Id.* at 247, *also citing and quoting Grimm*, 568 F.2d at 1138 ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."). The concern the Fourth Circuit expressed in *Molovinsky* with the distraction and diversion of trial time and jurors' attention that can result from admitting collateral evidence of other unrelated "good acts" is particularly apposite here with respect to FitzGerald's direction of the HIX redesign effort.

That FitzGerald performed her assigned responsibilities appropriately on many or even most days of her career in Maryland state government, or that she made a substantial contribution to getting the HIX operational and online over the course of

14

2014, similarly tells us nothing about whether she committed the corrupt acts charged in the indictment with respect to the Hosting and Applications contracts held by ACS/Xerox. On those occasions when she did not abuse her position to advance her personal interests and those of her paramour and favorite Kenneth Coffland, she was doing what she was hired and paid to do, and what her superiors (and the citizens of Maryland) expected her to do. Her noncriminal actions on those occasions tell us nothing about her state of mind and criminal intent when she saw the opportunity to advance her interests, and those of Kenneth Coffland and TCC, by misusing her authority over the Applications and Hosting contracts.

## **CONCLUSION**

Accordingly, for the reasons stated above, the Court should preclude the defense from introducing testimonial or documentary evidence concerning other, unrelated good deeds or examples of effective administrative performance by defendant FitzGerald that have no bearing on the facts relating to her management and oversight of the Applications and Hosting contracts between MDHR and ACS/Xerox that are the subject matter of the superseding indictment.

Respectfully Submitted,

By: /s/
_____
Jefferson M. Gray
Sean R. Delaney
Assistant U.S. Attorneys

United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4915

Date: February 21, 2020