**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.     ) | Crim. No. TEJ-17-0506 |
| ) | |
| ISABEL FITZGERALD, *et al.*, ) | |
| ) | |
| *Defendants.*   ) | |
| ) | |

**THE GOVERNMENT'S RESPONSE TO THE DEFENDANTS'
JOINT NOTICE OF SUPPLEMENTAL AUTHORITY
RELATING TO THE RECENT FOURTH CIRCUIT DECISION
IN *UNITED STATES v. BRIZUELA***

The United States of America states the following in response to the Defendants'

Joint Notice of Supplemental Authority (ECF # 178, filed July 24, 2020).

## INTRODUCTION

The defendants contend that the Fourth Circuit's recent decision in *United States*

*v. Brizuela*, 962 F.3d 784 (4th Cir. 2020), which arose out of a prosecution of a

physician for prescribing opioids outside the bounds of professional medical practice,

provides additional support for four of their previously filed motions *in limine*.[1]

*Brizuela*, however, involved completely different criminal charges from those brought

---

[1]   These four motions respectively sought to exclude evidence of a long-time close and
intimate personal relationship between co-defendants Isabel FitzGerald and Kenneth
Coffland, as well as of evidence demonstrating that FitzGerald established a bank
account under her name that subsequently received deposits of both her funds and of
over $150,000 in checks issued to Coffland that he endorsed over to her (ECF #s 83 &
85); to preclude the government from introducing evidence that FitzGerald knowingly
violated Maryland ethics laws by accepting payments from TCC relating to the MDHR
Applications contract, for which she had developed the Request for Proposal (RFP)
while serving as MDHR's Chief Information Officer (CIO) (ECF # 86); and seeking to
exclude evidence relating to FitzGerald's often abusive management style, which was an
integral part of the extortionate conduct charged in the indictment (ECF # 88).

against the defendants in this case, and there is no factual resemblance at all between the government evidence that was challenged in *Brizuela* and that contested by the defendants' motions *in limine* here.  In short, as applied to these proceedings, *Brizuela* is anything but a game-changer.

The government evidence that was challenged by the defense in *Brizuela* consisted of additional acts of similar criminal conduct (i.e., improper prescriptions of opioids) that were not charged in the indictment and which the Fourth Circuit found could not be admitted to "complete the story" of the charged improper prescription counts, because each charge of prescribing narcotics without a legitimate medical purpose and outside the bounds of professional medical practice stands and falls on its own.  962 F.3d at 796-97.  Here, in contrast, as shown in Part II below, the contested government evidence relating to the close personal relationship between co-defendants FitzGerald and Coffland is expressly identified in the indictment as the underlying motive for most of the criminal activity charged in this case.  In addition, evidence that FitzGerald accepted financial payments from TCC despite knowing that this was in violation of Maryland ethics laws is relevant to whether she acted "corruptly," which is an element of the violations of the Federal Program Bribery Act charged against her in Counts Two and Three.  Finally, FitzGerald's conduct in dealing with Xerox, the victim in this case, on matters relating to its Hosting and Applications contracts with the Maryland Department of Human Resources (MDHR) – which form the basis for the charges brought in the indictment – is clearly intrinsic evidence that is also inextricably intertwined with those offenses.  Moreover, it is also directly relevant to addressing a key (and unfounded) defense claim: the assertion that FitzGerald had no authority to act on behalf of the MDHR with regard to these contracts while she was an Executive

Consultant to MDHR Secretary Theodore Dallas between November 2011 and December 2012, and then while she was Secretary of the Maryland Department of Information Technology (DoIT) after late August 2013.

This evidence, presented in connection with the bribery and extortion offenses charged here, is thus fundamentally different from the evidence of other prescriptions involving completely different patients that the *Brizuela* court found was unnecessary to "complete the story" of the stand-alone improper prescription counts that were charged in that case.  And as we demonstrate in Part III below, motive evidence that relates to personal relationships, affairs, and even sexual conduct of a tawdry character is far from unprecedented in federal criminal prosecutions.   Contrary to the defense's assertions, such evidence has been approved and admitted in the past by this Court; by the Fourth Circuit; and by  other federal courts as well.  Accordingly, *Brizuela* adds nothing to the unpersuasive arguments the defendants have previously advanced in support of these four motions *in limine*.

