## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                    CRIMINAL ACTION NO. 1:17-cr-00506

ISABEL FITZGERALD, et al.,

               Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant Isabel Fitzgerald's ("Fitzgerald") Motion to Dismiss Counts I, II, and III, (ECF Nos. 55, 56); Supplemental Motion to Dismiss Counts I, II, and III, (ECF No. 113); and Motion to Dismiss Count VII, (ECF No. 114).   Also pending before the Court are Defendant Steven Maudlin's ("Maudlin") Motion to Dismiss Counts I, IV, and VI, (ECF No. 59); and Supplemental Motion to Dismiss Counts I, IV, and VI, (ECF No. 119).   Further pending before the Court are Defendant James Pangallo's ("Pangallo") Motion to Dismiss Counts I and IV, (ECF No. 61); and Supplemental Motion to Dismiss Count I and IV, (ECF No. 118).   Next, pending before the Court are Defendant Kenneth Coffland's ("Coffland") Motion to Adopt Motions, [ECF Nos. 55, 56], by Co-Defendant Isabel Fitzgerald, (ECF No. 58); Motion to Dismiss Count VII, (ECF No. 115); Motion to Adopt Motions, [ECF No. 113], Filed by Co-Defendant Isabel Fitzgerald, (ECF No. 117). Finally, pending before the Court is Defendants Fitzgerald and Maudlin's Joint Motion to Sever Counts V and VI.   (ECF No. 57.)   For the reasons more fully discussed below, Defendants' motions are **DENIED**.

1

## I. BACKGROUND

This criminal action arises out of an alleged conspiracy by Defendants Fitzgerald, Maudlin, Pangallo, and Coffland (collectively "Defendants") to enrich themselves through various contracts with the state of Maryland Department of Human Resources and private entities owned by the Defendants.   This criminal action was initiated when a grand jury returned a six-count indictment on September 27, 2017, charging all four named Defendants with various crimes.   (ECF No. 1.)   On December 27, 2018, a grand jury returned a superseding indictment that charged Defendants with seven criminal counts.   (ECF No. 75–1.)   Because the Defendants have challenged the legal sufficiency of the Superseding Indictment, the Court will next recount the allegations made by the grand jury.   Given the nature of the alleged scheme and the approximate time periods, the Court will review the allegations in a similar format as presented in the Superseding Indictment.

### A. Introduction

The following allegations are drawn from the Superseding Indictment.   The Maryland Department of Human Services, formerly known as the Maryland Department of Human Resources ("DHR"), is an agency of the state of Maryland that served as the primary social service provider for each of Maryland's 24 counties.   (ECF No. 75–1 at ¶ 1.)   The Secretary of DHR is the head of the agency and served as a member of the Governor of Maryland's cabinet.   (*Id.*)   In every fiscal year from 2011 through 2014, DHR received in excess of $10,000 in benefits under a Federal program or programs involving a grant, contract, subsidy, loan, guarantee, insurance, or other Federal assistance. (*Id.*)   DHR's Office of Technology for Human Services ("OTHS") was responsible for reviewing and implementing DHR's technology plans and projects, including budgets, staff, and purchasing.   (*Id.* at ¶ 2.)   OTHS had an annual budget of approximately $70 million.   (*Id.*)

The Maryland Department of Information Technology ("DIT") was an agency of the state of Maryland that was created to consolidate state information technology functions and policies into one department.   (*Id.* at ¶ 3.)   The Secretary of DIT, also known as the State Chief Information Officer ("CIO"), was the head of DIT and a member of the Governor's cabinet.   (*Id.*)   The CIO also oversaw and exercised supervision over the activities of the chief information officers of the various state agencies.   (*Id.*)

From February 2007 to October 14, 2011, Fitzgerald served as the Chief Information Officer of DHR and oversaw the day-to-day operations of OTHS.   (*Id.* at ¶ 4(a).)   From November 2011 to December 2012, Fitzgerald entered the private sector and served as the Executive Consultant to the Secretary of DHR.   (*Id.* at ¶ 4(b).)   There, Fitzgerald continued to exercise authority and managerial discretion over DHR matters, including the supervision of the acting CIO for DHR, who was previously Fitzgerald's deputy.   (*Id.*)   Fitzgerald was paid through her company, Aeon Consulting and Technical Services, Inc. ("Aeon"), which she incorporated in the state of Maryland while serving as the CIO for DHR.   (*Id.* at ¶¶ 4(b), 18.)   Then, from December 5, 2012, to August 25, 2013, Fitzgerald served as the Deputy Secretary of Operations for DHR.   (*Id.* at ¶ 4(c).)   There, Fitzgerald reported directly to the Secretary of DHR and oversaw not only OTHS but numerous other offices within DHR.   (*Id.*)   Finally, from August 26, 2013, to December 31, 2014, Fitzgerald served as the Secretary of DIT, where she supervised the activities of the CIO of DHR.   (*Id.* at ¶4(d).)

Sometime in 2008, DHR awarded a division of ACS/Xerox[1] two prime contracts: The Outsourcing of Hosting Services Contract (the "Hosting Contract") and the Application

---

[1] ACS/Xerox had been identified originally as "Company #1" in the charging documents.   (*See* ECF No. 75–1.)   The parties have since identified that Company #1 is "ACS/Xerox," (*see* ECF No. 65), and shall be referred to in this Order as "Xerox."

Maintenance/Operations and Enhancement Services Contract (the "Applications Contract").   (*Id.* at ¶ 5.)   The Hosting Contract had a term of five years and eight months, with the possibility of a five-year extension, and a potential worth of $129 million.   (*Id.* at ¶ 6.)   The Applications Contract had a term of five years and six months, with two separate two-year extension options, and a potential worth of $229 million.   (*Id.* at ¶ 6.)   The Applications Contract was further divided into four discrete subparts: The Client Automated Resource and Eligibility System ("CARES"); the Child Support Enforcement System ("CSES"); the Maryland Children's Electronic Social Services Information Exchange ("CHESSIE"); and the DHR Cottage Applications ("Cottage Apps").   (*Id.* at ¶ 8.)

Defendant Coffland, a resident of Maryland and Texas, was an employee of Xerox, where he worked on the Hosting Contract and, at one point, served in the position of Hosting Director.   (*Id.* at ¶ 9.)   Then, beginning in at least 2010, Coffland and Fitzgerald "developed a close personal relationship."   (*Id.* at ¶ 10.)   In approximately September 2011, Coffland left his employment with Xerox to pursue work as an independent contractor through another company.   (*Id.* at ¶ 11.)   This other company also worked on a contract with OTHS.   (*Id.*)   In about June 2013, Coffland returned to Xerox as an independent contractor, where he held the position of Hosting Director.   (*Id.* at ¶ 12.)   He was compensated with an annual salary and bonuses, and his total compensation was more than double what he earned in the position previously.   (*Id.*)

The Consultants Consortium, Inc. ("TCC") was a small company incorporated in Indiana in 2007.   (*Id.* at ¶ 13.)   TCC provided information technology services as a subcontractor in support of larger companies which held prime contracts.   (*Id.*)   As of September 2011, TCC employed fewer than 100 persons.   (*Id.*)   Defendant Maudlin, a resident of Indiana, owned 34% of TCC's shares—the largest single ownership—and served as its Chief Executive Officer.   (*Id.* at 14.)   Defendant

Pangallo, also a resident of Indiana, owned 33% of TCC's shares and, at various times, served as its Chief Financial Officer.   (*Id.* at ¶ 15.)

> B.  *The Conspiracy and Its Objects, Purpose, Manner and Means*

The Superseding Indictment alleges that Defendants knowingly conspired with each other to commit offenses against the United States.   (*Id.* at ¶ 16.)   Specifically, the Superseding Indictment alleges that Fitzgerald, as an agent of the government of the State of Maryland, corruptly solicited benefits for herself and Coffland from Maudlin and Pangallo.   (*Id.* at ¶ 16(a).)   Further, the superseding indictment alleges that Maudlin and Pangallo, with the intent to influence and reward Fitzgerald, gave both Fitzgerald and Coffland things of value.   (*Id.* at ¶ 16(b).)   The Superseding Indictment alleges that the purpose of the conspiracy was for Fitzgerald and Coffland to receive a "stream of benefits" from Maudlin, Pangallo, and TCC, in exchange for Fitzgerald's "performance of favorable official acts" for TCC's benefit.   (*Id.* at ¶ 17.)

As a part of the conspiracy, Fitzgerald is alleged to have incorporated Aeon while she served as the CIO for DHR.   (*Id.* at ¶ 18.)   While serving as the Executive Consultant to the Secretary of DHR, TCC agreed to pay Aeon for providing and supervising work of an unnamed person (Person 1) on the Cottage Applications portion of the Applications Contract.   (*Id.* at ¶ 19.)   Person 1 was already under TCC's supervision on the Applications Contract and continued to be supervised by TCC employees.   (*Id.*)   TCC paid Aeon $20 per hour worked by Person 1.   (*Id.*)   The Superseding Indictment alleges further that, during this same period, TCC also agreed to pay Aeon for providing and supervising the work of another unnamed person ("Person 2").   (*Id.* at ¶ 20.)   Person 2 was working under the supervision of TCC on a contract in Indiana and continued to be supervised by TCC thereafter.   (*Id.*)   TCC agreed to pay Aeon $10 per hour worked by Person 2.   (*Id.*)

During this same period, TCC allegedly agreed to pay Fitzgerald one-third of TCC's profits on certain subcontracts with DHR's prime contractor, Xerox, which had been obtained as a result of Fitzgerald's "influence and control" over Xerox.   (*Id.* at ¶ 21.) To disguise these payments, they were paid to Fitzgerald pursuant to a consulting agreement between Aeon and TCC.   (*Id.* at ¶ 22.)

The Superseding Indictment alleges next that around November 16, 2012, Defendant Coffland incorporated Blue Northern Consulting, LLC ("Blue Northern").   (*Id.* at ¶ 23.)   Three days later, on November 19, and shortly before Fitzgerald began her position as the Deputy Secretary of Operations at DHR, she directed Defendant Maudlin to transfer the Aeon contract covering the work of Person 1 to Coffland through Blue Northern.   (*Id.* at ¶ 24.)   Then, beginning in 2012, TCC agreed to pay Blue Northern $20 per hour worked by Person 1, despite Coffland performing no supervision of Person 1 or his work.   (*Id.* at ¶ 25.)

The Superseding Indictment next alleges that on February 25, 2013, and in furtherance of the conspiracy, Pangallo caused TCC to issue a check in the amount of $10,000 to Blue Northern.   (*Id.* at ¶ 26.)   Pangallo is alleged to have also directed a TCC employee to record this payment internally as "consulting work."   (*Id.*)

In August of 2013 and lasting until at least November 2014, the Superseding Indictment alleges that while Fitzgerald served as the Deputy Secretary of DHR, and subsequently the Secretary of DIT, she and Coffland "solicited and demanded that Maudlin and Pangallo pay Coffland one-third of TCC's profits on specified subcontracts with DHR's prime contractor," Xerox.   (*Id.* at ¶ 27.)   TCC allegedly received these subcontracts through Fitzgerald's influence on Xerox.   (*Id.*)   The parties are alleged to have agreed that TCC would pay Coffland under the guise of consulting work by Blue Northern in an attempt to conceal the nature of the payments.   (*Id.*)   Fitzgerald is alleged to have concealed her and Coffland's financial arrangements with TCC from officials and personnel in the

6

Maryland government and DHR, including the DHR Secretary and acting Chief Information Officer of DHR.  (*Id.* at ¶ 28.)

### C.  *Alleged Official Actions Taken by Fitzgerald on Behalf of TCC*

Next, the Superseding Indictment alleges numerous official actions that Fitzgerald took on behalf of TCC and in furtherance of the conspiracy.  First, between December 2011 and February 2012, Fitzgerald caused Xerox to agree to issue a task order to TCC, with no specific work obligations, in the amount of $253,000 under an OTHS contract.  (*Id.* at ¶ 29.)  She caused Xerox to agree by threatening to use her influence to cause the Secretary of the DHR and Chief Information Officer of DHR to withhold funding approval of a CARES modernization project, worth approximately $27.6 million to Xerox if it did not comply.  (*Id.* at ¶ 29.)

Next, in January of 2012 and continuing through at least August 2013, Fitzgerald is alleged to have caused Xerox to execute a fixed-price subcontract with TCC, worth approximately $23.72 million over 6 years, under the OTHS Hosting Contract.  (*Id.* at ¶ 30.)  She allegedly achieved this by threatening to use her influence as the Executive Consultant to the Secretary of DHR, and then later as the Deputy Secretary of DHR, to cause the DHR to not renew Xerox's prime Hosting Contract if it did not comply.  (*Id.*)

Then, beginning in 2013 and continuing until at least June 2014, and in exchange for the one-third payment of profits from TCC, Fitzgerald allegedly caused Xerox to execute a fixed-price subcontract with TCC under the Applications contract.  (*Id.* at ¶ 31.)  This subcontract was worth approximately $2.98 million in 2014 and $5.47 million in 2015.  (*Id.*)  Fitzgerald is alleged to have threatened Xerox to use her influence as Deputy Secretary of DHR and as the State Chief Information Officer to impose financial penalties on Xerox if it did not comply.  (*Id.*)  Then, between January and August of 2013, Fitzgerald allegedly directed Xerox to hire Coffland as the Hosting Director on

the Hosting Contract at an annual salary, including bonuses, of approximately $500,000.   (*Id.* at ¶ 32.)

### D.  *Alleged Overt Acts in Furtherance of the Conspiracy*

The Superseding Indictment alleges that the Defendants committed numerous overt acts in furtherance of the conspiracy.   On October 28, 2011, Maudlin emailed Fitzgerald and stated "here us a cottage resource that has decent margins (decent for us in MD).   [His/her] name is [Person #1]. We bill $75/hour, and we pay [Person #1] $55/hour . . . ."   (*Id.* at ¶ 33(a).)   Between October 27, 2011, and December 17, 2011, Maudlin and Fitzgerald allegedly negotiated an agreement where Fitzgerald "would be compensated for using her influence" to convince a subcontractor of Xerox to further subcontract work on the CARES project to TCC.   (*Id.* at ¶ 33(b).)   Then, TCC would subcontract one-third of that work to Aeon.   (*Id.*)   On November 3, 2011, Maudlin emailed Fitzgerald and thanked her for speaking with the subcontractor on his behalf.   (*Id.* at ¶ 33(c).)   He then told her, whatever the result of the subcontract, he would work out a compensation plan for her. (*Id.*)   Around November 18, 2011, Fitzgerald then emailed a TCC employee and stated that she had spoken with an employee of the subcontractor and indicated that this employee "had no issues running through Aeon for whatever the agreed upon number of positions would be."   (*Id.* at ¶ 33(d).)   The TCC employee responded, stating "That will make it easier for us to run one of the three positions through Aeon."   (*Id.*)   On December 17, 2011, after learning that the subcontract had been removed to TCC, Fitzgerald, in her capacity as Executive Consultant to the DHR Secretary, drafted an email and directed the acting CIO to send it to both Xerox and the subcontractor.   (*Id.* at ¶ 33(e).)   The email stated, among other things, that "the deal needs to go forward as we agreed."   (*Id.*)

Around December 22, 2011, an employee of TCC, at Maudlin's direction, emailed Fitzgerald to inform her that Xerox would be "cut[ting] [TCC] a Task Order" and that Aeon's one-third payment

would be worked out.  (*Id.* at ¶ 33(g).)  Then, on February 9, 2012, Maudlin signed a Task Order with Xerox, where the company would pay TCC $253,000 in monthly installments.  (*Id.* at ¶ 33(h).) These installments allegedly represented the payments Fitzgerald had demanded Xerox make as a precondition of DHR approval of the CARES project.  (*Id.*)

On February 20, 2012, a TCC employee, at the direction of Maudlin, emailed Fitzgerald to inform her that he had "engaged in a corp to corp agreement with an independent contractor – [Person #2]," and that he had asked Person #2 if "[he/she] would mind contracting through another firm[.]" (*Id.* at ¶ 33(i).)  Subsequently, on February 24, 2012, Fitzgerald incorporated Aeon Consulting and Technical Services, Inc., in the State of Indiana.  (*Id.* at ¶ 33(j).)  Thereafter, around April 3, 2012, Fitzgerald sent an invoice to TCC in the amount of $18,680.75 for work performed on the Applications Contract by Person 1 and on an Indiana contract by Person #2.  (*Id.* at ¶ 33(k).)