## ARGUMENT

I. **WHILE *BRIZUELA* INVOLVED DIFFERENT CRIMINAL CHARGES AND THERE IS NO FACTUAL RESEMBLANCE BETWEEN THAT CASE AND THIS ONE, THE COURT'S LEGAL DISCUSSION REAFFIRMS THAT THE EVIDENCE CHALLENGED HERE IS INTRINSIC TO THE CHARGED OFFENSES AND THUS IS RELEVANT AND ADMISSIBLE_____**

*Brizuela* involved the prosecution of a Morgantown, West Virginia physician whose medical practice ostensibly provided pain management services but in reality operated as a pill mill freely prescribing opioids to patients even when this was contraindicated.  The defendant was originally indicted on 21 counts of distributing controlled substances outside the bounds of professional medical practice in violation of

3

21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Each count involved a specific prescription written for one or another of five of his patients.  The indictment also included a conspiracy charge relating to Brizuela's separate involvement with two other physicians in an opioid addiction treatment center in another county, as well as 16 additional counts charging him with violating the federal anti-kickback act.  962 F.3d at 787-89.

At some point prior to trial, the government asked to dismiss the conspiracy charge relating to Brizuela's involvement in the opioid addiction treatment center.  *Id* at 789.  Next, for reasons not explained in the decision, the government determined to call as trial witnesses only two of the five patients who received the prescriptions charged in the indictment.  But the government also called an expert witness to provide testimony concerning all five patients based upon their medical records, data from the state Board of Pharmacy's Prescription Monitoring Database, and memoranda of interviews with the patients and their families.  *Id.* at 790.  The government expert's testimony was acknowledged to have been "compelling" by the Fourth Circuit (*id.* at 799), and indeed, the jury ultimately convicted the defendant on three-quarters (15 of 21) of the distribution counts, even as it acquitted him on all of the kickback charges.  *Id.* at 790-91.

However, the government further decided to supplement the testimony of the two patients whose prescriptions were charged in the indictment and of its expert witness at trial by also presenting the testimony of "four other patients who Brizuela treated, but whose prescriptions were not the basis for any of the charges in the indictment . . . ."  *Id.* at 791.  In a Rule 404(b) notice that it filed pre-trial, the government contended that this evidence was admissible because it was "necessary to complete the story of the crime on trial" as allowed by *United States v. Kennedy*, 32

F.3d 876, 886 (4th Cir. 1994).  More specifically, the government contended that, *inter alia*, the testimony of these additional patients would demonstrate that Brizuela "consistently failed to follow generally recognized procedures" in prescribing opioids to his patients; would show "the extent and severity of [his] violation of a professional norm"; and also demonstrate that he did not issue the 21 prescriptions charged in the indictment due to mistake or accident.  The district court overruled the defense's objections to these four other witnesses and permitted their testimony.  *Id.* at 791-92.

In seeking to present the testimony of these additional witnesses, and in granting its request, it seems likely that both the government and the trial court respectively were influenced by the well-established doctrine that in cases involving charges of a conspiracy or scheme, the government is not limited to offering proof of the specific transactions or incidents charged as overt acts or individual substantive counts, but may also offer proof of any other similar or related conduct that falls within the period charged in the indictment.  *See, e.g.*, *United States v. Bajoghli*, 785 F.3d 957, 962-64 (4th Cir. 2015) (where physician was charged with carrying out a health care fraud scheme in violation of 18 U.S.C. § 1347, the district court erred in limiting the government's proof to evidence of the 53 transactions charged as counts in the indictment); *United States v. Janati*, 374 F.3d 263, 270 (4th Cir. 2004) ("it is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment"); *United States v. Dozie*, 27 F.3d 95, 96-97 (4th Cir. 1994).[2]  In *Brizuela*, however, the only conspiracy charge was the

---

[2]  Moreover, the Fourth Circuit in *Bajoghli* further instructed that a district court's discretion to limit proof that is overly duplicative "must be balanced by the need to give

unrelated one involving the defendant's involvement with the opioid addiction treatment, and even that was dismissed prior to trial.  Moreover, in contrast to cases charging schemes to commit mail, wire, or other types of fraud, or to carry out an extortion scheme, the unlawful distribution counts under §§ 841(a)(1) and 841(b)(1)(C) in *Brizuela* did not charge any ongoing scheme, but instead simply listed a series of individual prescriptions that were alleged to have been made "without a legitimate medical purpose and outside the usual course of professional practice . . . ."  Indictment (Document # 1), *United States v. Brizuela*, Case No. 1:181-cr-00001-IMK-MJA (N.D.W. Va., filed 1/9/2018).