On April 17, 2012, an employee of TCC, at the direction of Maudlin, emailed Fitzgerald and informed her that an invoice was being set up for $2,008 per month, or "33% of the [Task Order]" that had been awarded TCC.  (*Id.* at ¶ 33(l).)  On about June 1, 2012, Fitzgerald sent an Aeon invoice to TCC for a total of $18,172.50 for work performed by Person 1 on the Cottage Applications Contract, by Person #2 on an Indiana contract in May 2012, and $2,080 for consulting services by Fitzgerald in May 2012.  (*Id.* at ¶ 33(m).)

Later, on September 14, 2012, an employee of TCC, at the direction of Maudlin, emailed Fitzgerald and informed her that a revised work order had increased the "monthly amount" by 65% to $3,430.  (*Id.* at ¶ 33(n).)  That same day, Fitzgerald allegedly forwarded the same email to Coffland, stating "FYI.  Thinking I should ask them to pay you.  But I don't want to look or be skeevy."  (*Id.* at ¶ 33(o).)

9

Then, in early October 2012, Fitzgerald sent an Aeon invoice to TCC for a total of $16,330 for work done by Person 1 on the Cottage Applications Contract in September 2012 and for $3,430 for "consulting services" performed by Fitzgerald herself.  (*Id.* at ¶ 33(p).)  On November 16, 2012, Coffland incorporated Blue Northern Consulting, LLC in the state of Maryland.  (*Id.* at ¶ 33(q).) Several days later, on November 19, Fitzgerald is alleged to have emailed Maudlin about the Person 1 contract, asking him how he would like it handled.  (*Id.* at ¶ 33(r).)  She informed him that the extension would be with Blue Northern, and then thanked him for the "surface," adding that she found it generous and thoughtful.  (*Id.*)  Maudlin responded the next day asking her to have "Ken" change and forward the agreement, and that Maudlin would try to discuss with him later that day.  (*Id.* at 33(s).)

Around December 3, 2012, Fitzgerald sent an invoice from Aeon to TCC for a total $14,530 for work performed by Person 1 on the Cottage Applications Contract in November 2012, and $3,430 for consulting services performed by herself.  (*Id.* at ¶ 33(t).)  On approximately January 15, 2013, Coffland, through Blue Northern, invoiced TCC for $11,550 for other services performed by Person 1.  (*Id.* at ¶ 33(u).)  Over a month later, on February 25 and at the direction of Pangallo, TCC issued a check in the amount of $10,000 to Coffland that was recorded in TCC's accounting records as a payment for "consulting."  (*Id.* at ¶ 33(v).)

In July 2013, Coffland is alleged to have executed a contract to return to Xerox as an independent contractor.  (*Id.* at ¶ 33(w).)  He would serve as the Hosting Director under this contract. (*Id.*)  Next, in August 2013, TCC allegedly executed a fixed-price subcontract with Xerox that totaled approximately $23.72 million over six years.  (*Id.* at ¶ 33(x).)  This contract represented a "substantial portion" of the OTHS Hosting Contract being given to TCC.  (*Id.*)

10

Around February 5, 2014, Coffland emailed Pangallo in response to a question regarding TCC's negotiations with Xerox over subcontractor rates on the Applications Contract.   (*Id.* at ¶ 33(y).)   Coffland allegedly stated, in pertinent part, that he "would not do this.   TCC is not responsible for [Xerox's] 3 yrs of purposefully underrunning of hours . . . .   You don't need to help help help [*sic*] these yahoos."   (*Id.*)   Two days later, Pangallo emailed Coffland and Maudlin and stated that he was "still working" with Xerox "on getting 72 per hour. . . . To document our conversation from yesterday: - You get 30% net profit each month – You will review each months P&L – total transparency.   Prefer you did this in Indy – Steve has one other item to discuss with you." (*Id.* at ¶ 33(z).)   Coffland responded that day: "33% one other item Steve?"   (*Id.* at ¶ 33(aa).)

In June of 2014, TCC entered into a fixed-price subcontract with Xerox worth approximately $2.98 million in 2014 and approximately $5.47 million in 2015, under which TCC took full responsibility for the Cottage Applications and CHESSIE contracts.   (*Id.* at ¶ 33(bb).)   Under these contracts, the individuals assigned to those subparts of the Applications Contract would have their positions relocated from Maryland to Indiana.   (*Id.*)   Near the end of July 2014, Pangallo emailed Coffland and confirmed that, per their earlier conversations, the agreement was for "33% of Net Profit for DHR Prod & Cottage Apps/Chessie."   (*Id.* at ¶ 33(cc).)   Pangallo then stated that "[w]e want to pay this on a quarterly basis," and that "Cottage Apps/Chessie so far has been a money loser."   (*Id.*) However, Pangallo stated that "[t]he 1st quarter of 2014 ended with hosting revenue of $1M and a net profit of $247,598.   So, 33% of that amount is $80,449.   In order for us to pay this amount, we need for you to send us an invoice for that amount[.]"   (*Id.*)   Finally, Pangallo instructed Coffland that the invoice should state that Coffland provided consulting services for the first quarter of 2014.   (*Id.*)

On November 14, 2014, Fitzgerald allegedly made false statements to Special Agents from the Federal Bureau of Investigation ("FBI").   (*Id.* at ¶ 33(dd).)   The Special Agents were

11

investigating suspected bribery and fraud in Maryland DHR-OTHS contracts and interviewed her as a part of that investigation.   (*Id.*)   Fitzgerald allegedly told the agents that TCC did not introduce her to Person 1, but rather that she, through Aeon, brought Person 1 to TCC; that Person 1 was not already working through TCC at the time; that TCC's consulting payments to her were not compensation for her speaking with the Subcontractor or the acting Chief Information Officer of DHR on TCC's behalf, but were instead for her knowledge of the industry and critique of particular applications; and that, after becoming the Secretary of DIT, she did not speak with anyone at Xerox about TCC working as a subcontractor for Xerox or which subcontractors should be used on the contract.   (*Id.* at ¶ 33 (dd)(i)–(iv).)

Finally, Maudlin allegedly made false statements to Special Agents from the FBI on November 14, 2014.   (*Id.* at ¶ 33(ee).)   Maudlin stated that, when Fitzgerald was the Executive Consultant to the Secretary of DHR, TCC paid Fitzgerald because she helped TCC with staffing, and that Aeon "gave TCC a body."   (*Id.* at ¶ 33(ee)(i).)   He further told the Special Agents that Fitzgerald did not use her influence to get TCC its contract with Xerox, and that there were no agreements between TCC and Fitzgerald to get TCC its contract with Xerox in exchange for giving Fitzgerald money.

### E.   The Charges

Based on the foregoing allegations, the Superseding Indictment states seven separate charges against the Defendants.   Count I charges each Defendant with a violation of 18 U.S.C. § 371, Conspiracy to commit offense or to defraud United States.   (*Id.* at 1–18.)   Count II charges Defendants Fitzgerald and Coffland with a violation of 18 U.S.C. § 666(a)(1)(B), Bribery Involving Agent of a Program Receiving Federal Funds, for accepting funds in exchange for causing Xerox to enter into subcontracting agreements with TCC on DHR contracts.   (*Id.* at 19.)   Count III similarly charges Fitzgerald and Coffland with a separate violation of 18 U.S.C. § 666(a)(1)(B) for corruptly

soliciting and demanding that Xerox hire Coffland as an independent contractor serving as the Hosting director on the Hosting Contract.   (*Id.* at 20.)   Count IV charges Maudlin and Pangallo with a violation of 18 U.S.C. § 666(a)(2) for corruptly offering and giving payments under the guise of consulting and other contracts to Fitzgerald and Coffland, with the intent to influence or reward Fitzgerald as an agent of the Maryland DHR.   (*Id.* at 21.)   Count V charges Fitzgerald with a violation of 18 U.S.C. § 1001, making false statements, for willfully and knowingly making materially false statements to Special Agents of the FBI during their investigation into bribery and fraud in Maryland DHR-OTHS contracts.   (*Id.* at 22–23.)   Count VI charges Maudlin a violation of 18 U.S.C. § 1001 for willfully and knowingly making materially false statements to Special Agents of the FBI during their investigation into bribery and fraud in Maryland DHR-OTHS contracts.   (*Id.* at 24.) Finally, Count VII charges Fitzgerald and Coffland with a violation of 18 U.S.C. § 1951(a), extortion under color of official right, by using her official position as Deputy Secretary of Operations of DHR to cause Xerox to hire Coffland by making Xerox fear it would suffer negative business consequences if it did not hire Coffland and agree to his compensation demands.   (*Id.* at 25.)

## II.    *LEGAL STANDARD*

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may file a motion to dismiss an indictment for failure to state an offense.   Rule 7(c)(1) requires that an indictment contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"   The Court of Appeals for the Fourth Circuit has instructed that, to be legally sufficient, an indictment "must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense."   *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997) (quoting *United States v. Daniels*, 973 F.3d 1059, 1060 (4th Cir. 1992)).   An indictment is usually sufficient if "it alleges an

offense in the words of the statute," *United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999), so long as the words used "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence." *Hamling v. United States,* 418 U.S. 87, 117 (1974).   However, simply parroting the language of the statute in the indictment is insufficient. *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002).

In reviewing a motion to dismiss, the district court must accept all factual allegations in the indictment as true.   *United States v. Oaks*, 302 F.Supp.3d 716, 720 (D. Md. 2018).   Further, the court should construe the indictment in a "practical," as opposed to a "purely technical," manner.   *Id.* (citing *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994)).   *See also United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss [a count of the] indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government.").

### III.   DISCUSSION

Each Defendant in this matter has filed multiple motions to dismiss, supplemental motions to dismiss, or motions to adopt.   These motions, and similarly, the Government's responses, are scattered across the docket with imprecise logical cohesion.   With the various motions and competing arguments from the Government, the Court will address each Defendant's motions in turn, noting where other Defendants have adopted the same arguments.   Therefore, and as many of these arguments are parroted by the remaining Defendants, the Court shall address Fitzgerald's motions to dismiss and the arguments therein before addressing the remaining Defendants and motions.

*A.   Isabel Fitzgerald's Motions to Dismiss and Supplemental Motion to Dismiss*

Defendant Fitzgerald has filed several motions to dismiss in which she attacks the sufficiency of the Superseding Indictment.[2]   In her first motion, Fitzgerald first argues that the Superseding Indictment fails to sufficiently allege that Fitzgerald was an "agent" of the State of Maryland DHR, as is required to allege a substantive violation of § 666, because it fails to allege that Fitzgerald was authorized or had authority to act with respect to DHR's federal program funds.   (ECF No. 55 at 13.)   Next, she argues that Count III should be dismissed because the Superseding Indictment does not allege sufficient factual information that Fitzgerald acted with the requisite intent to establish a violation of § 666.   (*Id.* at 18.)   Finally, in this first motion, Fitzgerald argues that Count I is subject to dismissal because it charges more than one offense.   (*Id.* at 19.)   Specifically, Fitzgerald argues that at least four separate agreements are alleged, such that it impermissibly joins multiple violations into a single charge.   (*Id.* at 19–25.)

Fitzgerald's next motion generally asks the Court to dismiss Counts I and II for a failure to state an offense.   (*See generally* ECF No. 56.)   First, Fitzgerald asserts that Counts I and II have failed to allege essential facts that Fitzgerald was an "agent" within the plain meaning of § 666.   (*Id.* at 7.)   Next, she asks the Court to find that the phrase "authorized to act," a term appearing in the definition of "agent," is ambiguous and to construe the meaning in favor of Fitzgerald.   (*Id.* at 18.) In a similar fashion, Fitzgerald further argues that if Counts I and II allege that Fitzgerald was able to influence other officers of the DHR—and those with the authority to act on its behalf—then the

---

[2] The Court notes that Ms. Fitzgerald's first motion to dismiss was filed prior to the Superseding Indictment.   In her motion, (ECF No. 55), Fitzgerald had argued that the original indictment failed to allege that the DHR was an entity covered by § 666 because it did not identify the source of federal funding.   (*See id.* at 10.)   That specific issue was addressed in the Superseding Indictment, rendering the issue is moot. Therefore, to the extent necessary, the Court **DENIES AS MOOT** Defendant Fitzgerald's assertion that the Indictment failed to allege the DHR was a covered entity under § 666.

charges rely on a constitutionally vague application of the term "agent" and thus runs afoul of the Due Process Clause.  (*Id.* at 19.)  Fitzgerald next asserts that, to the extent that Counts I and II allege violations of § 666 while Ms. Fitzgerald was a private citizen and Secretary of DIT, the application of § 666 exceeds Congress's authority under the Spending Clause and the Necessary and Proper Clause.  (*Id.* at 21–25.)  Further, Fitzgerald argues that if the statute itself is susceptible to an unconstitutional interpretation, then this Court should interpret it to mean that an "agent" should only include those with authority to act on behalf of an entity that receives federal funds.  (*Id.* at 33.) Finally, Fitzgerald argues that Count II should be dismissed, in part, as time barred.[3]  (*Id.* at 26.)

Fitzgerald's next motion, a supplemental motion to dismiss, argues that the presumption of scienter should apply to § 666, which would require that a defendant know the facts supporting a status of "agent."  (ECF No. 113 at 7.)  As such, Fitzgerald argues that Counts I, II, and III must be dismissed because the Superseding Indictment fails to allege that she knew she had authority to act on behalf of the DHR "with respect to its funds."  (*Id.* at 14.)  Fitzgerald then argues that, in the alternative, this Court should dismiss Count I for failing to allege that Fitzgerald knew she had the authority to act on DHR's behalf when she was private sector consultant and when she served as the Secretary of DIT.  (*Id.* at 15.)

Fitzgerald's final motion to dismiss argues that Count VII should be dismissed for failing to state the charged offense of Hobbs Act extortion.  (ECF No. 114 at 1.)  In particular, Fitzgerald asserts that there is no allegation that she obtained any "property," (*Id.* at 3), that the property of the

---

[3] Ms. Fitzgerald also argues that the "aiding and abetting" portion of Count II should be dismissed as to her.  (ECF No. 56 at 29.)  However, the Government conceded at the hearing held November 16, 2020, that the aiding and abetting charge is not directed at Fitzgerald, but rather the other Defendants.   Regardless, and as will be more thoroughly addressed later in this opinion, the aiding and abetting charge is implicit in every substantive charge brought.

victim alleged in Count VII cannot be extorted, (*Id.* at 6), and that at best Count VII only alleges "coercion," which is not a criminal offense under the Hobbs Act.   (*Id.* at 9.)

### 1.   The Constitutionality of § 666 and its Application of the Term "Agent"

The Court begins its analysis with the apparent constitutional challenges to various provisions of § 666.   Multiple arguments advanced by Fitzgerald and the other Defendants focus on the interpretation of "agent" within the statute, thus the constitutionality and application of this term is the best place to start.   The thrust of Fitzgerald's argument is that Counts I and II run afoul of the Due Process Clause of the Fifth Amendment because she was not on notice that she was subject to criminal liability under § 666 as an agent of DHR when she was a private-sector consultant or the Secretary of DIT.   (ECF No. 56 at 19.)   In essence, Fitzgerald argues that she could not have been an "agent" as contemplated by the statute because she did not possess any actual authority to act on behalf of the Maryland DHR.   In so arguing, Fitzgerald relies on the "void-for-vagueness" doctrine. (*Id.*)

The Fifth Amendment, among other things, protects persons from being "deprived of life, liberty, or property, without due process of law."   U.S. Const. Amend. V.   The Supreme Court of the United States holds that the Government "violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."   *Johnson v. United States*, 576 U.S. 591, 595 (2015).   The Supreme Court has consistently recognized that "[t]he prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'"   *Id.* (quoting *Connally v. General Constr. Co.,* 269 U.S. 385, 391 (1926)). Moreover, because "objections to vagueness under the Due Process Clause rest on the lack of notice,"

17

an as-applied vagueness challenge "may be overcome in any specific case where reasonable persons would know that their conduct is at risk."   *Maynard v. Cartwright,* 486 U.S. 356, 361 (1988).   Of course, where a statute is reasonably clear, "ignorance of the law generally is no defense to a criminal charge."   *United States v. Perry*, 659 Fed. App'x 146, 156 (4th Cir. 2016).   *See also McFadden v. United States*, 576 U.S. 186, 192 (2015) ("[I]gnorance of the law is typically no defense to criminal prosecution.")

Fitzgerald attacks Counts I and II under both the "fair notice" and the "arbitrary enforcement" prongs above.   First, Fitzgerald argues that § 666 does not provide fair notice "that those with the ability to influence others authorized to act on behalf of a government entity . . . qualify as 'agents.'" (ECF No. 56 at 20.)   Notably, Fitzgerald does not cite to any case law supporting this specific proposition.   In the Court's view, that is because her argument is without merit.