Critical to the Court's decision in *Brizuela* – but mentioned only in passing in a brief footnote in defense counsel's discussion, ECF # 178 at 5 n.3 – was the Fourth Circuit's emphasis on the discrete, stand-alone character of each of the charges of unlawful opioid distribution made against the defendant there.  As the court explained:

> An unlawful distribution violation under § 841 is, therefore, charged by citing a specific prescription.  Each of Brizuela's § 841 charges properly identified a different prescription that he wrote for one of five patients.
>
> For each of these charges, the "transaction" in question was Brizuela writing the specific prescription listed in that count of the indictment.  Significantly, the challenged testimony of the other four patients did not reference or encompass any of the 21 prescriptions listed in the indictment.  Thus, none of the acts they described arose from the same transaction, series of transactions or single criminal episode as the charged offenses. . . .
>
> . . . . Instead, the testimony offered *new* patient stories that were neither the basis for, nor necessary to prove, any of Brizuela's charges.

*Id.* at 795-96.

---

the government adequate latitude to prove its case, especially in a large and complex healthcare-fraud case where the defendant's criminal intent is placed at issue."  785 F.3d at 964.  It would not be surprising if the district court in *Brizuela* had this specific guidance in mind.

In view of the stand-alone character of the individual unlawful opioid prescription charges in *Brizuela*, the Fourth Circuit deemed the testimony of the other four witnesses to be extrinsic to the 21 charged distribution counts, since it was "separate from or unrelated to the charged offense."  *Id.* at 793, *quoting United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019); *see also id.* at 795 (noting that the testimony of the four other witnesses concerning uncharged prescriptions "was not necessary to 'complete the story' of the charged offenses and, therefore, *described conduct that was extrinsic to the offenses for which Brizuela was charged*") (emphasis added).  In contrast, the court noted that evidence was intrinsic where it either arose out of the same series of transactions as the charged offense or "is necessary to complete the story of the crime on trial."  *Id.* at 793-94, *quoting Kennedy,* 32 F.3d at 886.

After reviewing its earlier decisions in *Kennedy* and *United States v. McBride*, 676 F.3d 385, 389-90 (4th Cir. 2012), in which the court had reached contrasting results concerning the admissibility of evidence of earlier drug trafficking activity in narcotics prosecutions – approving its admission in *Kennedy,* rejecting it in *McBride* – the *Brizuela* court explained that evidence of uncharged conduct is admissible to "complete the story" of a charged offense and is therefore intrinsic in nature if that evidence is *either* "probative of an integral component of the charged offense" or if it "provide[s] information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself."  *Id.* at 795.  The *Brizuela* court further noted that evidence offered to "complete the story" must be "necessary" in the sense that "there is a clear link or nexus between the evidence and the story of the charged offense, and that the purpose for which the evidence is offered is actually

essential."  *Id.*  Otherwise, the court observed, the "complete the story" doctrine might become a means to facilitate the introduction of propensity evidence that would otherwise be barred by Rule 404(b).  *Id.*

Contrary to what the defense contends, nothing in these statements in *Brizuela* presents the slightest obstacle to the admission of the evidence they have challenged in their respective motions *in limine*.  For all of the evidence that the defendants have challenged in their four referenced motions *in limine* easily qualifies as intrinsic evidence and is therefore admissible under *Kennedy* and *Brizuela.*

First, the challenged evidence is probative of "an integral component of the charged offense" because the substantive federal program bribery act (FPBA, 18 U.S.C. § 666) charges (Counts Two and Three) against FitzGerald and Coffland, as well as the additional FPBA charge against Maudlin and Pangallo (Count Four), all require the government to prove that the defendants acted "corruptly."  As the defense clearly recognizes, knowing that defendants FitzGerald and Coffland were involved for years in an intense and intimate personal relationship strongly suggests that she took the actions she did that benefitted him because of that relationship, rather than for other, more appropriate reasons.  The same is true of TCC's agreement to pay Coffland one-third of its net profit from the Applications/Alternate Site Staffing subcontract in 2013-14.

Likewise, evidence that FitzGerald knew that state ethics law prohibited her from profiting from the MDHR Applications contract, for which she had drawn up the original Request for Proposal (RFP), and her decision to start accepting payments from TCC under that contract starting in November 2011, similarly provides a basis from which the jury can conclude that she acted "corruptly" as required by § 666, thereby

supporting a verdict of guilty on Count Two.  It would also counter any defense claim that she acted in good faith, or in ignorance of the relevant ethical requirement.