Fitzgerald, in making her as-applied constitutional challenge, asks the Court to assume a factual conclusion: That she did not have actual authority to act on behalf of DHR while she was a private-sector consultant or as the Secretary of DIT.   (*See* ECF No. 56 at 20.)   This is clearly an issue of fact, and one not appropriate for the Court to decide at this juncture, especially when no evidence has yet been presented.   *See, e.g.*, *United States v. Mata-Lara*, 527 F.Supp.2d 887, 892 (N.D. Iowa 2007) (finding that court lacked authority under the Rules of Criminal Procedure to dismiss charges in indictment on the basis of a sufficiency-of-the-evidence challenge).   Still, moving beyond this apparent flaw in Fitzgerald's argument, she has not directed the Court to any authority that would lead it to believe that § 666 is unconstitutionally vague.

An "agent," as used in § 666, is defined as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant and employee, and a partner, director, officer, manager, and representative[.]"   18 U.S.C. § 666(d)(1).

18

Section 666 is admittedly broad in scope, as it "targets bribes involving federal funds recipients." *United States v. Lindberg*, Docket No. 5:19-CR-00022-MOC-DSC, 2020 WL 4504434 at \*12 (W.D.N.C. Aug. 4, 2020) (citing *Salinas v. United States*, 522 U.S. 52, 56 (1997); *United Sates v. Ng Lap Seng*, 934 F.3d 110, 132 (2nd Cir. 2019); *United States v. McNair*, 605 F.3d 1152, 1191 (11th Cir. 2010)).   "But a broad statute is not necessarily an unconstitutionally vague statute."   *Id.* (emphasis in original).

In truth, Fitzgerald's argument is belied by the legislative history of § 666.   Congress's stated intent in enacting the federal bribery statute was "to protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and *undue influence* by bribery."   S.Rep. No. 98–225, at 370 (1983), 1984 U.S.C.C.A.N. 3182, 3511 (emphasis added).   Moreover, even if the Court were to accept Fitzgerald's contention that she was only able to "influence" the true decision-makers at DHR—which the Court does not accept or decide at this point—it seems difficult to fathom that the statute would not reach someone who corruptly accepted payments in return for her access and sway with government officials.   *See Maynard*, , 486 U.S. at 361.   In fact, that very scenario is what § 666 was specifically enacted to protect against.   S.Rep. No. 98–225, at 370 (1983), 1984 U.S.C.C.A.N. 3182, 3511.   Furthermore, under the "as-applied" standard, the meaning of the phrase "act on behalf of" must be viewed in light of Fitzgerald's knowledge and experience as the Chief Information Officer of DHR; Executive Consultant to the Secretary of DHR; Deputy Secretary of Operations for DHR; and Secretary of DIT.   *See United States v. Edgar*, 304 F.3d 1320, 1328 (11th Cir. 2002).   In light of this extensive employment history both within the DHR and working closely with the DHR as a private-sector consultant, as alleged in the Superseding Indictment, it would seem unlikely that Fitzgerald would not know that accepting payments for her own benefit and "influencing" decisions at the DHR would not run afoul of the law. Therefore, to argue that the statute

19

does not provide fair notice to a person corruptly accepting payments for her access and sway of public officials is meritless, at best. *See, e.g., id.* at 1328 (rejecting as-applied vagueness challenge of hospital executives who were convicted of converting hospital funds to their own benefit).

Regarding the arbitrary enforcement prong, a criminal statute must provide "minimal guidelines" to law enforcement so as not to "permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983). However, despite setting forth minimal guidelines, a statute "need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth." *Mannix v. Phillips,* 619 F.3d 187, 197 (2d Cir. 2010) (internal quotation marks omitted); *see also United States v. Petrillo,* 332 U.S. 1, 7 (1947) ("That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."). "Even in the absence of specific standards, however, a statute will survive an as-applied vagueness challenge if the conduct at issue falls within the core of what the statute prohibits." *United States v. Dawkins*, 17 Crim. 684 (ER), 2019 WL 2461722 at *4 (S.D.N.Y. May 23, 2019) (citing *United States v. Farhane*, 634 F.3d 127, 139–40 (2d Cir. 2011)).

Much like the first prong, Fitzgerald's argument plainly fails here too. Fitzgerald attempts to paint a nightmare scenario in which anyone who knows or is acquainted with a public official may be subject to prosecution under this statute should they hold even a shred of influence on a decision made by the official. (*See* ECF No. 56 at 21.) But, as the Supreme Court has long held, accepting bribes and kickbacks to serve corrupt ends while in public service plainly violates the law. *See Skilling v. United States*, 561 U.S. 358, 412 (2010) ("[I]t has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud."). *See also Broadrick v. Oklahoma,* 413 U.S. 601, 608

20

(1973) ("[E]ven if the outermost boundaries of [a statute are] imprecise, any such uncertainty has little relevance . . . where appellants' conduct falls squarely within the 'hard core' of the statute's proscriptions."). Moreover, and as the Government correctly identifies, any actual vagueness in the statute —and thus, the danger of prosecuting under an arbitrary standard—is mitigated by the *scienter* requirement. *See United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013) (citing *Skilling*, 561 U.S. at 412). *See also Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*."); *Boyce Motor Lines v. United States*, 342 U.S. 337, 331 (1952) ("[M]ost statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."). The scienter requirement, as will be discussed in more detail later in this opinion, protects against the standardless and arbitrary enforcement of § 666 by ensuring only those who *corruptly* solicit or accept a bribe are prosecuted. *Nelson*, 712 F.3d at 510.

Fitzgerald has failed to show that the term "agent" is unconstitutionally vague as applied to her circumstance under § 666. For the foregoing reasons, her motion, (ECF No. 56 at 26), is **DENIED** as to Counts I and II.

### 2.  The Rule of Lenity

Fitzgerald next asks the Court to apply the rule of lenity and construe the phrase "authorized to act" in her favor. (ECF No. 56 at 18.) Similar to her argument above, Fitzgerald argues that the

phrase is ambiguous and is susceptible to an interpretation of including individuals who do not have actual authority to act on behalf of a government agency.   (*Id.*)

The Supreme Court has held that the rule of lenity applies only where there is a "grievous ambiguity or uncertainty in the statute."   *Chapman v. United States*, 500 U.S. 453, 463 (1991) (quoting *Huddleston v. United States,* 415 U.S. 814, 831 (1974)).   *See also United States v. Svete*, 556 F.3d 1157, 1169 (11th Cir. 2009) (en banc) ("The rule of lenity is applied when a broad construction of a criminal statute would 'criminalize a broad range of apparently innocent conduct.'") (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985).   Only after a court has "seize[d] every thing from which aid can be derived" and it is still "left with an ambiguous statute," may the rule be appropriately applied.   *United States v. Bass,* 404 U.S. 336, 347 (1971) (quoting *United States v. Fisher,* 2 Cranch 358, 386, 2 L.Ed. 304 (1805)).   "Any ambiguity in the language of a criminal statute should be resolved in favor of the defendant."   *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (citing *United States v. Bass,* 404 U.S. 336, 347 (1971)).   However, "[t]he simple existence of some statutory ambiguity . . . is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree."   *McNair*, 605 F.3d at 1192 (quoting *Muscarello v. United States,* 524 U.S. 125, 138 (1998)).   "The mere possibility of a narrower statutory construction by itself does not make the rule of lenity applicable."   *Id.*

Fitzgerald's argument fails and the rule of lenity does not apply because she has failed to direct the Court to any grievous ambiguity.   What Fitzgerald has identified is a defense to the charged conduct and would be more appropriate in a Rule 29 motion or before the jury.   *See United States v. Anderson*, 517 F.3d 953, 962 (7th Cir. 2008) (recognizing that the rule of lenity does not apply to "factual ambiguities").   This Court is also aware of the fact that Fitzgerald has dedicated one paragraph to this argument which contains no citations to any decision that even considers applying

22

the rule of lenity to § 666(d)(1).   The Court's own research is similarly unable to locate any such case, and, while not ultimately determinative on this issue, it nonetheless supports the Court's conclusion that this factual determination is best left to the jury.   Fitzgerald's motion is **DENIED** as to Counts I and II.

> 3.   *The Superseding Indictment's Allegations as to Agency While Fitzgerald Worked in the Private Sector and in the Department of Information Technology*

Fitzgerald's next argument is that the plain language of § 666 does not reach an individual without authority to act on behalf of an entity.   (ECF No. 56 at 6.)   Fitzgerald argues that the Superseding Indictment fails to allege that a conspiracy to violate or an actual violation of § 666 occurred between October 15, 2011 and December 4, 2012, while she was an employee in the private sector, or between August 26, 2013 and December 31, 2014, when she was the serving as the Secretary of DIT.   (*Id.* at 7.)   Fitzgerald argues, essentially, that the Superseding Indictment fails to allege that she was an "agent" of DHR during these times.   (*Id.* at 11–17.)

First, and as this Court and other jurisdictions have repeatedly recognized, § 666 has a broad reach and an ambitious purpose.   *See, e.g.*, *Salinas*, 522 U.S. at 56; *Ng Lap Seng*, 934 F.3d at 132; *McNair*, 605 F.3d at 1191; *Lindberg*, 2020 WL 4504434 at *12.   This includes its definition of "agent."   *See Vitello*, 490 F.3d at 323; *United States v. Sotomayor-Vasquez*, 249 F.3d 1, 8 (1st Cir. 2001).   The Court need not look beyond even the plain language of the statute to find that the definition of "agent" contemplates a broad array of potential relationships that fall within its protections.   18 U.S.C. § 666(d)(1).   *See also Vitello*, 490 F.3d at 323 (rejecting defendants' assertion that because § 666(d)(1) did not include the term "independent contractor," such persons were excluded from its scope).

Moreover, courts and juries alike have applied this definition to find that individuals who, while not direct employees, have wielded enough authority to act on behalf of such entities such that they were found to be agents.   In *Sotomayor-Vasquez*, for example, the First Circuit found that evidence developed at trial showed conclusively that an external consultant to a health clinic acted as its director, manager, and a representative of the clinic and its subsidiary.   249 F.3d at 6.   The Third Circuit, in *Vitello*, similarly found that an independent contractor who wielded managerial responsibilities on several airport construction projects was an "agent" pursuant to § 666(d)(1).   490 F.3d at 318–19.   Likewise, the Sixth Circuit found that the prosecution introduced "ample evidence" for a jury to find that an independent contractor, under contract with a school district, was an agent of the district pursuant to this statute.   *United States v. Hudson*, 491 F.3d 590, 594 (6th Cir. 2007).

These decisions, and others like them, provide that one need not be a direct employee of a government agency in order to act on behalf of it.   With that in mind, the Court now turns to the Superseding Indictment to see if it sufficiently alleges that Fitzgerald was an agent of DHR at all relevant times.   The Court concludes that it does.

In particular, the Superseding Indictment alleges that Fitzgerald was an agent of the "government of the State of Maryland, as well as DHR and [DIT] . . . From in or about November 2011 to in or about December 2012[.]"   (ECF No. 75–1 at ¶ 4(b).)   During this time, Fitzgerald "served as Executive Consultant directly to the Secretary of DHR. . . .   Fitzgerald continued to exercise authority and managerial discretion over DHR matters, including the supervision of the Acting DHR CIO, who was previously Fitzgerald's deputy."   (*Id.*)   Then, the Superseding Indictment alleges that, from August 26, 2013 to approximately December 31, 2014, "Fitzgerald served as the Secretary of [DIT]," where she "exercised supervision over the activities the [*sic*] DHR CIO."   (*Id.* at ¶ 4(d).)   The Superseding Indictment, therefore, alleges specifically that not only was

24

Fitzgerald an agent of the government of Maryland, DHR, and DIT, but also provides that she continued to exercise managerial authority over several aspects of the agencies during the relevant time periods.

The Superseding Indictment alleges more than the above, however, and with specificity as to the actions Fitzgerald supposedly took as a part of the alleged conspiracy.  It also alleges, among other things, that Fitzgerald agreed to and accepted concealed payments from TCC while an Executive Consultant to the Secretary of DHR, (*Id.* at ¶¶ 19–22); she and Coffland "solicited and demanded" further concealed payments for Coffland under the guise of consulting work, (*Id.* at ¶ 27); she caused Xerox, between December 2011 and February 2012, to issue a task order with no specified work obligations under a DHR-OTHS contract by "threatening to use her influence to cause the DHR Secretary and Acting CIO to withhold funding" under another project if Xerox did not comply, (*Id.* at ¶ 29); she directed the Acting CIO, in her capacity as a consultant to the DHR Secretary, to communicate to Xerox that "the deal needs to go as we agreed," and subsequently followed up with Maudlin regarding the task order, (*Id.* at ¶ 33(e)–(g)); and she again threatened Xerox with financial penalties through her influence as Deputy Secretary of DHR and State CIO if it did not execute a fixed-price contract with TCC, (*Id.* at ¶ 31).  In fact, the Superseding Indictment lists at least 31 different overt acts taken in furtherance of the alleged conspiracy, several of which were undertaken while she was an executive consultant or the Secretary of DIT.  (*See id.* at ¶ 33.)  As has already been established, courts repeatedly hold that § 666 is expansive, in both its goals and scope. Defendants have simply not identified any authority that would justify such a narrow interpretation as the one they advance.

The Court feels obligated to again note the standard that must be met with an indictment.  The indictment must contain "a plain, concise, and definite written statement of the essential facts

constituting the offense," such that it "fairly inform[s] a defendant of the charge, and enable[s] the defendant to plead double jeopardy as a defense in a future prosecution for the same offense."   *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997).   The Superseding Indictment exceeds these standards as to alleging Fitzgerald was an agent of the DHR as a private consultant.[4]

Therefore, for the foregoing reasons, Fitzgerald's motion is **DENIED** as to Counts I and II.

### 4.   *The Spending Clause and the Necessary and Proper Clause*

Relatedly, Fitzgerald argues that, as applied to her, § 666 exceeds Congress's authority under both the Spending Clause and the Necessary and Proper Clause of the Constitution.   (ECF No. 56 at 23.)   Again Fitzgerald advances the argument that she did not have actual authority to act on behalf of the DHR when she was a private citizen or the Secretary of DIT, and therefore the Court must find that Congress exceeded its constitutional authority in enacting § 666 as applied to her in this case. (*Id.*)

Article I, Section 8, Clause 1 (the "Spending Clause") of the United States Constitution states as follows:

> The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States[.]

Article I, Section 8, Clause 18 (the "Necessary and Proper Clause") establishes as follows:

> [The Congress shall have Power] . . . To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

---

[4] The Court again notes that, at least to the extent Defendants argue that Fitzgerald *actually* lacked authority to act on behalf of the relevant agencies, this argument is inappropriate on a motion to dismiss.   Instead, it is more properly asserted either in a motion pursuant to Rule 29 or as a defense argued to the jury.   The Court's role in a motion to dismiss is not to speculate on the evidentiary proof offered by either party, but instead to judge the legal sufficiency of the indictment. *United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring).

Together, these clauses establish that Congress has the authority to "appropriate federal monies to promote the general welfare," and that Congress has the corresponding authority to ensure that "taxpayer dollars appropriated under [the Spending Clause] are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars." *Sabri v. United States,* 541 U.S. 600, 605 (2004).

Despite numerous challenges to the constitutionality of § 666, the Supreme Court and other lower courts have consistently held that the statute is a proper exercise of Congress's authority. *See id.* at 604–08 (rejecting a facial challenge to § 666 asserting that it was unconstitutional under the Spending Clause and the Necessary and Proper Clause because it failed to require proof of a connection between the bribe or kickback and federal funds); *Salinas*, 522 U.S. at 60–61 (holding that "there is no serious doubt about the constitutionality of § 666(b)(1)(B) as applied" to a sheriff's deputy who accepted bribes in return for allowing a federal prisoner held in a county jail to have contact visits with his wife and girlfriend); *United States v. Fernandez*, 722 F.3d 1, 11 (rejecting an as-applied challenge to § 666 based upon the Necessary and Proper Clause); *United States v. Keen*, 676 F.3d 981, 991 (11th Cir. 2012) (rejecting a defendant's contention that § 666 would be unconstitutional under the Spending and Necessary and Proper Clauses unless its application was limited to local governmental employees who had authority over federal funds); *United States v. Hines*, 541 F.3d 833, 835–36 (8th Cir. 2008) (rejecting defendant's as-applied challenge and finding that § 666 as drafted reflected that Congress had acted with a legitimate purpose and rational means); *United States v. Spano*, 401 F.3d 837, 841 (7th Cir. 2005) (rejecting an as-applied challenge to § 666 under both the Spending Clause and the Necessary and Proper Clause); *United States v. Bynum*, 327 F.3d 986, 991 (9th Cir. 2003) (rejecting a facial challenge to § 666 because there was no nexus between the criminal

action and federal funds); *United States v. Edgar*, 304 F.3d 1320, 1328 (11th Cir. 2002) ("[A] basis for the enactment of § 666 may be found in Congress's authority, under the Necessary and Proper Clause, to protect its capacity to fruitfully exercise the spending power. As a means of ensuring the efficacy of federal appropriations to comprehensive federal assistance programs, the anti-corruption enforcement mechanism strikes us as bearing a sufficient relationship to Congress's spending power to dispel any doubt as to its constitutionality."); *United States v. Westmoreland*, 841 F.2d 577, 577–78 (5th Cir. 1988) (finding that Congress acted properly to preserve the integrity of federal funds by passing § 666 as drafted); *United States v. Brady*, 694 Fed. Appx. 184, 185 (4th Cir. Aug. 2, 2017) (rejecting defendant's facial and as-applied constitutional challenges based upon the Spending Clause, the Necessary and Proper Clause, and the Tenth Amendment).   Congress certainly has an interest in protecting the efficacy and capacity of its authority under the Spending Clause, and as these and more courts have held, § 666 functioning as the "anti-corruption enforcement mechanism" is sufficiently related to those ends to "dispel any doubt as to its constitutionality."   *Edgar*, 304 F.3d at 1325.   The Supreme Court stated it simply: "Congress does not have to sit by and accept the risk of operations thwarted by local and state improbity."   *Sabri*, 541 U.S. at 605.