Second, the evidence relating to the nature and character of the Coffland-FitzGerald relationship, and to the reasons why Coffland had substantial financial needs in 2013 in particular – the year in which FitzGerald's pressure was decisive in allowing him to obtain the Hosting Director position with Xerox at a salary and bonuses that approached a half million dollars a year – clearly "provide[s] information without which the factfinder would have an incomplete or inaccurate view of other evidence or of the story of the crime itself." *Brizuela*, 962 F.3d at 795.  For if the defense were to be successful in its bid to withhold this evidence from the jury, then FitzGerald's counsel would be free to argue that as a result of her marriage to a highly compensated senior partner at a Big Four accounting firm, FitzGerald herself had no financial motive to take the actions she did.  If the defense succeeds in its efforts to throw a cloak of silence over the real nature of FitzGerald's and Coffland's relationship, then the defense would be able to present Coffland to the jury as simply an effective independent contractor who also worked for the State and whom FitzGerald had no reason to favor aside from his job performance.  If that occurs, the truth-seeking function of this trial will go very badly off the rails.

Finally, the defense's arguments fail to recognize that the fundamental underlying concern of the Fourth Circuit in cases like *McBride* and *Brizuela* was with propensity evidence, which is not what is at issue here.  Propensity evidence consists of evidence that a defendant has committed crimes similar to that charged in the indictment on other occasions, either previously or subsequently.  Its force – and its danger – proceeds from the suggestion that if the defendant can be shown to have

committed highly similar crimes on other occasions, that indicates he or she is more likely to have committed the crimes charged in the indictment here. *Brizuela*, 962 F.3d at 796 (finding that the additional testimony of the other four witnesses "invited the jury 'to find guilt by association or as a result of a pattern,' rather than examining whether sufficient evidence supported a conviction under each count of the indictment"), *quoting United States v. Tran Trong Cuong*, 18 F.3d 1132, 1142 (4th Cir. 1994); *McBride*, 676 F.3d at 398.  In contrast, evidence like that at issue here – which goes to demonstrating motive and intent, or that directly demonstrates how a defendant committed the crimes charged in the indictment – is processed and utilized by jurors very differently from propensity evidence.

The next section demonstrates that unlike in *Brizuela*, the contested evidence here squarely supports specific factual allegations of the indictment concerning the crimes charged, and/or that is necessary to prove elements of these offenses.

II.   **THE INDICTMENT HERE DEMONSTRATES THAT THE EVIDENCE CHALLENGED BY THE DEFENSE IS INTRINSIC TO THE CHARGED OFFENSES AND IS BOTH NECESSARY TO COMPLETE THE STORY OF THE DEFENDANTS' CRIMINAL CONDUCT AND IS INEXTRICABLY INTERTWINED WITH THE EVIDENCE OF THEIR WRONGDOING**

In this case, unlike in *Brizuela*, "there is a clear link or nexus between the [challenged] evidence and the story of the charged offense," and it can readily be demonstrated that "the purpose for which the evidence is offered is actually essential." 962 F.3d at 795.  For the indictment squarely alleges that FitzGerald engaged in a series of acts between the latter part of 2012 and extending into 2014 that were intended to financially benefit her co-defendant Kenneth Coffland, and that her actions were a product of their extremely close personal relationship.  The indictment alleges:

10

- Count One (§ 371 Conspiracy), ¶ 10 alleges that "Beginning in or about at least 2010, **FITZGERALD** and **COFFLAND** developed a close personal relationship."

- Count One, ¶ 16(a) ("The Conspiracy and its Objects") alleges that FitzGerald and Coffland worked together to corruptly solicit financial benefits from their co-defendants Maudlin and Pangallo, the top two officers and controlling shareholders of TCC.

- Count One, ¶ 16(b) ("The Conspiracy and its Objects") alleges that Maudlin and Pangallo provided both FitzGerald and later Coffland with financial benefits with the intent to influence and reward FitzGerald in connection with decisions she took relating to Maryland state government business.

- Count One, ¶ 24 ("Manner and Means of the Conspiracy") alleges that as FitzGerald prepared to formally return to the Maryland Department of Human Resources (MDHR) in December 2012 as Deputy Secretary of Operations, she directed TCC to transfer to Coffland the "consulting" payments she had been receiving from TCC since November 2011.

- Count One, ¶ 27 ("Manner and Means of the Conspiracy") further alleges that while she was MDHR's Deputy Secretary of Operations and later as Secretary of MDoIT, FitzGerald and Coffland demanded that TCC pay Coffland one-third of the profits that TCC received as a result of FitzGerald's compelling Xerox to subcontract away to TCC two components of its contract to provide Applications services to MDHR that were expected to be worth $8.5 million in revenue to TCC in 2014 and 2015.