Corruption is not limited to only those bribes and kickbacks directly affecting federal funds, see *id.*, nor is it limited to only those heads of departments, agencies, or entities.   *See, e.g.*, *Vitello*, 490 F.3d at 323; *Sotomayor-Vasquez*, 249 F.3d at 8.   Instead, Congress appropriately exercised its power under the Spending Clause and the Necessary and Proper Clause to fight corruption.   Within the statute, Congress built in further mechanisms to protect individuals from overly aggressive prosecution.   *See United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013) (citing *Skilling*, 561 U.S. at 412).   These mechanisms, such as the scienter requirement or the definition of "agent," helps ensure that any arbitrary enforcement is mitigated, as discussed previously.   *See id.*

28

Finally, as this Court has reasoned previously in this matter, Fitzgerald has challenged the legal sufficiency of the Superseding Indictment on a motion to dismiss.   This necessarily means that the Court must accept all factual allegations in the indictment as true.   *United States v. Oaks*, 302 F.Supp.3d 716, 720 (D. Md. 2018).   And as the Court has already shown, the Superseding Indictment has gone far beyond merely alleging Fitzgerald could only "influence" those at DHR.   Fitzgerald asks the Court to reach a conclusion of law that she lacked authority to act on behalf of DHR at these relevant times without an evidentiary record, and to then find that § 666 is unconstitutional as applied to her.   This the Court will not do.   Fitzgerald is welcome to introduce her argument as a defense to the jury or raise it in a motion pursuant to Rule 29.   At this point, however, she has failed to show that the allegations in the Superseding Indictment are legally deficient or that § 666 is unconstitutional as applied to her.   Fitzgerald's motion is **DENIED** as to Counts I and II.

### 5. *The Doctrine of Constitutional Avoidance*

Fitzgerald next argues that the Court should invoke the doctrine of constitutional avoidance to interpret § 666 to only apply "to those with authority to act on behalf of a state entity that receives federal funds."   (ECF No. 56 at 26.)   Fitzgerald's argument builds on the alleged constitutional infirmities identified in her previous arguments, namely that she cannot be considered an agent of the DHR or the state of Maryland because she could only "influence" those officials and agencies.   (*Id.*)

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems."   *Jennings v. Rodriguez*, 583 U.S. ---, ---, 138 S. Ct. 830, 836 (2018).   However, the canon only "comes into play" when a court has found that a statute is "susceptible of more than one construction."   *Id.* at ---, at 842.   *See also Warger v. Shauers*,

29

574 U.S. 40, 50 (2014) ("[The canon] has no application in the absence of . . . ambiguity.") (internal quotations omitted).

As explained, Fitzgerald has not succeeded in persuading this Court that § 666 is unconstitutional as applied to her, and she has not identified any ambiguity in the statute. *See* Parts III(a); III(b); III(c); III(d), *supra*. Moreover, Fitzgerald's argument is based on a legal conclusion that is not yet supported by an evidentiary record in this matter. At this juncture, Fitzgerald's motion only attacks the sufficiency of the Superseding Indictment, which the Court has found to be sufficient on these points. Fitzgerald's argument that she could not be considered an agent is more appropriate as a defense for the jury or for a motion made pursuant to Rule 29. As she has failed to identify any constitutional infirmities in § 666 as applied to her, this Court declines to invoke the doctrine of constitutional avoidance. Fitzgerald's motion is **DENIED** as to Counts I and II.

### 6. *The Presumption of Scienter pursuant to* United States v. Rehaif.

Next, Fitzgerald argues that the presumption in favor of *scienter* should direct the Court to read § 666(a)(1)(B) as requiring that not only a defendant be found to be an agent to secure a conviction, as contemplated by the statute, but also requiring that the defendant *know* she was an agent at the time the prohibited conduct occurred. (ECF No. 113 at 7.) Fitzgerald argues that the Supreme Court's recent decision in *United States v. Rehaif*, 588 U.S. ___, ___, 139 S. Ct. 2191, 2195 (2019), stands for the proposition that a defendant, whose "status is the crucial element separating innocent from wrongful conduct," must know the facts that support her status before she can be convicted. (ECF No. 113 at 8 (quoting *Rehaif*, 588 U.S. at ---, 139 S. Ct. at 2194).) Fitzgerald again asks this Court to find an ambiguity in the statute, regarding whether a *mens rea* requirement applies to the term "agent," and, assuming the Court does find an ambiguity, to then apply the rule of lenity in her favor. (*Id.* at 13.)

In *Rehaif*, the Supreme Court held that conviction under a federal sentencing statute authorizing imprisonment for up to ten years if a person "knowingly" violated a separate statutory provision which listed nine categories of individuals who could not possess a firearm required the person to actually know of his relevant status along with knowing that he possessed a firearm.   The facts in that decision were rather simple.   Rehaif entered the United States on a nonimmigrant student visa.   *Rehaif*, 588 U.S. at ---, 139 S. Ct. at 2194.   He attended a university, where he received poor marks.   *Id.*   Following these grades, the university dismissed him as a student and informed him that his immigration status would be terminated unless he transferred to another university or left the country.   *Id.*   Instead, Rehaif visited a firing range, where he shot two firearms.   *Id.*   He was then arrested and prosecuted for possessing firearms as an alien unlawfully in the United States, one of the nine categories of individuals prohibited from possessing a firearm under the federal statute.   *Id.* Rehaif was convicted following a jury trial and sentenced to 18 months imprisonment.   *Id.*   On appeal, Rehaif argued that the district court judge erred by instructing the jury "that it did not need to find that [Rehaif] knew he was in the country unlawfully."   *Id.* at ---, at 2195.   The Court of Appeals for the 11th Circuit affirmed his conviction.   *Id.*

The Supreme Court granted certiorari and considered the question of "whether, in prosecutions under [18 U.S.C.] § 922(g) and [18 U.S.C. ] § 924(a)(2), the Government must prove that a defendant knows of his status as a person barred from possessing a firearm."   *Id.* at ---, at 2194.   The Court began its analysis by recognizing that whether a criminal statute requires that the government prove a defendant acted "knowingly" is "a question of congressional intent."   *Id.* at ---, at 2195.   In determining Congress's intent, the Court looked to the "longstanding presumption" that Congress, in criminalizing certain behaviors, intends a defendant "to possess a culpable mental state regarding each of the statutory elements [of the statute.]"   *Id.*   This maxim is known as the "presumption in favor

31

of scienter," which means the presumption that criminal statutes "require the degree of knowledge sufficient to 'make a person legally responsible for the consequences of his or her act or omission.'" *Id.* (quoting Black's Law Dictionary 1547 (10th ed. 2014)).

The Supreme Court found no reason to depart from this ordinary presumption regarding Rehaif. *Id.*   In particular, the Court reasoned that the term "knowingly," as used in the sentencing statute, modified the term "violates" and its direct object, 18 U.S.C. § 922(g).   *Id.*   Section 922(g), of course, prohibited the possession of a firearm by an alien unlawfully in the United States.   *Id.* at ---, at 2195–96.   Therefore, "[a]s 'a matter of ordinary English grammar,' we normally read the statutory term "'knowingly'" as applying to all the subsequently listed elements of the crime.'"   *Id.* at ---, at 2196.

Rehaif's case presented an interesting dichotomy.   In many cases, possession of a firearm is entirely innocent, as our Constitution makes clear.   *See id.* at ---, at 2197.   *See also* Const. Amend. II.   Therefore, interpreting "knowingly" to modify the first element of this crime—"violates"—as well as the second element—the defendant's status—the presumption in favor of scienter "helps separate wrongful from innocent acts."   *Id.*   Because "knowingly," in Rehaif's case, meant that he not only knew he possessed a firearm but that he also knew of his status as a category of person barred from possessing the firearm, the Supreme Court reversed the 11th Circuit decision and remanded the case.   *Id.* at ---, at 2200.

Fitzgerald argues that it is this element of the charge against her—her alleged status as an agent—which means that she must be entitled to the presumption in favor scienter and that the Superseding Indictment is deficient because it fails to allege she knew she was an agent.   Fitzgerald's reliance on *Rehaif* for this argument, however, is an awkward fit.

32

"The language of the statute" is "the starting place in our inquiry[.]"   Section 666(a)(1)(B) is the basis for the conspiracy charge in Count I, and it represents the substantive violations in Counts II and III.   That section establishes the following:

**(a)** Whoever, . . .

> **(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—

> > **(B)** corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more;

Shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a)(1)(B).

This Court's first observation is that, unlike *Rehaif*, the word "knowingly" does not appear in this subsection of § 666.[5]   "Knowingly," as used in 18 U.S.C. § 924(a)(2), necessarily modified the verb "violates," and its direct object, which happened to be § 922 and the list of relevant categories of persons who were prohibited from possessing a firearm.   *See* 18 U.S.C. § 924(a)(2) ("Whoever *knowingly* violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title[.]") (emphasis added).   "Knowingly," then, modified everything that followed in § 922, including the relevant statuses at issue in *Rehaif*: Namely, that Rehaif knew he was an alien, knew he was in the country unlawfully, and knew that he was in possession of the firearm.   *See Rehaif*, 588 U.S. at ---, 139 S. Ct. at 2196.

---

[5] Notably, § 666(a)(1)(A) does use the term "knowingly": "Whoever, . . . embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property . . . shall be fined under this title[.]"   A violation of this section has not been charged in this case.

In the statute before us, however, that is not the case.   Instead, § 666(a)(1)(B) introduces and applies the specific *mens rea* to the actual action: "*corruptly* solicit[ing] or demand[ing] . . . anything of value from any person, intending to be influenced or rewarded[.]"   18 U.S.C. § 666(a)(1)(B) (emphasis added).   This inclusion of *mens rea* is the pivotal distinction between *Rehaif* and Fitzgerald's argument.[6]

Absent the proscribed statuses at issue in the unlawful possession of a firearm statute, possession of a firearm "can be entirely innocent."   *Rehaif*, 588 U.S. at ---, 139 S. Ct. at 2197. However, *corruptly* soliciting or demanding something of value and *intending* to be influenced or rewarded in connection with any business or transaction is not innocent behavior, despite Fitzgerald's creative attempt to argue otherwise.   (ECF No. 113 at 10.)   This combination of *mens rea*—corruptly and intending to be influenced—sufficiently protects truly innocent individuals from being prosecuted without limit, in contrast to Fitzgerald's exaggerated fears.   *See United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998) ("A bribe requires that the payment be made or promised 'corruptly,' that is, with 'corrupt intent.'").   It is this difference in the framework between §§ 924(a)(2) and 922(g) and § 666 that is ultimately determinative.   Possession of a firearm, when considering § 922(g), is entirely lawful unless it is done by a person with a particular status.[7]   Corruptly soliciting or demanding things of value with the intent to be influenced in connection with business or transactions of a government, agency, or other federally-funded organization is not.   *See Skilling v. United States*,

---

[6] The Court also notes the placement of the term "knowingly" in § 924(a)(2), as opposed to the placement of the term "corruptly" in § 666(a)(1)(B).   As the Supreme Court recognized in *Rehaif*, basic grammar indicated that "knowingly" modified the verb "violates" *and* its direct object § 922(g), which necessarily included Rehaif's status.   *Rehaif*, at ---, at 2196.   Therefore, the "status" provision at issue in *Rehaif* actually possessed a scienter requirement, as "knowingly" modified all that followed it.   As demonstrated here, however, because "corruptly" follows agent, it only modifies the acceptance, solicitation, demand, etc., of bribes and kickbacks.   *See* 18 U.S.C. § 666(a)(1)(B).   The two statutes are simply not alike.

[7] This Court is obviously aware that there are other circumstances where possession of a firearm is unlawful, but for purposes of this discussion considering *Rehaif*, the Court limits its discussion only to § 922(g).

561 U.S. 358, 412 (2010) ("[I]t has always been 'as plain as a pikestaff that' bribes and kickbacks constitute honest-services fraud.")

Moreover, this reading of the statute fits squarely within Congress's stated intent in enacting § 666. Again, Congress's intent in enacting § 666 was to protect the integrity of "the vast sums of money distributed through federal programs from theft, fraud, and undue influence by bribery." S.Rep. No. 98–225, at 370 (1983), 1984 U.S.C.C.A.N. 3182, 3511. Congress accomplished this ambitious goal with a broad-reaching criminal statute. *See, e.g.*, *Sabri v. United States,* 541 U.S. 600, 606 (2004); *Fischer v. United States,* 529 U.S. 667, 678 (2000); *Salinas v. United States*, 522 U.S. 52, 56 (1997). Whatever fear there may be that innocent people would get caught up by the statute's broad sweep is mitigated by the express *scienter* requirement in the statute, that the defendant acted with corrupt intent. *United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013).

However, even if this Court were to accept Fitzgerald's argument that a *scienter* requirement applies to "agent," Fitzgerald has again jumped the gun. Fitzgerald has challenged the legal sufficiency of the Superseding Indictment under a motion to dismiss pursuant to Rule 12(b)(3)(B)(v). The Superseding Indictment alleges that, while a private consultant, Fitzgerald exercised authority and managerial discretion over DHR matters, including the supervision of the acting CIO for DHR, who was previously Fitzgerald's deputy. (ECF No. 75–1 at ¶ 4(b).) Similarly, when she served as the Secretary of DIT, the Superseding Indictment alleges that she supervised the activities of the CIO of DHR. (*Id.* at ¶4(d).) As previously detailed in this Order, and accepting the factual allegations of the Superseding Indictment as true, Defendant Fitzgerald used these positions and her influence at DHR to threaten and structure several subcontracts in her favor, among other things. (*See, e.g.*, *id.* at ¶¶ 30, 33.) Should she choose to present the defense that she was not an agent of DHR, it is best

saved for a jury or a Rule 29 motion.   But, in the Court's view, the Superseding Indictment clearly alleges that she was aware of her status, even though § 666 does not require such a scienter requirement.

Justice Alito's clairvoyance in *Rehaif* rings especially true in light of Fitzgerald's argument: "The majority today opens the gates to a flood of litigation that is sure to burden the lower courts with claims for relief in a host of cases where there is no basis for doubting the defendant's knowledge." *Rehaif*, 588 U.S. at ---, 139 S. Ct. at 2213 (Alito, J., dissenting).   For the foregoing reasons, Fitzgerald's supplemental motion, (ECF No. 113), is **DENIED**.

7.   *The Definition of "Agent" under § 666(d)*

Fitzgerald again attacks the definition of "agent," as applied to her, for her next argument.   To refresh, 18 U.S.C. § 666 of the United States Code establishes, in pertinent part, as follows:

**(a)** Whoever, . . . —

> **(1)** being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof—
>
> ***
>
> > **(B)** corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; . . .

shall be fined under this title, imprisoned not more than 10 years, or both.

An "agent," as used in this section, is defined as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative[.]"   *Id.* at § 666(d)(1).