- Count One, ¶ 32 ("Manner and Means of the Conspiracy") further alleges that while she was Deputy Secretary of Operations for MDHR in the winter and spring of 2013, FitzGerald compelled Xerox to hire Coffland as the Hosting Director (also known as the Infrastructure Director) for Xerox's contract to provide Hosting services to MDHR, at an annual salary, with bonuses, that could potentially net Coffland close to $500,000 annually.

- Count One, ¶ 33(u) ("Overt Acts") alleges that Coffland billed TCC $11,550 in January 2013 on the consulting services contract with it that he had inherited from FitzGerald.

- Count One, ¶ 33(v) ("Overt Acts") alleges that in February 2013, Pangallo directed a TCC employee to cut a check to Coffland for $10,000 as a payment for "consulting."

- Count One, ¶ 33(z) & (aa) ("Overt Acts") alleges that in early February 2014, Pangallo and Coffland had an email exchange in which they discussed whether TCC owed Coffland 30% or 33% from its net profits on the Applications subcontract (also known as "Alternate Site Staffing").

- Count One, ¶ 33(cc) ("Overt Acts") alleges that in late July 2014, Pangallo emailed Coffland on their respective personal email accounts to confirm that they had agreed to pay him 33% of TCC's net profit on the Applications/Alternate Site Staffing subcontract that TCC had received from Xerox at FitzGerald's behest.

- Counts Three and Seven respectively charge FitzGerald and Coffland with demanding and extorting that Xerox hire Coffland as the Hosting Director on Xerox's Hosting services contract with MDHR in July 2013 with an annual compensation in salary and bonuses of potentially as much as $500,000.00, which was at least two-and-a-half times what Coffland had earned when he previously served as Hosting Director on the Hosting contract before Xerox fired him in the late summer of 2011.

Nor is this all.  The evidence at trial will further demonstrate that FitzGerald intervened with the owner of a consulting company named Angarai, which held the contract with MDHR to provide independent validation and verification (IV&V) services on Xerox's Hosting contract, to hire Coffland as its auditor on the Hosting contract in the late summer of 2011 after he resigned his position as Hosting Director with Xerox.

This is therefore not a situation where evidence relating to the nature of the FitzGerald-Coffland relationship is extrinsic or extraneous to the rest of the government's evidence at trial, or where "matter of scant or cumulative probative force [has been] dragged in by its heels for the sake of its prejudicial effect."  *United States v. Roark*, 753 F.2d 991, 994 (11th Cir. 1985).  And it could hardly be further removed from the facts in *Brizuela*, where no ongoing scheme or conspiracy was alleged and the testimony of the additional patients could not be said to be "inextricably connected with" or "necessary to complete the story" of the separate and discrete charges involving

other patients who were actually named in the indictment, each of which had to stand or fall on its own merits.

### III. CONTRARY TO WHAT THE DEFENSE CONTENDS, THE COURTS HAVE REPEATEDLY RECOGNIZED THAT EVIDENCE OF AFFAIRS OR SEXUAL LIAISONS CAN BE PROBATIVE OF MOTIVE AND THEREFORE RELEVANT AND ADMISSIBLE IN FEDERAL CRIMINAL CASES

Finally, with respect to defendant FitzGerald's repeated assertions that evidence of the close and intimate personal relationship between FitzGerald and Coffland is "attenuated" from the charges relating to her use of her position to benefit him financially (ECF # 178 at 1), or that "[i]n no way can allegations of an alleged romantic affair . . . be said to be 'actually essential' to charges . . . that Ms. FitzGerald extorted Xerox" (ECF # 178 at 7), there are many judges and courts who would beg to disagree – and that includes the Fourth Circuit. In *United States v. Aramony*, 88 F.3d 1369 (4th Cir. 1996), for example, a high-profile case and a leading authority in this circuit that has since been cited in judicial decisions no less than 263 times, the Fourth Circuit easily found that evidence that the Chief Executive Officer of the United Way embezzled money from the charity in order "to further his relationships with various women," several of whom were his subordinates and one of whom was underage, "was relevant to show Aramony's motive in perpetrating his various frauds upon the UWA. Specifically, it tended to prove that Aramony defrauded the UWA by mail and by wire in order to seek sexual pleasures at no financial cost to himself." *Id.* at 1374, 1376-78. The Fourth Circuit also rejected the defendant's attack on this evidence based on Rule 403.