Defendants rely heavily on a decision from the United States Court of Appeals for the Fifth Circuit in arguing that an "agent" must have the authority to act on behalf of an entity's funds.   In *United States v. Phillips*, 219 F.3d 404 (5th Cir. 2000), the Fifth Circuit held that a Louisiana parish tax assessor was not an agent of the parish under § 666.   *Phillips* presented a classic kickback scheme involving the use of public funds in which the tax assessor was alleged to have placed his friend and co-defendant on the payroll of the tax assessor's office, while the co-defendant credited the amount of his after-tax salary to the tax assessor's account at a hardware store owned by the co-defendant. *Id.* at 408.   The prosecution argued that the tax assessor's office was an agency of the parish, which received federal funds, and that therefore the tax assessor was an agent of the parish government.   *Id.* at 410.   In determining the meaning of "agent" as applied to the facts presented, the Fifth Circuit reasoned that the definition "must be read in the context of that statute whose purpose is to protect the integrity of federal funds."   *Id.* at 411.   With this concept in mind, the Fifth Circuit then reasoned that, with the expansive definition of "agent," the statute could potentially reach the misuse of "virtually all funds of an agency that administers the federal program in question."   *Id.*   The court went on to explain that it was entirely different, however, to suggest that § 666   "can reach any government employee who misappropriates purely local funds, without regard to how organizationally removed the employee is from the particular agency that administers the federal program."   *Id.*   Accordingly, the court reasoned that the question of whether the tax assessor was an agent of the parish, then, turned on whether the tax assessor possessed the authority to act on behalf of the parish with respect to its funds.   *Id.*

Despite framing the question as one of "control and expenditure of the funds" of the parish, the court found that the assessor was not an employee or officer of the parish and further lacked legal authority to bind the parish as a function of state law.   *Id.*   In fact, the court found that the Louisiana

37

Constitution established that tax assessment districts were independent of the parish government and that the parish did not have any authority, control, or power over the tax assessor's job duties or performance. *Id.* at 412–13. Moreover, the tax assessor had a separate health and retirement plan than did other parish employees, and there was "a complete absence of any relationship" between his office and that of the parish, and especially the parish office that received federal funding. *Id.* Ultimately, the Fifth Circuit held that the tax assessor was not an agent of the parish because he "was not an employee or officer of the parish and because he was not authorized to act on behalf of the parish with respect to its funds[.]" *Id.* at 413.

The *Phillips* approach has been squarely rejected by other courts of appeals facing the same issue, however. *See United States v. Fernandez*, 722 F.3d 1, 11 (1st Cir. 2013) ("Even if the officials accepting bribes do not have the ability to control the expenditure of an entity's funds, it cannot be denied that their fraudulent conduct poses a threat to the integrity of the entity, which in turn poses a threat to the federal funds entrusted to that entity.") (internal quotation omitted); *Vitillo*, 490 F.3d at 323 (Because § 666(d)(1) does not define an "agent" as someone who necessarily controls federal funds, we conclude that the Vitillo argument fails."); *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007); *United States v. Spano*, 401 F.3d 837, 839–41 (7th Cir. 2005) ("[A] plain reading of the statute requires no nexus between the bribe and the federal funds received—in other words, the bribe need not be linked to federal funds to violate the law."); *United States v. Keen*, 676 F.3d 981, 990 (11th Cir. 2012) ("[W]e must decline to read into the definition of 'agent' a requirement that the person be authorized to act with respect to the entity's funds."). Even the Fifth Circuit has acknowledged that *Phillips* added "extra-textual teeth" to the "agent" definition. *United States v. Lipscomb*, 299 F.3d 303, 313 (5th Cir. 2002). In fact, even the *Phillips* panel itself seems to insist that it is not adding to the definition of "agent." *See Phillips*, 219 F.3d at 411 n.10 ("The dissent

seems to suggest that we impose a requirement under the statute that a defendant be authorized to act with respect to the agency's funds.  If this is the suggestion of the dissent, the dissent completely miscomprehends the thrust of the majority's opinion.")   Rather, it would seem even the *Phillips* court only identifies authority over an entity's funds to be but one factor in addressing the "various forms of conduct that can affect the integrity of federal funds."   *Id.*

These courts, in rejecting the argument seemingly endorsed in *Phillips* and advanced by the Defendants here, rely not only on basic tenants of statutory interpretation but also the legislative history of § 666.  District courts have long been instructed to apply and follow the "plain and unambiguous meaning of statutory language," absent "only the most extraordinary showing of contrary intentions" in the legislative history of a statute.  *United States v. Albertini*, 472 U.S. 675, 680 (1985).  As the Eleventh Circuit noted in *Keen*, "[n]owhere does the statutory text either mention or imply an additional qualifying requirement that the person be authorized to act *specifically with respect to the entity's funds.*"  *Keen*, 676 F.3d at 989–90 (emphasis in original).  The Eleventh Circuit noted further that the legislative history of § 666 supported this interpretation.  In particular, the court explained that § 666 was enacted "to protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery."  *Id.* at 990 (quoting S.Rep. No. 98–225, at 370 (1983), 1984 U.S.C.C.A.N. 3182, 3511).  Instead of limiting itself to only pursuing those corrupt individuals "who abuse their positions to skim federal funds," the Eleventh Circuit recognized that Congress "was committed to the even broader objective of ensuring 'the integrity of organizations participating in federal assistance programs.'"  *Id.* (citing *Sabri* 541 U.S. at 606; *Fischer*, 529 U.S. at 678).  In turn, and in keeping with Congress's broad and ambitious intent, the Eleventh Circuit identified several Supreme Court decisions in which the High Court

repeatedly refused to narrow § 666's scope.  *Id.* (citing *Sabri*, 541 U.S. at 606–07; *Fischer*, 529 U.S. at 677–79; *Salinas*, 522 at 57–59).

Indeed, the Supreme Court has repeatedly affirmed the broad construction of § 666.  *Sabri*, 541 U.S. at 604–05 (rejecting the defendant's contention that § 666(a)(2) was facially overbroad and therefore unconstitutional "because it fails to require proof of any connection between a bribe or kickback and some federal money"); *Salinas*, 522 U.S. at 56, 58 ("The enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered, does not support the interpretation that federal funds must be affected to violate § 666(a)(1)(B)."); *Fischer*, 529 U.S. at 678 (finding that the language of § 666(b) "reveals Congress' expansive, unambiguous intent to ensure the integrity of organizations participating in federal assistance programs"), 681–82 (emphasizing that fraudulent acts by state, local, and agency officials that do not directly implicate federal funds "raise the risk that participating organizations will lack the resources requisite to provide the level and quality of care envisioned by the [federal] program").  Given its broad and ambitious purpose, the Supreme Court has consistently held that not only is such a broad interpretation of this statute within its power but that narrowing this scope would be contrary to Congress's intent for enacting § 666. *See Salinas* 522 U.S. at 57–58 (reasoning that the "expansive, unqualified language . . . does not support the interpretation that federal funds must be affected" and that the petitioner's "attempts to circumscribe" § 666 does not fit with Congress's intent); *Sabri*, 541 U.S. at 606 (noting that Congress intended for § 666 to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery" while recognizing that "corruption does not have to be that limited to affect the federal interest").

Naturally then, the Supreme Court's recognition in *Sabri* and *Salinas* that corruption does not have to directly affect federal funds leads to the conclusion that there is no basis for adding extra-

textual teeth to the statutory definition of "agent."   This was the exact conclusion reached by the Third Circuit in *Vitillo* where it rejected the same argument advanced by Defendants here.   *Vitillo*, 490 F.3d at 323.   The Third Circuit warned against reading into the statute what was not there: "There is nothing in the statute to suggest that we should consult extrinsic sources, such as the Restatement of Agency, in attempting to further define 'agent.'   To do so might result in the improper importation of extraneous language into the statutory text."   *Id.* (citing *Phillips*, 219 F.3d at 422 n.2 (Garza, J., dissenting)).   Certainly, as demonstrated, the majority of the Courts of Appeals to have faced this issue have declined to include requirements in the definition of "agent" that do not appear in the statutory text.   *See Fernandez*, 722 F.3d at 11; *Vitillo*, 490 F.3d at 323; *Spano*, 401 F.3d at 839–41; *Keen*, 676 F.3d at 990.

Accordingly, this Court agrees that the definition of "agent" by § 666(d) does not require a demonstration or allegation that the individual charged have authority over the entity's funds.   As even the *Phillips* panel itself acknowledged, control or authority over an entity's funds is but a factor to analyze among the "various forms of conduct that can affect the integrity of federal funds."   *See Phillips*, 219 F.3d at 411 n.10.   Therefore, this Court joins the many others and rejects *Phillips* and the notion that a violation under § 666 requires that an agent have authority over an entity's funds. Defendants' argument is simply without basis in the statute, and this Court will not read into what is not there.   Fitzgerald's motion (ECF No. 55), is **DENIED** as to its application to Counts I, II, and III.[8]

>    *8.   The Intent Element of § 666(a)(1)(B).*

_____

[8] Similarly, the Court **DENIES** Defendants' Coffland, (ECF No. 58 at 1); Maudlin, (ECF No. 59–1 at 4); and Pangallo's, (ECF No. 61 at 7), motions as to this specific argument.

Fitzgerald next argues that Count III must be dismissed against her because the Superseding Indictment fails to allege that Fitzgerald acted with the intent to be influenced or rewarded in connection with any of the transactions or business at issue with DHR.   (ECF No. 55 at 23.)   While Fitzgerald concedes that, between January 1 and June 26, 2013, the Superseding Indictment does allege that she solicited and demanded that Xerox hire Coffland as an independent contractor, it fails to allege that she "agreed to or intended to be influenced in connection with DHR." (*Id.* at 18.)   The Government responds, generally, that Count III sufficiently alleges that Fitzgerald acted with the requisite intent because Count III incorporated the factual allegations of the Superseding Indictment and because the Government has charged Defendants with a "stream of benefits" corruption scheme. (ECF No. 72 at 16, n.5.)

As the Fourth Circuit has long recognized, "simply parroting the language of the statute in the indictment is insufficient." *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002).   Still, an indictment will be sufficient so long as the language of the statute is "accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Id.*

A "stream of benefits" prosecution occurs where an official is charged with "entering into an ongoing agreement to accept benefits in exchange for providing government business to the briber." *United States v. Lopez-Cotto*, 884 F.3d 1, 8 (1st Cir. 2018.)   In a stream-of-benefits prosecution, the Government must prove an agreement for the ongoing stream of benefits, rather than "stand alone bribes." *Id.   See also United States v. McNair*, 605 F.3d 1152, 1186 (11th Cir. 2010) (" Nor do [§§ 666(a)(1)(B) or 666(a)(2)] contain language such as 'in exchange for an official act' or 'in return for an official act.'   In short, nothing in the plain language of § 666(a)(1)(B) nor § 666(a)(2) requires that a specific payment be solicited, received, or given in exchange for a specific official act."); *United*

*States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998) ("Also, the government need not show that the defendant intended for his payments to be tied to specific official acts (or omissions).").

As the definition of a stream-of-benefits scheme makes clear, a specific action need not be tied directly to a specific official act to fulfill the requisite elements of a bribe.   That fundamental aspect of a stream-of-benefits scheme is where Fitzgerald's argument fails to pass muster.   The Superseding Indictment alleges in Paragraph 17 that "FITZGERALD and COFFLAND received and agreed to receive a stream of financial benefits from MAUDLIN, PANGALLO, and TCC in exchange for FITZGERALD's performance of favorable official acts for the benefit of TCC,"   (ECF No. 75–1 at ¶ 17), plainly alleging facts that would be found legally sufficient.

As demonstrated, no specific official act needs to be tied to a specific payment in a stream-of-benefits scheme.   Here, Count III of the Superseding Indictment incorporates and realleges "Paragraphs 1 through 15 and 17 through 33 of Count One . . . as though fully set forth herein."   (ECF No. 75–1 at Count III, ¶ 1.)   In particular, the Superseding Indictment alleges the specific acts, among numerous others, that Fitzgerald intended to be rewarded for official acts for the benefit of TCC, (*Id.*); that she furthered the interests of TCC by directing Xerox to hire Coffland as an independent contractor on the Hosting Contract, that she had previously caused Xerox to execute a subcontract with TCC through her influence, (*Id.* at ¶¶ 30, 31); and, more generally, that she and Coffland both corruptly solicited and accepted payments for their own benefit intending to be influenced or rewarded for these series of transactions.   (*Id.* at ¶ 16(a).)   While it is true that Count III itself may not contain any direct alleged payments to Fitzgerald or other acts tied specifically to the placement of Coffland in a lucrative position, other acts and benefits, along with the requisite intent to establish a violation of § 666(a)(1)(B), are alleged throughout the Superseding Indictment.

For the foregoing reasons, Fitzgerald's motion to dismiss Count III of the Superseding Indictment, (ECF No. 55 at 18), is **DENIED**.

### 9.   Duplicitousness of Count I

Fitzgerald next argues that Count I must be dismissed because it actually alleges multiple conspiracies and, as such, creates a risk that the jury will be divided on several of the agreements but will still convict because of an improper double count.   (ECF No. 55 at 19.)   In particular, Fitzgerald argues that Count I alleges four conspiracies: First, between Fitzgerald and Maudlin where Fitzgerald would use her influence to direct subcontracting work to TCC and Aeon would receive some of TCC's work in exchange; second, between Fitzgerald and Maudlin where Fitzgerald would direct work from Xerox to TCC, and that Fitzgerald would be paid from TCC's profits on that work; third, between Fitzgerald, Maudlin, Pangallo, and Coffland, where Fitzgerald would direct work from Xerox to TCC, and that Blue Northern would accept a portion of TCC's profits from that work; and finally, between Fitzgerald and Coffland and Maudlin and Pangallo, that Maudlin and Pangallo pay Coffland a portion of TCC's profits from work that TCC obtained through Fitzgerald's influence on Xerox.   (*Id.* at 20.) Because Count I alleges different agreements at different times with different actors, Fitzgerald argues that Count I must be dismissed.   (*Id.* at 25.)

An indictment is impermissibly duplicitous when it combines two or more distinct and separate crimes into one charge, and the defendant is thereby prejudiced.   *United States v. Sturdivant*, 244 F.3d 71, 76 (2d Cir. 2001).   *See also United States v. Burfoot*, 899 F.3d 326, 337 (4th Cir. 2018) ("An indictment is duplicitous if it charges 'two offenses in one count' . . . [and] creates 'the risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count.'")   The defendant may be prejudiced when a jury does "not unanimously agree on the offense

44

that the defendant committed," thereby violating the defendant's right to a unanimous verdict under the Sixth Amendment.  *Id.*  This danger does not exist, however, if the wrongful acts which would normally "constitute an offense standing alone" can be "characterized as part of a single, continuing scheme."  *Id.* (quoting *United States v. Kamalu*, 298 F. App'x 251, 254 (4th Cir. 2008) (unpublished)).   Finally, even if a charge in an indictment is found to be duplicitous, it "is not to be dismissed unless it causes prejudice to the defendant."  *Id.*

In deciding whether an indictment is duplicitous, the Court "limits its review to a reading of the indictment itself to determine whether it may be read to charge a single violation."  *United States v. King,* 200 F.3d 1207, 1212 (9th Cir. 1999).   On this review, the Court determines that Count I of the Superseding Indictment is not duplicitous, and, even if it was, the proper remedy would not be dismissal because it is not prejudicial to Fitzgerald.   First, what is apparent to the Court is that it alleges a "stream of financial benefits" conspiracy in which Defendants Fitzgerald and Coffland agreed to receive payments from Maudlin and Pangallo, through their company, TCC.   (*See* ECF No. 75–1 at ¶ 17.)   In exchange for these ongoing financial benefits, Fitzgerald was to perform "favorable official acts" for the benefit of TCC.   (*Id.*)   The Superseding Indictment then, as has been previously explored in detail in this Order, alleges numerous actions by the Defendants taken over the course of several years.   In other words, the Superseding Indictment appropriately alleges a continuous crime or course of conduct.

The conspiracy alleged in Count I perhaps *could* be read as separate offenses, but despite Fitzgerald's attempt to dissect it with a surgical knife, as alleged the conspiracy involves all the same persons, the same entities, the same means, and, most importantly, the same agreement.  *See United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988) (finding evidence of a single conspiracy sufficient for jury to find one conspiracy with the same actors, same location, and same methods).  *See also*

*King*, 200 F.3d at 1212–13 ("However, while these independent acts probably *could* constitute separate offenses, Count One alleges only a single execution of the fraudulent scheme. Thus, the indictment is not duplicitous.")   Moreover, she has also not shown or argued that there was any abandonment of or a defeat of the conspiracy or its purpose, such that a new agreement between the parties may be entered.   *See id.*

Of course, there has not been any evidence developed in this case, as of yet, wherein the Court could make a ruling as a matter of law on the duplicity issue.   The Government retains the burden of proving a single conspiracy charged in the indictment.   *United States v. Hines*, 717 F.2d 1481, 1489 (4th Cir. 1983).   Whether there was a single conspiracy, or multiple, "depends upon the overlap of key actors, methods, and goals."   *Leavis*, 853 F.2d at 218 (citing *United States v. Crockett*, 813 F.2d 1310, 1316–17 (4th Cir. 1987)).   Appropriately, then, these questions are best suited for the jury.   *Id. See also United States v. Urbanik*, 801 F.2d 692, 695 (4th Cir. 1986); *United States v. Fauntleroy*, 800 F.Supp.2d 676, 689 (D. Md. 2001).   In this case, what has been properly alleged is a continuous conspiracy over several years and involving the overlap of key actors, methods, and goals.   It is now up to the Government to prove the conspiracy.