In *United States v. Chapman*, 209 Fed. Appx. 253 (4th Cir. Dec. 8, 2006) (unpublished), another high-profile case that was tried in this very Court, both the

district court (the Hon. William Quarles) and the Fourth Circuit had no issue with evidence presented by the government demonstrating that the defendant, a prominent investment adviser and the-then Chairman of the Maryland State University System Board of Regents, had taken money from his publicly-held companies to support multiple extramarital affairs. *Id.* at *260-61 & *270-72. Likewise, in *United States v. Poole*, 451 Fed. Appx. 298 (4th Cir. Oct. 20, 2011) (unpublished), both the district court and the Fourth Circuit found that evidence of a defendant's three extramarital affairs was relevant and admissible because it "went to motive and Poole's need to finance an extravagant lifestyle." *Id.* at 303-04 & 307. Finally, in *United States v. Basham*, 561 F.3d 302 (4th Cir. 2009), the Court held that evidence of a defendant's sexual relationship with a woman was appropriately presented at trial because it completed the story of the crime and explained their relationship and the circumstances surrounding particular events – in this case, his giving her a stolen ring and writing her inculpatory letters from prison. *Id.* at 327.

The Third Circuit also approved admission of evidence of a defendant's affair in *United States v. Repak*, 852 F.3d 230 (3d Cir. 2017), a case with some striking similarities to this one. The defendant in *Repak*, the Executive Director of the Johnstown Redevelopment Authority, was charged with both violations of the FPBA and the Hobbs Act in connection with extorting various gifts and even substantial construction work from contractors who sought to do business with the city. At trial, the government introduced evidence that Repak was having an affair with his assistant, Debbie Walter, who also received gifts from contractors, either at her own request or at Repak's. On appeal, the Third Circuit rejected the defense's challenges to this evidence, finding that "The affair evidence was unquestionably relevant." *Id.* at 250. The Court of

Appeals explained that evidence of Repak's affair was properly introduced (1) to show that Repak possessed the necessary *mens rea*; (2) to show his motive in requesting that gifts be given to Walter; (3) to show his knowledge that gifts were made to Walter in order to curry favor with him; and (4) because Walter testified at trial, and knowing about her affair with Repak was relevant to the jury's assessment of Walter's credibility. *Id.* at 249-50 ("As we have unequivocally held, 'evidence concerning a witness's credibility is always relevant, because credibility is always at issue.'"), *quoting United States v. Green*, 617 F.3d 233, 251 (3d Cir. 2010).  *See also United States v. Powell*, 124 F.3d 655, 660-61 (5th Cir. 1997) (approving the admission of evidence of the defendant's generous patronage of topless bars in his tax evasion trial).

Similarly, in this case, evidence of the extremely close personal relationship between FitzGerald and Coffland is relevant to understanding how he came to receive the final "consulting" payment from TCC for Ms. P.R.'s services after FitzGerald became MDHR's Deputy Secretary in late 2012; why FitzGerald pushed Xerox so hard to hire him as the Hosting Director on the MDHR Hosting contract in the winter and spring of 2013; and why TCC was willing to pay him one-third of its net profits on the Applications-Alternate Site Staffing subcontract in 2014.  Accordingly, FitzGerald's repeated assertion that it would somehow be beyond the pale for the jury to be informed about the facts of FitzGerald's and Coffland's extremely close personal relationship is wholly devoid of merit – and nothing in *Brizuela* changes that.

## **CONCLUSION**

Not for the first time (see, e.g., ECF # 128 [Government's Opposition to *Rehaif* motion]), the defense is trying to pound a precedential square peg into a round hole.

There is no similarity between the charges presented in *Brizuela* and those brought here, or between the nature of the challenged evidence there and that which the defense has challenged in this case.  When the legal standards cited by the *Brizuela* court are applied to the facts of this case, it is clear that the contested evidence is intrinsic to the offenses charged because it is necessary to complete the story of the crimes at issue; because it demonstrates the nature of the relationship between two of the co-defendants, who are jointly charged in four of the indictment's seven counts; because it is inextricably intertwined with evidence of the defendants' criminal acts; and because it is admissible to establish the defendants'  motive and intent.

Respectfully Submitted,

/s/

By:   _____

Jefferson M. Gray
Sean R. Delaney
Assistant U.S. Attorneys

United States Attorney's Office
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4915

Date:   August 14, 2020