For the foregoing reasons, Fitzgerald's motion to dismiss Count I based on duplicity is **DENIED**.

### 10. Count II and the Statute of Limitations

Fitzgerald next argues that Count II must be dismissed as time barred because violations of § 666(a)(1)(B) are not "continuing offenses."   (ECF No. 56 at 26–27.)   Because violations of § 666 are not continuing offenses, Fitzgerald argues that any allegations prior to September 27, 2012—five years preceding the return of the original indictment—are time barred.   (*Id.* at 29.)

46

Violations of § 666(a)(1)(B) are subject to a five-year statute of limitations. 18 U.S.C. § 1382(a). "The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie v. United States*, 397 U.S. 112, 114 (1970). The statute of limitations begins to run upon completion of the crime. *Id.* at 115 (citing *Pendergast v. United States*, 317 U.S. 412, 418 (1943)). Congress has stated an intent that the statute of limitations should not be extended "[e]xcept as otherwise expressly provided by law." 18 U.S.C. § 1382(a). *See also Toussie*, 397 U.S. at 115. However, in "limited circumstances," a limitation period may be extended if the offense at issue is found to be continuing. *Id.* "The hallmark of the continuing offense is that it perdures beyond the initial illegal act, and that 'each day brings a renewed threat of the evil Congress sought to prevent' even after the elements necessary to establish the crime have occurred." *United v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999).

The Government contends that the continuing offense doctrine should apply in this case, as the Superseding Indictment has alleged a stream-of-benefits conspiracy. (ECF No. 72 at 19–25.) The Government's main contention is that Congress clearly intended § 666(a)(1)(B) to include a "prolonged course of conduct," through its inclusion of the phrase "series of transactions" within the statute. (ECF No. 72 at 22 (quoting *Toussie*, 397 U.S. at 120).) The Government's position is that while the bribery scheme alleged in Count II began in November 2011, it continued through the issuing of personnel service contracts through early 2013, subcontracting work on the Hosting Contract and the appointment of Coffland as the Hosting Director, and concluded in December 2014 with Fitzgerald forcing Xerox to subcontract work on the Applications Contract to TCC and the subsequent payments of portions of the profits from the Applications Contract to Coffland. (*Id.* at 20.) Thus, the Government argues that the very nature of this bribery scheme, coupled with

47

Congress's stated intent in § 666, leads to the conclusion that Count II is not subject to the statute of limitations in this matter.   (*Id.* at 25.)

The Court agrees with the Government's contention.   The Supreme Court instructed in *Toussie* that a "continuing offense" may be found either where the statute itself establishes the concept through its express language or where "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Toussie*, 397 U.S. at 115.   Both of the *Toussie* prongs are satisfied here.

As the Court has already detailed at length, Congress had ambitious goals in protecting the integrity of federal funds through the enactment of § 666.   These broad goals of preventing corruption are evidenced through the statute's broad application and interpretation. *See*, *Salinas v. United States*, 522 U.S. 52, 56 (1997); *United Sates v. Ng Lap Seng*, 934 F.3d 110, 132 (2nd Cir. 2019); *United States v. McNair*, 605 F.3d 1152, 1191 (11th Cir. 2010); *United States v. Lindberg*, Docket No. 5:19-CR-00022-MOC-DSC, 2020 WL 4504434 at *12 (W.D.N.C. Aug. 4, 2020).   Congress felt it necessary, then, to include the phrase "series of transactions," indicating that it recognized and explicitly authorized "stream of benefits" prosecutions under this statute. *Jennings*, 160 F.3d at 1014 (recognizing that a stream of benefits bribery scheme involves a "course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor."). *See also United States v. Jefferson*, 674 F.3d 332, 359 (4th Cir. 2012) ("[B]ribery can be accomplished through an ongoing course of conduct."); *United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007). Given that the Congress contemplated the existence of these "stream of benefits" bribery schemes through its express inclusion of a "series of transactions" within the gambit of § 666, it is simply unfathomable that Congress did not intend to protect the integrity of federal funds from corruption by limiting complex and continuous schemes to only individual acts.

Moreover, this matter is easily distinguishable from the cases cited by Fitzgerald, as none were prosecuted under a "stream of benefits" theory.  *See United States v. Sampson*, 122 F.Supp.3d 11 (E.D.N.Y. 2015) (embezzlement); *United States v. Sunia*, 643 F.Supp.2d 51 (D.D.C. 2009) (fraudulent conversion of property); *Yashar*, 166 F.3d 873 (embezzlement); *United v. Askia*, 893 F.3d 1110 (8th Cir. 2018) (embezzlement).   Similarly, *United States v. Jones*, 676 F.Supp.2d 500 (W.D. Tex. 2009) and *United States v. Musto*, 2012 WL 5879609 (M.D. Pa. Nov. 21, 2012), while bribery cases, did not prosecute under a "stream of benefits" theory.   Instead, what has been alleged here is the very thing the Seventh Circuit identified about continuing offenses in *Yashar*: Each day brought "a renewed threat of the evil Congress sought to prevent" through the alleged forcing of subcontracts and profits to and through TCC and Coffland and Fitzgerald.

The stream-of-benefits bribery scheme alleged here is properly characterized a continuing offense such that the statute of limitations does not bar those overt acts that occurred before September 27, 2012.   For the foregoing reasons, Fitzgerald's motion is **DENIED** as to Count II.

*11. Hobbs Act Extortion*

Finally, Fitzgerald argues that Count VII should be dismissed for failing to state the offense of extortion under the Hobbs Act.   (ECF No. 114.)   Fitzgerald argues that the Superseding Indictment fails to allege that Fitzgerald "obtained" any property of the victim, Xerox.   (*Id.* at 3.) Fitzgerald argues that Count VII also fails because the "property" at issue—a paid position of employment for Coffland at Xerox—is not "property" as contemplated by the statute because it is not transferable.   (*Id.* at 6.)   Finally, Fitzgerald asserts that the Superseding Indictment does not allege extortion, but instead alleges "coercion," which is not actionable under the Hobbs Act.   (*Id.* at 9.)

Title 18, § 1951 of the United States Code is more well known by the name "Hobbs Act."   It establishes the following:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a).   The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."   *Id.* at § 1951(b)(2).

The Court notes that nowhere in the Hobbs Act does it state that the extortionist must obtain the property directly.   In fact, Fitzgerald appears to implicitly recognize this fact by hiding a citation to *Scheidler v. National Organization for Women, Inc.* behind the signal "*accord*."[9]   (ECF No. 114 at 3.)   That quote, however, only supports the notion that not only does the victim need to be deprived of his property, but that "*a person* must obtain property from another" to commit extortion.   *Scheidler*, 537 U.S. 393, 404 (2003) (emphasis added).   Like the statute itself, *Scheidler* does not limit the obtainment of property to only the alleged extortionist.   This notion is only further supported by the *Scheidler* Court quoting the Model Penal Code, in distinguishing the crime of extortion from coercion, in which it states that the "obtaining" element of extortion "is further explained as 'bring[ing] about a transfer or purported transfer of a legal interest in the property, whether to the obtainer or another.'" *Scheidler*, 537 U.S. at 408, n.13.

In truth, *Scheidler* had nothing to do with which party actually obtains the extorted property, but rather whether the deprivation of certain rights could be considered "property" for a prosecution under the Hobbs Act.   *See Scheidler*, 537 U.S. at 400–01 (respondents argued that property rights

---

[9] "Accord," when used in legal citations, is commonly used when two or more sources support a proposition, but only one source is actually referred to or quoted.   *The Bluebook: A Uniform System of Citation*, 62 (Columbia L. Rev. Ass'n et al. eds., 21st ed. 2020).   The Court believes this to be a poor and stretched use of the signal here.

subject to the Hobbs Act include "a woman's right to seek medical services from a clinic, the right of the doctors, nurses or other clinic staff to perform their jobs, and the right of the clinics to provide medical services free from wrongful threats, violence, coercion and fear.") The Supreme Court rejected the assertion that these rights constituted property but declined to "trace the outer boundaries of extortion liability" because to do so was not necessary here. *Id.* Thus, the *Scheidler* Court reaffirmed that their prior decisions concerning the Hobbs Act similarly did not require the Court to explore these outer boundaries because they were not implicated. *Id.* (citing *United States v. Green*, 350 U.S. 415, 420 (1956)). Nowhere in the *Scheidler* decision did the Supreme Court disavow or otherwise overrule *Green*, despite Fitzgerald's assertion that it did. Moreover, the *Scheidler* Court explicitly warned against what Fitzgerald now attempts to persuade this Court to do: "We have said that the words of the Hobbs Act 'do not lend themselves to restrictive interpretation' because they 'manifes[t] . . . a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.'" *Scheidler*, 537 U.S. at 408.

Similarly, Fitzgerald's reliance on *Sekhar v. United States*, 570 U.S. 729 (2013) is equally misplaced. In *Sekhar*, the Court again wrestled with the question of whether a recommendation to approve investments in a fund was an "obtainable property" under the Hobbs Act. In *Sekhar*, the managing partner of a venture investment firm was convicted of attempted extortion for threatening the State Comptroller for the State of New York in order to have a certain investment, managed by the firm, approved by the Comptroller's Office. *Id.* at 731. The Court, however, found that the recommendation for investment was not "property" under the Hobbs Act: "The property extorted must therefore be *transferable*—that is, capable of passing from one person to another. The alleged property here lacks that defining feature." *Id.* at 734 (emphasis in original). The fact that the recommendation

51

for investment itself was not obtainable drove the Court's analysis, a point which the Court explicitly acknowledged while notably recognizing its earlier decision in *Scheidler* was similar. *Id.* at 736 ("*Scheidler* rested its decision, as we do, on the term 'obtaining.'").   Aside from one throw-away line in this decision, in which the Court mentioned in the simplest of ways that the "extortionist 'gain possession' of [the property]," *Sekhar* did not discuss at all whether a *third-party* could receive the extorted property.

The law could not be clearer that an extorter may be prosecuted under the Hobbs Act even though she transmits the property to a third party.  *See Green*, 350 U.S. at 420 ("And extortion as defined in the statute in no way depends upon having a direct benefit conferred on the person who obtains the property."); *United States v. Valentini*, 944 F.3d 343, 350 (1st Cir. 2019) ("To satisfy the 'obtaining of property' element of Hobbs Act extortion, our law is clear that the defendant need not receive any personal benefit or take personal possession of the property[]: directing the transfer of property to a third party is enough."); *United States v. Carlson*, 787 F.3d 939, 944 (8th Cir. 2015) (finding the "obtaining of property" element met where the defendant "did demand items of value, she just did not seek to obtain them for herself"); *United States v. McFall*, 558 F.3d 951, 956 (9th Cir. 2009) ("Instead, there must be an 'obtaining': someone—either the extortioner or a third person—must receive the property of which the victim is deprived.") (internal quotation omitted); *United States v. Vigil*, 523 F.3d 1258, 1264 (10th Cir. 2008) (holding that the "obtaining of property" element was met where a state treasurer "attempted to obtain money from [a company's head] and direct that money to [a political supporter's wife]"); *United States v. Lewis*, 797 F.2d 358, 364 (7th Cir. 1986) ("To secure a conviction under the Hobbs Act, the prosecution does not have to show that the defendant acted to receive, either directly or indirectly, the proceeds of his extortion or any benefit therefrom."); *United States v. Clemente*, 640 F.2d 1069, 1079–80 (2d Cir. 1981) ("[W]hether a Hobbs

52

Act defendant personally receives any benefit from his alleged extortion is largely irrelevant for the purpose of determining guilt under that Act."); *United States v. Cerilli*, 603 F.2d 415, 420 (3rd Cir. 1979) ("It is well-established that a person may violate the Hobbs Act without himself receiving the benefits of his coercive actions."); *United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978) ("Extortion under the Hobbs Act does not require a direct benefit to the extortionist[.]").   Fitzgerald's attempt to read out-of-context and cherry-picked statements in her favor is without merit.

Fitzgerald's next argument is that the "property" of Xerox—the position of Hosting Director on the Hosting Contract—is not the type of "property" contemplated by the Hobbs Act.   (ECF No. 114 at 9.)   Here, Fitzgerald and the Government argue what appears to be two sides of the same coin: Fitzgerald argues that the "property" at stake is the actual job of Hosting Director with Xerox, while the Government maintains that it is actually the salary, bonuses, and benefits that represent the property.[10]   (*Compare id.* at 6, n.3 *with* ECF No. 130 at 24.)   While Fitzgerald attempts to contort an argument that the actual position of Hosting Director is separate and apart from the wages and benefits earned in that position, practically speaking, it makes little difference.   Fitzgerald's argument fares no better than her previous one.

The Hobbs Act does not define "property."   *See Sekhar*, 570 U.S. at 739 (Alito, J., concurring). "[A]bsent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.'"   *Id.* at 732 (quoting *Neder v. United States,* 527 U.S. 1, 23 (1999)). As the Supreme Court identified, at the common law "extortion" typically "required the obtaining of items of value, typically cash, from the victim."   *Id.* at 733 (citing *People v. Whaley,* 6 Cow. 661

---

[10] In various places throughout her argument, Fitzgerald also refers to the position of Hosting Director—the "property"— as the actual contract between Coffland and Xerox.   (*See* ECF No. 114 at 7.)   Again, Fitzgerald rests this argument on her previous argument: Namely, that she herself did not obtain the wages and benefits of this position, nor could she have transferred the "contract" to herself.   (*Id.*)

(N.Y. Sup. Ct. 1827); *Commonwealth v. Bagley,* 24 Mass. 279 (1828); *Commonwealth v. Mitchell,* 66 Ky. 25 (1867); *Queen v. Woodward,* 11 Mod. 137, 88 Eng. Rep. 949 (K.B. 1707)).   *See also Scheidler*, 537 U.S. at 402 ("At common law, extortion was a property offense committed by a public official who took 'any money or thing of value' that was not due to him under the pretense that he was entitled to such property by virtue of his office.")   Obtaining property meant that not only was the victim deprived of the property, but that the property itself was acquired, meaning that the property was transferable.   *Sekhar*, 570 U.S. at 734.

Under the Hobbs Act, property is not limited to physical or tangible things, but includes "any valuable right considered as a source or element of wealth."   *United States v. Tropiano*, 418 F.2d 1069, 1075 (2d Cir. 1969).   Naturally, both Congress in enacting the Hobbs Act and the Supreme Court in interpreting it have identified "wages" as a form of property subject to the Act.   *See United States v. Emmons*, 410 U.S. 396, 403 (1973) (quoting 91 Cong. Rec. 11,900 (1945) (remarks of Rep. Hancock)); *see also Green*, 350 U.S. 415 at 419 (charge of extortion under Hobbs Act appropriate where union attempted to exact money from employer in form of payment of wages for superfluous and fictitious services of certain laborers, upon threat of violence); *United States v. Kemble*, 198 F.2d 889, 891 (3d Cir. 1952) ("[T]he conclusion seems inescapable that Congress intended that the language used in the [Hobbs Act] be broad enough to include, in proper cases, the forced payment of wages."); *United States v. Kirsch*, 903 F.3d 213, 227 (2d Cir. 2018) ("Wages and benefits are 'capable of passing from one person to another,'—in this case, from the employer to the employee—and are therefore 'transferable.'").   *Cf. Sekhar*, 570 U.S. at 742 (Alito, J., concurring) ("The general counsel's job surely had economic value to him, as did his labor as a lawyer, his law license, and his reputation as an attorney. But the indictment did not allege, and the jury did not find, that petitioner attempted to obtain those things.")

Because this is a motion challenging the legal sufficiency of the Superseding Indictment, the Court again turns to its allegations.  Count VII alleges that Defendant Fitzgerald "used her official position to cause [Xerox] to hire defendant Coffland as the Hosting Director on the Hosting Contract[.]"  (ECF No. 75–1 at 25.)  The Superseding Indictment alleges further that Coffland "demanded that he be paid, and which he was subsequently paid, an annual salary along with potential bonuses of up to $500,000 yearly."  (*Id.*)  Through theses alleged actions, Defendant Fitzgerald "obtained property not due" by means of extortion under color of official right.  (*Id.*)

Fitzgerald's argument is simply and obviously without merit.  As courts have previously recognized, wages and benefits are easily transferable property under the Hobbs Act.  Even attempting to paint that the property at issue was Coffland's "employment contract" or the position itself does not change the allegations in the Superseding Indictment that Coffland was paid an exorbitant salary with bonuses, nor does it change the allegations that Fitzgerald used her official position to extort those economic benefits from Xerox.  (*Id.*)  The position and, along with it, the wages and benefits, were clearly transferable, as Coffland was actually hired into the position and then presumably paid for it.  *See Kirsch*, 903 F.3d at 227.  Again, the Court stresses that the challenge here is the legal sufficiency of the Superseding Indictment.  And again, what has been alleged by the Superseding Indictment passes muster.

Finally, Fitzgerald argues that what has been alleged here is coercion and that Count VII must be dismissed on that basis.  (ECF No. 114 at 9.)  Fitzgerald asserts that "[w]hen the alleged act is to force another to do something in accordance with one's own wishes, what has occurred is *coercion*, not extortion."  (*Id.*)  Fitzgerald appears to rely on her already rejected theory that she must be the individual to obtain the property, and therefore, she implies that she only interfered with Xerox's property.  (*Id.* at 10.)

55

"Extortion" is defined by the Hobbs Act as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."   18 U.S.C. § 1951(b)(2).   As the Supreme Court explained in *Sekhar*, the Hobbs Act was "borrowed, nearly verbatim" from the New York State penal code, which also criminalized coercion but only as a misdemeanor.   *Sekhar*, 570 U.S. at 734–35.   Under that statute, coercion only required the use of threats "to compel another person to do or to abstain from doing an act which such other such person has a legal right to do or to abstain from doing."   *Id.* at 735 (quoting N.Y. Penal Law § 530 (1909)).   *See also id.* at 736, n.4 ("It is coercion, not extortion, when a person is forced to do something and when he is forced to do nothing."); *Schediler*, 537 U.S. at 405 ("The crime of coercion, . . . , involves the use of force or threat of force to restrict another's freedom of action. ").

Fitzgerald's argument fails because it ignores that the Superseding Indictment alleges that property—namely, the position of Hosting Director and its wages, bonuses, and benefits—was obtained, which graduates coercion into extortion.   *See Scheidler*, 537 U.S. at 405 ("Eliminating the requirement that property must be obtained to constitute extortion would not only conflict with the express requirement of the Hobbs Act, it would also eliminate the recognized distinction between extortion and the separate crime of coercion[.]").   Of course extortion and coercion both involve forcing someone to do something that is within the extortionist's own wishes, but the key distinction between the two is the obtainment of property.   *Id.*   *See also* 18 U.S.C. § 1951(b)(2) (identifying that extortion occurs through force when property is obtained with the victim's consent).

Here, property was clearly obtained through the wages and benefits paid to Coffland, despite Fitzgerald's distortion of the allegations that it was not the wages and benefits of the position that were obtained, but instead the actual position of Hosting Director.   (ECF No. 132 at 16.)   Really, however, this distinction is of no matter, as it is clear that wages and benefits are transferable property

as contemplated by the Hobbs Act, and it is similarly clear that the extortionist herself need not directly benefit from the transfer of property.   Any formulation of the Hobbs Act that Fitzgerald advances would leave the statute entirely toothless.   For the foregoing reasons, Fitzgerald's Motion to Dismiss Count VII, (ECF No. 114), is **DENIED**.

For the foregoing reasons, Fitzgerald's Motion to Dismiss Counts I, II, and III, (ECF Nos. 55, 56); Supplemental Motion to Dismiss Counts I, II, and III, (ECF No. 113); and Motion to Dismiss Count VII, (ECF No. 114), are hereby **DENIED** in their entirety.

### B.   *Steven Maudlin's Motion to Dismiss and Supplemental Motion to Dismiss*

The Court next takes up Defendant Maudlin's Motion to Dismiss Counts I, IV, and VI, (ECF No. 59); and Supplemental Motion to Dismiss Counts I, IV, and VI, (ECF No. 119).[11]   Maudlin first argues that Count I must be dismissed for duplicity and must be dismissed.[12]   (ECF No. 59 at 6.) Maudlin then argues that Count VI must be dismissed because it fails to allege that Maudlin made a false statement, that the statement regarded a material fact, and that the statement was made with fraudulent intent.   (*Id.*)   In his Supplemental Motion, Maudlin argues that Counts I and IV must be dismissed because the Superseding Indictment fails to allege that Maudlin knew Defendant Fitzgerald was an agent of DHR or that she had authority with respect to DHR's funds.[13]   (ECF No. 119 at 4.)

### 1.   *Agency under § 666*

---

[11] Maudlin, in a footnote, incorporates Defendant Fitzgerald's "arguments describing why Count One should be dismissed," as well as her arguments as to Count II, only applied to Count IV as charged to him.   (ECF No. 59 at 3, n.1.) As the Court has already decided and explained these issues, it declines to do so again here.   Therefore, for those reasons more fully detailed in Part III(A), *supra*, Maudlin's motion to dismiss Count I and Count IV relying on Fitzgerald's arguments is **DENIED**.

[12] Maudlin did argue that Counts I and IV must be dismissed because it failed to allege that the Maryland DHR was subject to § 666 because the Indictment did not allege that it was in receipt of federal funds.   (ECF No. 59 at 4.)   That argument has been mooted by the Superseding Indictment and conceded by the Defendants.

[13] Maudlin also restates his arguments as to Count VI and applies them to the newly alleged false statements contained within Count VI of the Superseding Indictment.   (ECF No. 119 at 5.)

The Court has previously gone into extensive detail regarding the statutory definition of "agent" under § 666.   As before, the Court remains unconvinced that § 666 requires an agent to wield authority over an agency's funds.   *See* Part III(A)(7), *supra*.   As such, Maudlin's motion, (ECF No. 119), is **DENIED** to the extent it relies on the argument that an agent is required to wield authority with respect to a covered entity's funds.

Similarly, the Court finds Maudlin's argument regarding scienter and the application of *Rehaif* to this matter unpersuasive.   Count IV charges Maudlin with a violation of 18 U.S.C. § 666(a)(2). (ECF No. 75–1 at 21).   Section 666(a)(2) establishes, in pertinent part, as follows:

> (a) Whoever, . . .
>
> (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666(a)(2).   Thus, to establish a violation of this statute, the Government must establish that a defendant (1) "[gave], offer[ed], or agree[d] to give a thing of value to any person; (2) with the corrupt intent to influence or reward an agent of an organization that receives more than $10,000 in federal funding in any one-year period; (3) in connection with any business transaction or series of transactions of that organization involving more than $5,000."   *See United States v. Pacchioli*, 718 F.3d 1294, 1300 (11th Cir. 2013).   *See also United States v. Whiteagle*, 759 F.3d 734, 753 (7th Cir. 2014).

Much like § 666(a)(1)(B), this subsection does not include the term "knowingly," and instead includes the requirement that such gift or offer be given "corruptly" and with the "intent to influence or reward" an agent of an agency.   *See* Part III(A)(6), *supra*.   In truth, Maudlin has not directed the

Court to any authority dictating that the "knowing" element as to Defendant Fitzgerald's status is required in charging a violation of § 666(a)(2), and the Court is unable to locate any authority in its own research.

Still, the Court again returns to the Superseding Indictment to ensure that the indictment sufficiently alleges a violation of § 666(a)(2).   In part, the Superseding Indictment alleges as follows:

> Between in or about November 2011 and December 2014, in the District of Maryland and elsewhere, . . . Maudlin . . . did corruptly give, offer, and agree to give anything of value to any person, namely payments under the guise of consulting and other contracts to Fitzgerald and Coffland, with intent to influence or reward Fitzgerald, an agent of the Maryland Department of Human Resources, an agency that received federal benefits in excess of $10,000 in the one-year period beginning January 1, 2012 and ending December 31, 2012, in connection with a business, transaction, and series of transactions of the Department of Human Resources involving $5,000 or more.

(ECF No. 75–1 at 21.)   This paragraph closely mirrors the language of the statute, specifically identifies the item of value, identifies the agent, the intent of the payments, and the jurisdictional hook of the DHR receiving federal benefits.   The Superseding Indictment alleges more, however.   First, as already detailed previously, the Superseding Indictment alleges Defendant Fitzgerald's previous employment, as well as the authority she had in those positions.   (*Id.* at ¶ 4.)   It then alleges, among other things, that Maudlin served as the CEO of TCC and was also its largest shareholder.   (*Id.* at ¶ 14.)   The Superseding Indictment goes on to allege that Maudlin negotiated with Fitzgerald and reached an agreement where Fitzgerald "would be compensated for using her influence" to funnel subcontract work on the CARES Modernization Project to TCC.   (*Id.* at ¶¶ 33(b)–(c).)   Further, it alleges that Maudlin, through his employees, informed Fitzgerald of changes to her agreed-to compensation, as well as the execution of Task Orders issued to TCC by Xerox, which represented payments that Fitzgerald had demanded of Xerox as a precondition of DHR approval of the CARES project.   (*Id.* at ¶¶ 33(g)–(h).)

59

Accepting the allegations of the Superseding Indictment as true, and even if the Court were to find that a "knowing" element needs to be alleged as to Fitzgerald's status, it is difficult to reconcile that Maudlin took the actions he did without knowing that Fitzgerald was an agent of the DHR.   As it stands, the Superseding Indictment alleges precisely what is required by the statute, while providing enough detail to put Maudlin on notice of the charges facing him.   There simply is no basis for doubting Maudlin's knowledge of Fitzgerald's status based on the allegations in the Superseding Indictment.   *See Rehaif*, 588 U.S. at ---, 139 S. Ct. at 2213 (Alito, J., dissenting).

For the foregoing reasons, and as additionally detailed in Part III(A)(6), *supra*, Maudlin's motion to dismiss Counts I and IV, (ECF No. 119), is **DENIED**.

### 2.   *Duplicitousness of Count I*

Maudlin, like Fitzgerald, moves this Court to dismiss Count I for duplicity because he asserts that, instead of alleging one conspiracy, it alleges several.   (ECF No. 59 at 6.)   The Court, having received and considered this argument previously, is similarly unconvinced that Count I charges any more than one conspiracy.   *See* Part III(A)(9), *supra*.   For those reasons more fully detailed in Part III(A)(9), *supra*, Maudlin's motion to dismiss Count I on grounds of duplicty, (ECF No. 59), is **DENIED**.

### 3.   *False Statements*

Maudlin finally moves for the dismissal of Count VI, which alleges that Maudlin made false statements to investigators in violation of 18 U.S.C. § 1001.   (ECF Nos. 59, 119–1.)   In support of this motion, Maudlin argues that the Superseding Indictment failed to allege that Maudlin's statements (1) were false; (2) regarded a material fact; and (3) were made with fraudulent intent. (ECF No. 119–1 at 5.)   Maudlin also argues that, as to the two "new" false statements alleged in the

Superseding Indictment, Count VI should be dismissed because the allegations are ambiguous in that they fail to identify which of multiple contracts Maudlin referred to.   (*Id.* at 7.)

Section 1001 provides the following, as relevant to the charges here:

(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully— . . .

    (2) makes any materially false, fictitious, or fraudulent statement or representation; . . .

shall be fined under this title, imprisoned not more than 5 years . . . or both.

18 U.S.C. § 1001(a)(2).   Again, the Court notes that, in challenging the legal sufficiency of an indictment, an indictment need only contain "the elements of the offense and fairly inform the defendant of the exact charges and [] enable the defendant to plead double jeopardy in subsequent prosecutions of the same offense."   *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998). *See also Hamling v. United States*, 418 U.S. 87, 117 (1974) (statutory language must be accompanied by such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general heading, with which he is charged); *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002); *United States v. Loayza*, 107 F.3d 257, 260–62(4th Cir. 1997); *United States v. Sutton*, 961 F.2d 476, 479 (4th Cir. 1992).   Simply parroting the statute is not enough, as the indictment must also allege sufficient factual information "as will inform the accused of the specific offence, coming under the general description, with which he is charged."   *Hamling*, 418 U.S. at 117–18.

Count VI alleges as follows:

On or about November 14, 2014, in the District of Maryland and elsewhere, the defendant, **STEVEN MAUDLIN**, did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the

jurisdiction of the executive branch of the Government of the United States, by falsely stating that:

  a. When **FITZGERALD** was a consultant to the DHR Secretary, TCC paid **FITZGERALD** because she helped TCC with staffing and Aeon "gave TCC a body," or words to that effect.

  b. **FITZGERALD** did not use her influence to get TCC its contract with [Xerox].

  c. There were no agreements between TCC and **FITZGERALD** to get TCC its contract with [Xerox] in exchange for giving **FITZGERALD** money.

(ECF No. 75–1 at 24.)

Even a cursory review of the allegations of Count VI reveals that the Superseding Indictment is more than legally sufficient.  First, it alleges that Maudlin "did willfully and knowingly make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States," almost directly repeating the language of the statute.  Count VI also alleges the date on which these statements occurred, the location of the statements, and the gist of the statements themselves.  Combined, this factual information more than adequately informs Maudlin of the specific offense with which he is charged, and it provides sufficient detail to inform him of the general charge so that he may plead double jeopardy in subsequent prosecutions.  *See Hamling*, 418 U.S. at 117–18; *Williams*, 152 F.3d at 299.

Maudlin argues that the Superseding Indictment is defective because it fails to allege that his statements (1) were false; (2) regarded a material fact; and (3) were made with fraudulent intent. (ECF No. 119–1 at 5.)   The allegations, however, do just that: "[Maudlin] did *willfully and knowingly* make *materially false*, fictitious, and *fraudulent* statements and representations[.]"   (*See* ECF No. 75–1 at 24.)   What Maudlin is really arguing, though, is that the Government has failed to allege *how*

the statements were false; *how* the statements were material; and *for what purpose* he made the statements.   (*See* ECF No. 59–1 at 7, 9.)   Maudlin's argument, however, is misguided as what he argues needs to be *alleged* is in actuality what needs to be *proved* by the Government at trial to secure a conviction.   *See, e.g.*, *United States v. Powell*, 767 F.3d 1026, 1030 (10th Cir. 2014) ("[W]here the indictment quotes the language of a statute and includes the date, place, and nature of illegal activity, it need not go further and allege in detail the factual proof that will be relied upon to support the charges."); *United States v. Mancuso*, 718 F.3d 780, 790 (9th Cir. 2013) ("An indictment must provide the essential facts necessary to apprise a defendant of the crime charged; it need not specify the theories or evidence upon which the government will rely to prove those facts."); *United States v. Edmond*, 924 F.2d 261, 269 (D.C. Cir. 1991) ("[T]he function of a federal indictment is to state concisely the essential facts constituting the offense, not how the government plans to go about proving them.").   As demonstrated, the allegations in the Superseding Indictment are sufficient to fairly inform Maudlin of the charges pending against him and to allow him to plead double jeopardy in any subsequent prosecutions.

Finally, regarding Maudlin's assertion that the false statements alleged are "fundamentally ambiguous," the Court disagrees and finds, again, that the allegations in the Superseding Indictment are legally sufficient.   Much like the above analysis illustrates, an indictment "need not be perfect, and common sense and reason are more important than technicalities."   *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013).   Furthermore, a false statement charge "need not specify in the indictment the particular false statements upon which the charge is based."   *United States v. Mermelstein*, 487 F. Supp. 2d 242, 251 (E.D.N.Y. 2007) (citing *United States v. Gabriel*, 920 F.Supp. 498, 508 (S.D.N.Y.1996)); *see also United States v. Cason*, 2015 WL 4988206 at *3; *United States v. Sullivan*, No. S102CR.1144, 2004 WL 253316, at *3 (S.D.N.Y. Feb. 10, 2004) ("There is no

63

precedent that requires that indictments identify each and every statement the Government might argue at trial is false."); *United States v. Lang*, 766 F.Supp. 389, 396 (D. Md. 1991).   Count VI lays out the basic factual allegations upon which the charge is levelled against Maudlin, and it details the essential elements of the false statements charge.   The Superseding Indictment itself, in rather superfluous detail, spells out numerous actions taken by the Defendants in furtherance of the alleged conspiracy, such that Maudlin is fairly informed of the charges pending against him.

For the foregoing reasons, Maudlin's motions to dismiss Count VI of the Superseding Indictment are **DENIED**.

For the foregoing reasons, Maudlin's Motion to Dismiss Counts I, IIII, and VI, (ECF No. 59), and his Supplemental Motion to Dismiss Counts I, IIII, and VI, (ECF No. 119) are hereby **DENIED** in their entirety.

### C.  James Pangallo's Motion to Dismiss and Supplemental Motion to Dismiss

The Court now turns to Pangallo's Motion to Dismiss Counts I and IV, (ECF No. 61); and Supplemental Motion to Dismiss Count I and IV, (ECF No. 118).   Pangallo argues that Counts I and IV, as asserted against him, must be dismissed because the Superseding Indictment fails to allege that Fitzgerald "had the requisite authority to act on behalf of DHR," referring to the supposed requirement that an agent have control over an agency's funds.   (ECF No. 61 at 6.)   Pangallo argues further that Counts I and IV must be dismissed because § 666 did not apply to Fitzgerald at the time of the alleged crimes because she was not an agent of the DHR while a private citizen or employee of the DIT.   (*Id.* at 7–12.)   Next, Pangallo argues that Count I is subject to dismissal because "it violates the rule against duplicity."   (*Id.* at 12–13.)   Finally, Pangallo's supplemental motion to dismiss adopts Fitzgerald's scienter argument based on *Rehaif* and argues that Counts I and IV must be dismissed as

to him because the Superseding Indictment fails to allege that he knew Fitzgerald was an agent of DHR.   (ECF No. 118 at 4.)

This Court has already addressed each of these arguments in detail, *supra*.   Pangallo's argument regarding the authority over an agency's funds is **DENIED** for the reasons more fully explained in Part III(A)(7), *supra*.   Similarly, Pangallo's motion to dismiss based on the authority he argues that Fitzgerald actually possessed while in the private sector and while an employee of the DIT is **DENIED** for the reasons more fully explained in Part (III)(A)(3), *supra*.   Likewise, Pangallo's argument regarding the alleged duplicity of Count I is **DENIED** for the reasons more fully explained in Part III(A)(9), *supra*.   Finally, Pangallo's motion based on Fitzgerald's *Rehaif* scienter argument is **DENIED** for the reasons more fully set forth in Parts III(A)(6) and III(B)(1), *supra*.

For the foregoing reasons, Pangallo's Motion to Dismiss Counts I and IV, (ECF No. 61), and Supplemental Motion to Dismiss Count I and IV, (ECF No. 118), are **DENIED** in their entirety.

### D.  Kenneth Coffland's Motion to Dismiss Count VII

Finally, as to the motions to dismiss, the Court now addresses Defendant Coffland.   Coffland has filed a Motion to Adopt, (ECF No. 58), in which Coffland adopts the arguments advanced by Fitzgerald in her motions to dismiss, (ECF Nos. 55 and 56), "to the extent they are relevant" to him. Coffland filed another Motion to Adopt, (ECF No. 117), in which he adopts the arguments advanced by Fitzgerald in her supplemental motion to dismiss, (ECF No. 113), again "to the extent they are relevant" to him.[14]   Finally, Coffland has filed a motion to dismiss of his own, (ECF No. 115), in

---

[14] While Coffland has styled these motions as "Motions to Adopt," Coffland does not actually move the Court for permission to adopt the arguments advanced by Ms. Fitzgerald.   (*See* ECF No. 58.)   Instead, these filings serve more as notice that Coffland intended to "piggyback" on Fitzgerald's arguments.   Therefore, the Court shall treat these motions as Coffland's own motions to dismiss since that is his clear intent.

which he argues that Count VII is subject to dismissal because the Superseding Indictment fails to allege sufficient facts that Coffland aided and abetted Fitzgerald in extortion. (*Id.* at 2.)

### 1. *Motions to Adopt*

To the extent that any of Fitzgerald's arguments apply to Coffland, those arguments have already been thoroughly addressed by the Court.   Therefore, and for the reasons more fully explained in Part III(A) of this Order, Coffland's motion to dismiss, (ECF No. 58), and supplemental motion to dismiss, (ECF No. 117), are hereby **DENIED** in their entirety.

### 2. *Motion to Dismiss Count VII – Hobbs Act Extortion*[15]

The thrust of Coffland's argument as to why Count VII should be dismissed as asserted against him is that the Superseding Indictment fails to allege any facts that he "participated in, contributed to, or even knew of the alleged extortion perpetrated by Ms. Fitzgerald."   (ECF No. 115 at 2.)   Coffland argues that the Government has failed to allege that he was an active participant in the alleged extortion, and that the Government has similarly failed to allege that he acted as an aider and abettor. (*Id.* at 5.)

The Court finds itself again revisiting the standards for reviewing a challenge to an indictment. To be sufficient under the Federal Rules of Criminal Procedure, an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"   Fed. R. Crim. P. 7(c)(1).   In the Fourth Circuit, the indictment "must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense."   *Loayza*, 107 F.3d at 260.   Finally, the

---

[15] Coffland also argues that Count VII should be dismissed "for the reasons stated in Ms. Fitzgerald's motion to dismiss" because "she committed no crime."   (ECF No. 115 at 6.)   As was explained in detail by this Court in Part III(A)(11), *supra*, this argument has no merit.   Therefore, for those reasons more fully explained in Part III(A)(11) of this Order, Coffland's motion is **DENIED**.

district court must accept all factual allegations in the indictment as true at this stage, while construing the indictment in a practical, as opposed to a technical, manner. *United States v. Oaks*, 302 F.Supp.3d 716, 720 (D. Md. 2018) (citing *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994)).

> Count VII of the Superseding Indictment alleges the following:
>
> [f]rom in or about January 2013 and continuing through at least November 2014, in the District of Maryland . . . **COFFLAND**, did knowingly obstruct, delay and affect commerce, and the movement of articles and commodities in commerce, by extortion, and did attempt to do so, in that defendant **FITZGERALD**, . . ., used her official position to cause [Xerox] to hire defendant **COFFLAND** as the Hosting Director . . ., for which defendant **COFFLAND** demanded that he be paid, and which he was subsequently paid, an annual salary along with potential bonuses of up to $500,000 yearly[.]

(ECF No. 75–1 at 25.)   Count VII also alleges that Fitzgerald caused Xerox to fear "negative business consequences" if it did not hire Coffland and agree to his compensation demands.   (*Id.*)   This paragraph alone includes the language of the statute, the approximate date, place, and nature of the illegal activity.   *See Powell*, 767 F.3d at 1030 ("[W]here the indictment quotes the language of a statute and includes the date, place, and nature of illegal activity, it need not go further and allege in detail the factual proof that will be relied upon to support the charges.").   What is apparent here is that Count VII puts Coffland on fair notice of the charge asserted against him.   In sum, it alleges that Coffland worked with Fitzgerald to extort Xerox, where Fitzgerald used her official position to force Xerox to rehire Coffland and to submit to Coffland's exorbitant compensation demands.   (ECF No. 75–1 at 25.)   Count VII alleges that Xerox was threatened with "negative business consequences," including the loss of renewal of the Hosting Contract if Xerox did not rehire Coffland at his compensation.   (*Id.*)   Therefore, Count VII alleges the relevant dates, the place, the role of both Coffland and Fitzgerald in the extortion, the position and Coffland's salary demands, and the threats

utilized by Fitzgerald, all of which more than satisfy the standard set forth in Rule 7(c)(1) of the Federal Rules of Criminal Procedure.

The Court moves to Coffland's "aiding and abetting" argument next.   "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."   18 U.S.C. § 2(a).   Importantly, aiding and abetting is not an independent offense, and the government is not required to explicitly charge aiding and abetting so long as the underlying offense is charged.   *See United States v. Alexander*, 447 F.3d 1290, 1298 (10th Cir. 2006); *United States v. Dodd*, 43 F.3d 759, 762–63 (1st Cir. 1995) (recognizing that aiding and abetting is implicit in all indictments for substantive offenses and therefore need not be specifically pleaded); *United States v. Perry*, 643 F.2d 38, 45 (2d Cir. 1981) ("[T]he provision of 18 U.S.C. § 2 can be read into an indictment which specifically charges only a substantive offense."); *United States v. Pigford*, 518 F.2d 831, 834 (4th Cir. 1975) ("An indictment . . . need not specifically charge aiding and abetting to support a conviction on that charge.").

Consistent with the above caselaw, the Superseding Indictment does not use the phrase "aiding and abetting" or any variation thereof in charging Coffland with extortion.   The sole reference is a citation to 18 U.S.C. § 2.   As the Court has already explained, the charge of extortion is legally sufficient in this manner.   Similarly, aiding and abetting is also sufficiently charged, as it is implicit in the indictment with the underlying substantive offense of extortion.   Coffland's argument fails.

For the foregoing reasons, Coffland's Motion to Dismiss Count VII, (ECF No. 115), is hereby **DENIED**.

### E.  Motion to Sever

Finally pending before the Court is Fitzgerald and Maudlin's Joint Motion to Sever Counts V and VI.   (ECF No. 57.)   Fitzgerald and Maudlin argue that severance of the false statement charges

from the bribery and conspiracy charges is warranted because any judicial economy achieved by a joint trial on these issues is outweighed by the substantial risk of prejudice to the defendants through their presentation of defenses to the jury.   (*Id.* at 1.)   Fitzgerald and Maudlin assert that jointly trying the false statement charges with the bribery charges will force them to choose "between asserting their Fifth Amendment rights against self-incrimination . . . and presenting their defenses against the false statement charges[.]"   (*Id.* at 3.)

Federal Rule of Criminal Procedure 8(a) allows for the charging of a defendant with two or more offenses, if the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."   Rule 14(a) of the Federal Rules then gives a district court discretion in ordering separate trials of counts or severing the defendants' trials if the joinder of offenses "appears to prejudice a defendant or the government[.]"

"Where offenses are properly joined under Rule 8(a), severance of the offenses is rare." *United States v. Hornsby*, 666 F.3d 296, 309 (4th Cir. 2012).   In fact, when joinder is proper under Rule 8, a district court should grant severance "*only* if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (emphasis added).   But a showing of prejudice is not enough to warrant severance, as the district court may exercise its discretion to tailor relief to any potential prejudice.   *Id.* at 538–40.   *See also United States v. Hayden*, 85 F.3d 153, 160 (4th Cir. 1996) ("Often, less drastic measures, such as limiting instructions, act to cure any risk of prejudice.").

Here, Rule 8 permitted the Government to join the false statement charges with the bribery charges, as the alleged statements have also been alleged as overt acts in furtherance of the conspiracy charged.   (*See* ECF No. 75–1 at ¶¶ 33(dd)–(ee).)   Naturally, the statements' inclusion as overt acts

in furtherance of the conspiracy brings the charges within the gambit of Rule 8(a) as the statements "are connected with or constitute parts of a common scheme or plan." *See, e.g.*, *United States v. Melvin*, 489 Fed. App'x 695, 697 (4th Cir. 2012) (finding that false statements were properly joined to racketeering and conspiracy to distribute cocaine charges because they were a part of a common scheme or plan). Defendants Fitzgerald and Maudlin seemingly concede that these charges are properly joined, as they do not argue otherwise.

Defendants advance the argument that severance is the only remedy here to what they perceive as a substantial risk of violating their constitutional right against self-incrimination. The Court does not agree. As the Court has just recounted, the charges of false statements are directly related to the underlying substantive offenses of bribery, as well as the conspiracy charge, in that they constitute parts of a common scheme or plan. On this note, the Court is not convinced that "the universe of evidence" will be constricted to the extent Fitzgerald and Maudlin argue. (*See* ECF No. 100 at 7.) As Defendants concede, at the very least "some evidence might need to be repeated" about the alleged bribery scheme to give the false statements context. (*Id.*) But more than that, and given Defendants' arguments regarding both materiality and the truthfulness of the statements at issue, it would appear more than likely that the Defendants would in fact need to delve into the alleged bribery scheme itself to demonstrate why the statements were not false or material. *See United States v. Arce-Serrano*, 21 Fed. App'x 623, 624–25 (9th Cir. 2001) (criminal charges stemming from possession of firearms formed basis of false statement charges, thus making evidence of each essentially the same); *Melvin*, 489 Fed. App'x at 697 (joined crimes of making false statements and conspiracy to distribute cocaine "have a logical relationship with one another . . . and the evidence . . . would have been mutually admissible in separate trials.") Indeed, because the false statements are inextricably connected to the alleged conspiracy and subsequent bribes, evidence of either crime may arguably be admissible in a

70

separate trial of the other under Federal Rule of Evidence 404(b) to prove motive, intent, plan, or knowledge. *United States v. Ranaldson*, 386 Fed. App'x 419, 425 (4th Cir. 2010); *United States v. Goldman*, 750 F.2d 1221, 1225 (4th Cir. 1984); *United States v. Cook*, 95-10012-01, 1995 WL 617642 at *2–3 (D. Kan. Oct. 19, 1995) ("Although the admissibility of evidence is not before the court at this time, the court notes that the weight of authority suggests that evidence of witness tampering is admissible to show a defendant's 'guilty knowledge' on an underlying offense, while evidence of the underlying offense is admissible to show a defendant's motive for engaging in witness tampering."). As other courts have identified, where there is evidence of one crime that would be admissible in the trial of the other, there is generally no prejudice. *See, e.g.*, *Melvin*, 489 Fed. App'x at 697; *United States v. Tyson*, 462 Fed. App'x 402, 407 (4th Cir. 2012); *Arce-Serrano*, 21 Fed. App'x at 624–25.

The potential overlap of evidence is not the only factor that sways the Court's reasoning. In order to succeed in showing strong prejudice by invoking his Fifth Amendment right against self-incrimination, a defendant must "make[] a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *United States v. Goldman*, 750 F.2d at 1225 (quoting *Baker v. United States,* 401 F.2d 958, 976–77 (D.C. Cir. 1968)). The Court is unconvinced at this time that Defendants Fitzgerald and Maudlin have satisfied this high standard. Fitzgerald and Maudlin have both made generalized proffers of their expected testimony as to the false statements, including what each meant by making their statements, what their intent was, and what the various relationships were between companies, subcontractors, and employees. (*See* ECF No. 100 at 5.) But, as to their reasons for refraining from testifying on the remaining charges, Fitzgerald and Maudlin assert that they would have to weigh whether they can accurately recall events from eight years ago, people and subcontractors with whom they worked, and whether their trial strategy would require them to testify. These are factors weighed by every defendant in

every criminal trial, and while important to the individual defendants, do not demonstrate a strong need to refrain from testifying on the other charges.   *See, e.g.*, *United States v. Thomas*, 752 Fed. App'x 606, 612 (10th Cir. 2018); *United States v. Smith*, 919 F.2d 67, 68 (8th Cir. 1990).   Finally, while Defendants are correct that precedent does not require that the decision to testify must be made at the time of filing of their pretrial motions, the Court is skeptical of any actual prejudice when that decision has not yet been made.   *See Tyson*, 462 Fed. App'x at 407.

Finally, the strain on judicial economy, absent a strong showing of prejudice by the Defendants, also counsels against severance.   At the time of this opinion, four individual defendants are facing conspiracy and bribery charges, while two of those individuals are similarly facing extortion charges for their alleged conduct.   (*See* ECF No. 75–1.)   Two are additionally facing the aforementioned false statement charges.   (*Id.*)   Regardless how "limited" the Defendants try to present the scope of another trial, the fact remains that the false statements relate directly to the conspiracy and bribery charges, and evidence of these additional crimes would likely be admissible under Rule 404(b).   Having multiple defendants in multiple trials with redundant evidence is a concern the Court does not take lightly, especially given the current national, regional, and local climate as this country struggles to contain the COVID-19 pandemic.

For the foregoing reasons, Defendants Fitzgerald and Maudlin's Motion to Sever, (ECF No. 57), is **DENIED**.

## IV.   CONCLUSION

For the foregoing reasons, Defendant Fitzgerald's Motion to Dismiss Counts I, II, and III, (ECF No. 55); Motion, in the Alternative, to Dismiss Counts I and II, (ECF No. 56); Joint Motion to Sever Counts V and VI, (ECF No. 57); Supplemental Motion to Dismiss Counts I, II, and III, (ECF No. 113); and Motion to Dismiss Count VII, (ECF No. 114), are hereby **DENIED**.   Similarly, for the

foregoing reasons, Defendant Maudlin's Joint Motion to Sever Counts V and VI, (ECF No. 57); Motion to Dismiss Counts I, IV, and VI, (ECF No. 59); and Supplemental Motion to Dismiss Counts I, IV, and VI, (ECF No. 119), are hereby **DENIED**.   Further, Defendant Pangallo's Motion to Dismiss Counts I and IV, (ECF No. 61), and Supplemental Motion to Dismiss Count I and IV, (ECF No. 118), are hereby **DENIED**.   Finally, Defendant Coffland's Motion to Adopt Motions by Co-Defendant Isabel Fitzgerald, (ECF No. 58); Motion to Dismiss Count VII, (ECF No. 115); and Motion to Adopt Motions by Co-Defendant Isabel Fitzgerald, (ECF No. 117), are hereby **DENIED**.

      **IT IS SO ORDERED**.

      The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

            ENTER:        January 21, 2021

_____

THOMAS E. JOHNSTON, CHIEF JUDGE